**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CASEY'S DISTRIBUTING, INC., | |
| Plaintiff, | Case No. 1:22-cv-3934-ALC |
| v. | |
| NATIONAL FOOTBALL LEAGUE, ET AL., | |
| Defendants. | |

**<u>NFL DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 5

I.      NFLP'S LICENSING POLICIES ......................................................................... 5

II.     FANATICS' DISTRIBUTION PRACTICES. ..................................................... 8

ARGUMENT ....................................................................................................................... 9

I.      CASEY'S FAILS TO STATE A CLAIM CHALLENGING NFLP'S ROLE AS
        LICENSING AGENT. ............................................................................................ 9

        A.      Casey's Lacks Standing to Challenge the Upstream Agency Agreement. ............. 9

        B.      Even if Casey's Had Standing, Any Challenge to the Upstream Agency
                Agreement Fails on the Merits. ............................................................................ 11

II.     CASEY'S FAILS TO STATE A CLAIM CHALLENGING THE ODP. ........................ 12

        A.      Casey's Lacks Standing to Challenge the ODP. ................................................. 12

                1.      Casey's Has Not Suffered Antitrust Injury. ............................................. 12

                2.      Casey's Is Not an Efficient Enforcer of the Antitrust Laws. ................... 15

        B.      Casey's Conspiracy Claims Fail Because the ODP is a Unilateral Policy. .......... 16

        C.      Casey's Per Se Claim Fails Because the ODP Is a Vertical Non-Price Policy.
                ...................................................................................................................... 18

        D.      Casey's Rule of Reason Claim Fails. ................................................................. 19

                1.      Casey's Fails to Properly Allege a Relevant Antitrust Market. ................ 19

                2.      Casey's Fails to Allege Anticompetitive Effects. .................................... 22

        E.      Casey's Monopolization Claims Fail. ................................................................ 23

III.    THE NFL DEFENDANTS ARE NOT LIABLE FOR FANATICS' CONDUCT. .......... 24

IV.     THE NFL AND ITS CLUBS ARE NOT PROPER DEFENDANTS. ............................. 24

V.      CASEY'S SELF-INFLICTED INJURY IS NO BASIS FOR INJUNCTIVE
        RELIEF. ................................................................................................................. 24

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*1-800 Contacts, Inc. v. Fed. Trade Comm'n,*
1 F.4th 102 (2d Cir. 2021) ......................................................................................24

*A. H. Cox & Co. v. Star Mach. Co.,*
653 F.2d 1302 (9th Cir. 1981) ................................................................................13

*Agfa Corp. v. Goldman Sachs Grp., Inc. (In re Aluminum Warehousing Antitrust
Litig.),*
520 F. Supp. 3d 455 (S.D.N.Y. 2021)....................................................................10

*Al Otro Lado v. Wolf,*
952 F.3d 999 (9th Cir. 2020) ....................................................................................4

*Am. Needle, Inc. v. NFL,*
560 U.S. 183 (2010).........................................................................................11, 17

*Apple Inc. v. Pepper,*
139 S. Ct. 1514 (2019)............................................................................................10

*Apple Inc. v. Psystar Corp.,*
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................ 19-20

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983)..................................................................................................9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................................18

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
441 U.S. 1 (1979)....................................................................................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)....................................................................................10, 13, 14

*City of New York v. Grp. Health Inc.,*
649 F.3d 151 (2d Cir. 2011)....................................................................................19

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)................................................................................................25

---

[*] Unless otherwise noted, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted.

*Cont'l T.V., Inc. v. G.T.E. Sylvania Inc.*,
    694 F.2d 1132 (9th Cir. 1982) ...............................................................4, 22, 23

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) .......................................................................... 2-4, 18

*Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*,
    2020 WL 5894079 (S.D.N.Y. 2020) ...................................................24

*Cupp v. Alberto-Culver USA, Inc.*,
    310 F. Supp. 2d 963 (W.D. Tenn. 2004).............................................21

*Dang v. San Francisco Forty Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013) ..............................................20

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005)................................................10, 14, 15

*Dreamstime.com, LLC v. Google, LLC*,
    2019 WL 341579 (N.D. Cal. 2019) ...................................................23

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997)................................................................13

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981)................................................................12

*G.K.A. Beverage Corp. v. Honickman*,
    55 F.3d 762 (2d Cir. 1995)..................................................................13

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013)....................................................................9

*GEO Grp., Inc. v. United States*,
    100 Fed. Cl. 223 (2011) .....................................................................24

*Giordano v. Saks Inc.*,
    2023 WL 1451534 (E.D.N.Y. 2023).................................................22

*IBM v. Platform Sols., Inc.*,
    658 F. Supp. 2d 603 (S.D.N.Y. 2009)...............................................14

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977).............................................................................10

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    19 F.4th 127 (2d Cir. 2021) ...............................................................15

iii

*In re Treasury Sec. Auction Antitrust Litig.*,
  595 F. Supp. 3d 22 (S.D.N.Y. 2022) .................................................................18

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
  924 F.3d 57 (2d Cir. 2019) ...............................................................................10

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ..........................................................................................22

*Loc. Beauty Supply, Inc. v. Lamaur Inc.*,
  787 F.2d 1197 (7th Cir. 1986) ..........................................................................14

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  420 F. Supp. 2d 212 (S.D.N.Y. 2005) ...............................................................11

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) ...................................................................12, 13, 20

*MHB Distribs., Inc. v. Parker Hannifin Corp.*,
  800 F. Supp. 1265 (E.D. Pa. 1992) ...................................................................22

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ..........................................................................................17

*NFL v. Ninth Inning, Inc.*,
  141 S. Ct. 56 (2020) ..........................................................................................11

*Nynex Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) .....................................................................................18, 24

*O.S.C. Corp. v. Apple Comput., Inc.*,
  601 F. Supp. 1274 (C.D. Cal. 1985) ........................................................... passim

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ................................................................................18, 22

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ..............................................................................14

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  2006 WL 2786882 (E.D.N.Y. 2006), *aff'd*, 507 F.3d 117 (2d Cir. 2007) ..............11

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*,
  812 F. Supp. 387 (S.D.N.Y. 1993) ....................................................................13

*Reilly v. Apple Inc.*,
  578 F. Supp. 3d 1098 (N.D. Cal. 2022) .............................................................21

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987) ...................................................................13

*Second City Music, Inc. v. City of Chicago*,
  333 F.3d 846 (7th Cir. 2003) ...................................................................25

*Shaw v. Rolex Watch, U.S.A., Inc.*,
  673 F. Supp. 674 (S.D.N.Y. 1987) ...........................................................20

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) .....................................................................9

*Spinelli v. NFL*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) ..........................................................20

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ................................................................................3, 17

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ................................................................ 22-23

*Todorov v. DCH Healthcare Auth.*,
  921 F.2d 1438 (11th Cir. 1991) ...............................................................15

*Union Cosm. Castle, Inc. v. Amorepacific Cosms. USA, Inc.*,
  454 F. Supp. 2d 62 (E.D.N.Y. 2006) ...................................................17, 25

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) .....................................................................19

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) .................................................................................16

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) .......................................................................19

*Valley Prods. Co. v. Landmark*,
  877 F. Supp. 1087 (W.D. Tenn. 1994) ......................................................13

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .............................................................................3, 16

*Weber v. NFL*,
  112 F. Supp. 2d 667 (N.D. Ohio 2000) .....................................................20

*Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Dazs Co.*,
  691 F. Supp. 539 (D. Mass. 1988) ............................................................16

**STATUTES**

15 U.S.C. § 1, Sherman Act.............................................................................................11

**OTHER AUTHORITIES**

AREEDA & HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST
    PRINCIPLES AND THEIR APPLICATION ch. 348e1 (2d ed. 2000).........................................10, 17

## INTRODUCTION

Merchandise bearing the trademarks of the National Football League is sold throughout the United States, has great value, and is extremely popular with consumers. These goods are made available in the marketplace through licenses provided by NFL Properties ("NFLP"), which licenses the trademarks and other intellectual property of the NFL and its 32 member clubs, including licensing manufacturers to produce NFL-branded merchandise. AC ¶ 53. Since at least 2015, NFLP has had a simple policy: its licensees must ensure that retailers who want to sell licensed NFL merchandise in venues beyond their own stores or websites first request and obtain NFLP approval to do so. *Id.* ¶ 89. This Online Distribution Policy, or "ODP," has a rational, well-recognized, and entirely pro-competitive purpose: the ODP supports retailers who invest the time and resources to create a positive, consumer-friendly, and successful retail experience that reflects the prestige and quality of the NFL brand. In doing so, it helps protect consumers by also preventing third-party online marketplace ("TPOMs") like Amazon from filling with unauthorized retailers who have not made those investments and turning into the digital equivalent of a flea market. This benefits everyone in the chain of commerce, including NFLP's licensees, retailers of NFL-branded merchandise, and the consumers who buy those goods. And the policy is by nature flexible; retailers who want to sell NFL merchandise through other channels, such as Amazon, may do so with NFLP's approval. *Id.*

Casey's challenges the ODP. But Casey's has not asserted, and it cannot assert, a cognizable antitrust claim – not as a matter of procedure and antitrust standing, and not as a matter of basic substantive antitrust law. To start, Casey's has no contractual relationship with NFLP. It is not a licensee, and is not directly bound by the ODP. AC ¶ 94. Casey's resells NFL-branded merchandise it buys from licensed manufacturers. *Id.* ¶ 6. It is those licensees who are subject to the ODP. *Id.* ¶ 89. For years, Casey's sold NFL goods on Amazon without NFL approval. *Id.* ¶

1

118.  Two years ago, NFLP established a formal process for retailers like Casey's to apply to sell NFL goods on Amazon.  *Id.* ¶ 107.  Casey's was invited to apply to become an authorized retailer, but it declined to do so.  *Id.* ¶ 109.  Under these circumstances, Casey's is not a proper plaintiff to assert an antitrust claim against NFLP, even if such a claim could be stated.

Beyond Casey's limitations as a plaintiff, though, its claims fail because the ODP is lawful. NFLP unilaterally imposes the ODP on its licensees, who sit below NFLP (or, as it is often referred to, "downstream") in the chain of commerce.  In the nearly half century since the Supreme Court's seminal decision in *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977), no court has invalidated a unilateral, vertical, non-price policy like the ODP.  And that is exactly what is at issue here.  As described in more detail below, it is unilateral – the ODP is set and imposed by a single actor, NFLP; it is vertical – it is applied by NFLP not to its competitors but downstream to licensees in the distribution chain; and it does not impose any restrictions or rules on price or limitation of output (but instead is focused on brand and consumer protection).  AC ¶ 89.  *Sylvania* is instructive.  It upheld the "frequently include[d] provision" in distributorship agreements "barring the retailers from selling franchised products from locations other than those specified in the agreements."  433 U.S. at 37.  As *Sylvania* explained, such policies promote **inter-brand** competition—the main goal of the antitrust laws—by helping licensors and manufacturers build a more robust distribution network and by discouraging "free riding" retailers who do not invest similar resources.  *Id.* at 54-55.

The ODP similarly promotes competition, and the result should be the same as in *Sylvania*. Without the ODP, Amazon and other TPOMs could devolve into digital flea markets for NFL merchandise.  As courts have recognized, that would devalue the NFL brand in part by allowing consumers to be duped into buying counterfeit merchandise.  And it disincentivizes traditional

retailers – those that invest in brick-and-mortar stores and their own ecommerce sites – from promoting the NFL over other brands. Casey's does not deny this. It recognizes that other branded products lawfully employ policies like the ODP. *See* AC ¶ 50. Instead, Casey's contends that longstanding antitrust rules do not apply here because the NFL is an association of 32 clubs.

But again, Casey's is not in a position to challenge that threshold arrangement appointing NFLP the licensing agent for the NFL and its clubs. For one, Casey's lacks standing to challenge such arrangements because it is not a licensee of NFL trademarks. *Id.* ¶¶ 6, 89. As such, it neither participates in the trademark licensing market nor is it directly in the distribution chain, and so it cannot be an efficient enforcer of these type of claims. Moreover, it does not seek to end the blanket licensing system that allows manufacturers to make the full roster of NFL merchandise. *Id.* ¶ 81. It wants to continue that practice and indeed to be a beneficiary of it. It just wants to do so without having to follow rules or policies that apply to NFLP's licensees and authorized retailers.

Critically, Casey's does not allege that the basic existing threshold arrangement establishing NFLP as licensing agent, commonly referred to as an "upstream" arrangement because it precedes the distribution chain, is itself unreasonable or has anticompetitive effects in any cognizable relevant market. Thus, it must be "presume[d] … lawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006). And NFLP's *subsequent* adoption of a *downstream* authorized retailer policy governing its licensing of the marks must be treated as unilateral. *Id*. As a unilateral act, the ODP is plainly lawful. The antitrust laws do "not restrict the long-recognized right of [a] trader … freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). NFLP has every right to refuse to deal with licensees who allow NFL merchandise to appear on third party sites

like Amazon without approval.  Casey's does not argue that trademark owners lack this right, nor could it.  Nor does Casey's allege that NFLP conspired with its licensees (or anyone) to adopt the ODP.  Casey's *per se* claim, therefore, fails.

Casey's rule of reason claim also fails because authorized retailer policies are not anticompetitive.  Such policies "promote interbrand competition without overly restricting intrabrand competition."  *Cont'l T.V., Inc. v. G.T.E. Sylvania Inc.*, 694 F.2d 1132, 1137 (9th Cir. 1982).  Here, the ODP is even less restrictive than the exclusive territorial dealerships upheld in *Sylvania*.  It does not limit output.  It does not regulate price.  It does not establish exclusive territories or distribution rights.  It does not prohibit direct sales through a retailer's own website (including by Amazon on Amazon).  And it does not prohibit sales by approved retailers, including at least one of *Casey's* own retailer customers.  It only prohibits licensees from selling, for resale on Amazon and other TPOMs, to retailers who have not received approval, like Casey's. (Again, Casey's chose to not even apply).  Thus, the ODP guards against free-riding, *increases* demand for NFL goods from traditional retailers to the benefit of its licensees, and promotes a consumer-friendly shopping experience.  Hence, it is not surprising that the Amended Complaint does not allege any anticompetitive restraints or effects.

Apparently recognizing this, Casey's seeks to distance itself from a direct attack on NFLP's ODP, weaving in allegations relating to Fanatics – a vertically integrated manufacturer, distributor, and retailer of sports merchandise – claiming that Fanatics required two of its manufacturer partners not to sell products to Casey's even though Casey's customer *was* an authorized retailer under the ODP.  As Fanatics explains in its separate motion, those agreements are lawful vertical agreements.  At any rate, those alleged agreements do not involve the NFL Defendants.  Because NFLP's ODP is lawful on the face of the Amended Complaint, Casey's claims against the NFL

Defendants should be dismissed with prejudice.

**FACTUAL BACKGROUND**

**I.    NFLP'S LICENSING POLICIES.**

The NFL "operates much like other licensed merchandise industries." AC ¶ 50. There are four links in the distribution chain:



At the start, NFLP licenses its "marks to licensees who make products that are then sold to distributors, who then re-sell the products to retailers, who in turn re-sell them directly to consumers." *Id.* As a distributor/retailer, Casey's falls at or near the end of this chain. It does not "hold a license" from NFLP and does not make any NFL branded products. *Id.* ¶ 58. Rather, it buys them from licensed manufacturers. *Id.* ¶ 6.

*NFLP's Upstream Agency Agreement.* The NFL and its teams vested in NFLP the right to license NFL and club trademarks. *Id.* ¶ 53. That threshold agreement – commonly referred to as "upstream" because it precedes the distribution chain – simplifies and improves the licensing process. Take a manufacturer seeking to make NFL-branded hats. To do so, it would need a license for the NFL's trademarks (*e.g.*, the NFL shield) and each of the 32 clubs' trademarks (*e.g.*, team logos). Rather than negotiate separate licenses with the NFL and each club, this manufacturer can get all it needs from NFLP. *Id.* ¶¶ 53, 149. Casey's maligns this more efficient licensing arrangement as a "cartel" among the NFL and its 32 clubs. *Id.* ¶ 50. But by providing a one-stop shop for all NFL marks through NFLP, the NFL ensures that *all* clubs' products are represented in the market; and manufacturers are assured that no individual club can block their plans to produce and distribute the full line of NFL products. Casey's does not dispute this, and it does not actually

challenge NFLP's upstream agency arrangement. It does not, for example, allege that it sought a license from any individual team, or that it wants to preclude its suppliers from obtaining blanket licenses from a single seller. Indeed, the relief Casey's seeks – an injunction allowing it to sell products manufactured under these blanket licenses on TPOMs without NFLP's pre-approval – presupposes that NFLP's agency arrangement continues with Casey's as a beneficiary.

*NFLP's Downstream Unilateral, Vertical Online Distribution Policy*. Not having challenged the legality of NFLP's upstream agency agreement, Casey's focuses on one aspect of NFLP's downstream relationships with its licensees: the ODP, which Casey's alleges NFLP *unilaterally* adopted in 2015. *Id.* ¶ 89. The ODP prohibits NFLP's licensees "from selling to distributors or retailers that intended to sell on Amazon (or other TPOMs) without receiving prior authorization to do so from the NFL." *Id.* The ODP states that:

> "All Licensees … shall ensure that retailers sell such Licensee's Licensed Products via their e-commerce site(s) [and] maintain control over, and responsibility for, their e-commerce transactional environment. Such retailers are not authorized to sell Licensed Products under a third-party URL, including the URL of any third party Internet marketplace site (e.g., buy.com, ebay.com, amazon.com), without the prior written approval of NFLP."

*Id.* ¶ 125. Casey's concedes, as it must, that licensees, distributors, and retailers may sell NFL merchandise on their own websites or other venues that they control. *Id.* ¶ 89. They may also sell directly to online retailers like Amazon or Walmart. *Id.* Furthermore, they are not prohibited from selling NFL merchandise on third-party online marketplaces like Amazon or Walmart; the ODP merely requires that retailers obtain approval from NFLP before doing so. *Id.*

Casey's does not allege that the ODP derived from any unlawful *agreement*. It does not allege, for example, that each NFL club conspiratorially adopted identical online distribution policies. Here, only one policy is at issue, and it is NFLP's. *Id.* ¶¶ 3, 136. It is, quite simply, a typical distribution policy implemented by a trademark holder. Accordingly, as alleged, the ODP

is a unilateral, vertical, non-price policy of a type adopted by many premium consumer brands.[2]

*NFLP's Enforcement of the ODP*.  Between May 2019 and February 2021 – when there were no authorized Amazon retailers under the ODP – three suppliers (NFLP-licensed manufacturers) asked Casey's to remove NFL Licensed Products it had posted for sale on Amazon. *Id*. ¶ 104.  A fourth supplier merely asked Casey's to verify compliance with the ODP.  *Id*.  Casey's does not claim these were anything but ordinary-course unilateral applications of the ODP by NFLP licensees.  Casey's also does not allege that it removed any product or was otherwise harmed by these requests.  *See id*. ¶ 118.

In March 2021, NFLP began approving retailers to sell on Amazon.  NFLP entered into an agreement with Amazon to ensure that products on Amazon were from approved resellers.  *Id*. ¶ 110.  This agreement was hailed as procompetitive, "plug[ging] a gap in [Amazon's] online store by making the vast majority of the league's fan gear available…." *Id*. ¶ 113.

Although Fanatics was one of those approved retailers, NFLP did not limit sales on Amazon to just Fanatics.  It allowed others, including Casey's, to apply to be "Approved Marketplace Retailers."  As the Approved Marketplace Retailer Application ("AMRA") notes: "NFLP will authorize its Licensees to sell their NFL licensed products to a limited number of approved quality retailers that will sell those NFL licensed products under an Amazon URL through the Amazon Marketplace." *Id*. ¶ 107.[3]  Casey's does not complain about the terms of the application, except one: it contained a release that Casey's did not want to sign. *Id*. ¶¶ 108-09.

Although Casey's elected not to apply (and therefore the NFL licensed products it posted

---

[2] The ODP protects the NFL brand and supports authorized retailers because TPOMs are hard for brands to police for malicious activity, such as counterfeit goods, gray market goods (*i.e.*, outdated inventory), and ambush goods (*i.e.*, look-alikes).

[3] The AMRA policy is simply a ***vertical*** application of the ODP, which always vested discretion in NFLP to permit authorized online sales.  The AMRA simply provided a mechanism for retailers to obtain such approval.

for sale were removed by Amazon), others – including Casey's own retail customers – applied and were approved. *Id*. ¶¶ 114, 127. Casey's claims it has "sold few, if any," NFL products since it chose not to apply to sell them on Amazon. *Id.* ¶ 118.

## II.    FANATICS' DISTRIBUTION PRACTICES.

Casey's complains about ***Fanatics'*** individual agreements with two licensee-suppliers – WinCraft and Logo Brands – that allegedly prohibit those supply partners from selling to online TPOM retailers, *even if those sales are permitted by the ODP*. *Id.* ¶ 114. Casey's also alleges that Walmart removed Casey's products from its website after Walmart made Fanatics the exclusive seller on Walmart.com. *Id.* ¶ 4. The Amended Complaint is clear, however, that those allegations have nothing to do with the NFL Defendants.

***WinCraft***. Casey's alleges it bought hard goods from WinCraft, a manufacturer of NFL goods that Fanatics acquired in December 2020. Both shortly before and after that acquisition, WinCraft called Casey's, claiming to act "on Fanatics behalf" to request Casey's remove its products from Amazon. *Id.* ¶¶ 104(e), 114. Casey's noted its retail customer was approved to sell on Amazon, *id.*, but WinCraft persisted, saying its decision was unilaterally dictated by Fanatics, as 100% owner of WinCraft, and that its decision had nothing to do with NFLP's ODP. *Id.* Casey's does not allege that any NFL Defendant urged Fanatics to take this action.

***Logo Brands***. During this same period, Fanatics also entered into a supply agreement with Logo Brands. Casey's claims that, under this agreement, Logo Brands agreed not to sell NFL merchandise to any Amazon retailer other than Fanatics. *Id.* ¶ 114(d). When Casey's noted that its customer was an NFL-Approved Amazon Retailer, Logo Brands stated, like WinCraft, this has "nothing to do" with the NFL. *Id.* ¶ 114(j). Logo Brands said it "would not have mattered" if Casey's applied and became "an Approved Marketplace Retailer" because "[t]he Logo Brands agreement with Fanatics is why he can't sell this." *Id.* ¶ 114(i), (j). Casey's admits the NFL

Defendants were uninvolved in this alleged exclusive supply arrangement, alleging that "under the ODP language Casey's would have been permitted" to sell these products to Amazon.  *Id.* ¶ 114(j).

## ARGUMENT

### I.    CASEY'S FAILS TO STATE A CLAIM CHALLENGING NFLP'S ROLE AS LICENSING AGENT.

Casey's asserts that by "jointly organiz[ing] the licensing" of the NFL's and clubs' marks through NFLP, the NFL Defendants have formed a "cartel."  AC ¶ 50.  But Casey's does not seek to end this upstream agency arrangement, lacks standing to do so, and could not prevail anyway.

### A.    *Casey's Lacks Standing to Challenge the Upstream Agency Agreement.*

Casey's *suppliers* each operate under a license from NFLP, which allows them to manufacture the NFL merchandise Casey's distributes.  *Id.* ¶ 6.  If those licenses were cancelled, Casey's would have nothing to sell.  Casey's does not want that.  It wants to *continue* buying the full range of NFL merchandise produced under the *same* licenses NFLP grants to the *same* suppliers.  *See id.* ¶ 81.  For three independent reasons, any challenge by Casey's to NFLP's agency agreement is doomed.

***First***, Casey's does not participate in any alleged trademark licensing market.  *See id.* ¶¶ 6, 94.  Antitrust standing is "a threshold, pleading-stage inquiry."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013).  An antitrust plaintiff must "be a participant in the ***same*** market as the alleged malefactors," meaning it "must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market."  *Somers v. Apple, Inc.*, 729 F.3d 953, 963-64 (9th Cir. 2013); *see also, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539-40 (1983) (no claim where plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").  As Casey's does not allege that it is a consumer, competitor, or participant in the

trademark licensing market, it lacks standing to challenge NFLP's licensing arrangement.

*Second*, Casey's upstream challenge is barred because Casey's is not an "efficient enforcer" of the antitrust laws. NFLP's licensees may like their arrangement and would not want their contracts voided by purchasers further downstream. If there is a licensee that believes NFLP's policies are too restrictive, perhaps *they* might have standing. But Casey's does not. *See, e.g.*, *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66 (2d Cir. 2019) ("Given that IQ is further removed from the harm caused by the Defendants than the parties directly affected by the boycott…, the second efficient-enforcer factor weighs against IQ's antitrust standing."); *Agfa Corp. v. Goldman Sachs Grp., Inc. (In re Aluminum Warehousing Antitrust Litig.)*, 520 F. Supp. 3d 455, 492 (S.D.N.Y. 2021) (dismissing "claims based on transactions with nondefendants [who] are more efficient enforcers who could and, indeed have, sued….").

*Third*, Casey's has not suffered antitrust injury – *i.e.*, injury that "flows from that which makes [the alleged conduct] unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-89 (1977). Casey's does not want to force its suppliers to negotiate individual team licenses. It wants to *continue* buying the full range of NFL merchandise produced by the *same* suppliers under the *same* licenses from NFLP. *See* AC ¶ 81. Casey's "cannot [itself] state an *antitrust* injury" from the agency agreement "when [its] purpose is to join the [collaboration] rather than disband it." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 440 (2d Cir. 2005); *see also* AREEDA & HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ch. 348e1 (2d ed. 2000) (plaintiff who "seeks to join the exclusive arrangement while leaving [it] otherwise intact" is "not a victim of antitrust injury").[4]

---

[4] Casey's upstream damages claim also fails because it is an indirect purchaser, and, as such, those claims are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("[I]ndirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue."). Casey's does not claim to be a direct purchaser or licensee of NFLP trademarks. Rather, it is at least two or

**B.   Even if Casey's Had Standing, Any Challenge to the Upstream Agency Agreement Fails on the Merits.**

Joint licensing arrangements are not *per se* illegal. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979) (blanket licensing arrangement was "not a 'naked [restraint] of trade"). This is particularly true for sports leagues, where the value of the marks is derived from member clubs' joint efforts in producing the league's entertainment product. Indeed, the Supreme Court has already held the rule of reason applies to licensing through NFLP. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 420 F. Supp. 2d 212, 219 (S.D.N.Y. 2005) ("This Court cannot say that the organization of MLBP and its licensing authority is a per se violation of § 1 of the Sherman Act."). As such, any *per se* claim must be dismissed.

Any rule of reason challenge to the upstream agency agreement fails for two distinct reasons. **First**, Casey's does not allege a relevant market. It *references* an upstream "market for the licensing" of NFL trademarks, *see* AC ¶ 150, but does not claim it is a "relevant" antitrust market, *see id.* ¶ 143. The only relevant market it attempts to allege is for the downstream sale of finished goods. This mismatch between where the conduct occurs, on the one hand, and where its effects are alleged, on the other hand, undermines any rule of reason challenge. *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 2006 WL 2786882, *5 & n.2 (E.D.N.Y. 2006) (rejecting claim where restraints arose in the unalleged manufacturing market, but effects were felt in the alleged distribution market), *aff'd*, 507 F.3d 117 (2d Cir. 2007).

**Second**, Casey's does not allege anticompetitive effects from the upstream agency arrangement. It does not allege, for example, that a ban on blanket licenses would increase output.

---

three steps removed from NFLP's licensing. *See NFL v. Ninth Inning, Inc.*, 141 S. Ct. 56, 57 (2020) (Kavanaugh, J., concurring in denial of certiorari) (because plaintiffs "did not purchase [television rights] from the NFL or any team, [they] may therefore be barred from bringing suit….").

To the contrary, as noted, NFLP's licenses enable manufacturers to produce the full roster of NFL merchandise, eliminating any club's ability to delay or block production. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008) ("The Clubs' agreement to make MLBP their exclusive licensor does not by its express terms restrict or necessarily reduce the number of licenses to be issued; it merely alters the identity of the licenses' issuer."); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 151 (3d Cir. 1981) ("If every potential retailer had to contract with each player individually for a group license, few licenses would exist.").

## II.    CASEY'S FAILS TO STATE A CLAIM CHALLENGING THE ODP.

The heart of Casey's Amended Complaint concerns the ODP.  But Casey's, as a *non-licensee* and *unauthorized* retailer – indeed, one who chose not to apply to sell on Amazon – lacks standing to challenge the ODP.  Casey's claims also fail because the ODP is not anti-competitive, even as alleged.

### A.    *Casey's Lacks Standing to Challenge the ODP.*

Casey's seeks to enjoin the ODP, but is not bound by that policy since it is not a licensee. Accordingly, Casey's has not suffered antitrust injury.  *See* AC ¶ 94.  Furthermore, any injunction would interfere with the contractual relationships between NFLP and the many **non-party** licensees who are **not accused** of any wrongdoing and who benefit from the ODP.  Antitrust standing does not extend so far.

#### 1.    Casey's Has Not Suffered Antitrust Injury.

It is elemental that the antitrust laws protect competition, *not competitors*.  They are not dealer protection statutes that guarantee every potential distributor access to a manufacturer's distribution network, let alone on terms dictated by the distributor.  Rather, businesses may restrict their downstream distributors to specific sales channels.  As the Ninth Circuit explained, "[c]ompetition is promoted when manufacturers are given wide latitude in establishing their

method of distribution and in choosing particular distributors.… A contrary rule would foster rigidity in distribution arrangements, a result antithetical to a market dependent on vigorous competitive forces." *A. H. Cox & Co. v. Star Mach. Co.*, 653 F.2d 1302, 1306 (9th Cir. 1981). Thus, even if Casey's applied to NFLP for approval to sell on Amazon, "a mere refusal to grant [approval] would not suffice to support a claim of antitrust violation." *Salvino*, 542 F.3d at 318.[5]

Authorized reseller policies prevent unauthorized sales, so there are *always* some distributors who can claim such a policy caused them "injury-in-fact." But that is not "*antitrust* injury." *Brunswick Corp.*, 429 U.S. at 487-89. For example, in *Valley Products Co. v. Landmark*, the court explained that "[P]laintiffs' injury … was caused by [the trademark owner's] decision to license only a limited number of manufacturers," and "[a]lthough plaintiffs were understandably hurt by that decision, their injury flows from the fact that plaintiffs were not chosen to be preferred vendors …, ***not from any anticompetitive activity***." 877 F. Supp. 1087, 1093 (W.D. Tenn. 1994).

Here, as in *Valley Prods.*, Casey's injury flows from the fact that it did not become (or even apply to be) an authorized Amazon retailer, not from any allegedly anticompetitive aspect of the ODP. *See* AC ¶ 109. Casey's "would have suffered the ***identical loss***" whether the ODP is anticompetitive or procompetitive. *See Valley Prods.*, 877 F. Supp. at 1093. It thus has not suffered injury that "flows from" anything "forbidden in the antitrust laws." *Id.*; *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995) (no antitrust injury for terminated distributors where the injuries would have been the same whether or not the vertical integration was lawful). Indeed, where a policy like the ODP benefits consumers or increases output by only

---

[5] *See also, e.g.*, *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244-45 (2d Cir. 1997) ("Such exclusive distributorship arrangements are presumptively legal."); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735-36 (9th Cir. 1987) ("[A]n exclusive distributorship is not, standing alone, a violation of antitrust laws."); *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993) ("[A]n exclusive distributorship agreement does not give rise to the requisite inference of intent to harm competition.").

authorizing retailers that meet certain standards of quality and service, allowing retailers who fail to meet those standards (or even apply) to sue under the antitrust laws would be "inimical to the purposes of [those] laws." *Brunswick*, 429 U.S. at 487-88.

Antitrust injury is also lacking because Casey's purported injury does not match the alleged anticompetitive *effect* of the ODP. To determine whether an alleged injury is an "antitrust injury," the court must identify "the anticipated anticompetitive effect of the specific practice at issue" and compare "it to the actual injury the plaintiff alleges." *Port Dock & Stone Corp.*, 507 F.3d at 122. Where the two do not match, there is no antitrust injury. In *Port Dock*, for example, a terminated distributor challenged its suppliers' anticompetitive merger, claiming injury from consolidation of their distribution chains. But the distributor had not suffered antitrust injury because the "anticipated anticompetitive effect" from a merger is higher prices. The distributor complained not about higher prices, but only about its expulsion from the defendants' distribution chain. That injury would occur whether or not the consolidation of the distribution network reflected an anticompetitive output reduction or a procompetitive synergy.

Such a mismatch exists here too. Casey's does not object to any allegedly *anticompetitive effects* of NFLP's distribution network. It claims injury from its failure to seek approval to sell on Amazon, AC ¶ 121, not an inability to compete against NFLP as a licensor in the licensing market. In fact, Casey's seeks to *join* NFLP's distribution network. That is not antitrust injury. *See Daniel*, 428 F.3d at 440 ("plaintiffs cannot themselves state an antitrust injury when their purpose is to join the [collaboration] rather than disband it"); *IBM v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 610-11 (S.D.N.Y. 2009) (terminated IBM distributor did not suffer antitrust injury; only IBM's manufacturing competitors would have standing).

*Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197, 1202 (7th Cir. 1986) is

14

particularly instructive.  A branded beauty products company, Lamaur, adopted an authorized distributor policy limiting sales to salons.  The plaintiff was terminated for failing to abide by the policy and sued to enjoin it.  *Id.* at 1204.  Rejecting the claim, the Seventh Circuit explained that, by selling through unauthorized channels, the plaintiff sought to "avoid [the] additional costs of advertising and promotion and 'free ride' off of the other full-service distributors' efforts."  Thus, it claimed injury from the procompetitive aspects of the policy.  *Id.* at 1200, 1202-03 (the injuries do "not reflect lessened competition").  The "award of damages *or an injunction*," in that case, "would be 'inimical to the purpose of these [antitrust] laws.'"  *Id*. at 1202 (alteration in original).

Casey's is just like the *Lamaur* plaintiff, only one step further removed.  If it wants to buy products from NFLP's authorized licensees, those licensees must abide by NFLP's authorized retailer policy.  Exempting Casey's (and its suppliers when selling specifically to Casey's) from the ODP would be inimical to the antitrust laws because it would allow Casey's to free ride on the investments that other retailers make in developing their own online presence and physical stores.

## 2.    Casey's Is Not an Efficient Enforcer of the Antitrust Laws.

Casey's also lacks standing because it is not an "efficient enforcer" of the antitrust laws. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir. 1991).  The efficient enforcer inquiry focuses on the nature of plaintiffs' injury, the "directness … of the asserted injury," the existence of other potential plaintiffs to vindicate the antitrust laws, and the effect on other parties. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021).

These factors weigh against standing.  Most importantly, any injunction would *injure competition* by interfering with policies that *benefit* licensees and authorized retailers, as well as consumers – all non-parties who are not accused of any wrongdoing.  *See Daniel*, 428 F.3d at 444 (plaintiff who seeks "to gain entry into an exclusive arrangement" is not an "efficient enforcer" of the antitrust laws where it is "questionable whether … injunctive relief would genuinely promote

15

the public interest in antitrust enforcement").  "Manufacturers are generally permitted a wide latitude to discontinue relationships with distributors, to determine the profile of its distributorship[s], and to otherwise establish vertical nonprice restraints," because they can benefit manufacturers, authorized resellers, and consumers.  *Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Dazs Co.*, 691 F. Supp. 539, 545 (D. Mass. 1988).

For this reason, there is no standing where an injunction would interfere with beneficial commercial relationships with non-parties.  The ODP supports retailers who invest resources in brick-and-mortar or online platforms to promote and sell licensed NFL products.  They maintain stores, hire staff, pay for advertising, and establish their *own* online retail presence.  Those efforts would be undermined, and discouraged, if other retailers could simply channel their products to a TPOM without the same investment.  The ODP ensures that traditional retailers will continue to carry licensed NFL products, while also allowing approved sales on TPOMs, thus ***increasing*** the available retail outlets and collectively benefiting NFLP's licensees.  While Casey's may dislike the ODP, that is no reason to allow it to interfere with NFLP's relationship with its licensees.

### B.    Casey's Conspiracy Claims Fail Because the ODP is a <u>Unilateral</u> Policy.

Standing aside, Casey's challenge to the ODP fails on the merits because it is a unilateral policy, not concerted action.  *See O.S.C. Corp. v. Apple Comput., Inc.*, 601 F. Supp. 1274, 1293 (C.D. Cal. 1985) (policy prohibiting mail order sales was not "concerted action"), *aff'd*, 792 F.2d 1464 (9th Cir. 1986).  The Supreme Court has long "recognized [the] right of [a] trader or manufacturer … freely to exercise his own independent discretion as to parties with whom he will deal."  *Verizon*, 540 U.S. at 408 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  This allows a manufacturer to unilaterally determine how distributors resell its product.  In *Colgate*, for example, the Court upheld a policy that barred distributors from discounting products without analyzing the policy's competitive effects because unilateral

16

restraints simply are not "contracts, combinations, or conspiracies." 250 U.S. at 307. Today, vertical resale policies are commonplace and "presumptively legal." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) (manufacturer's termination of a discounting dealer in response to dealer complaints insufficient to establish an *agreement*); *Union Cosm. Castle, Inc. v. Amorepacific Cosms. USA, Inc.*, 454 F. Supp. 2d 62, 71-72 (E.D.N.Y. 2006) (citing cases).

Casey's contends the ODP is nonetheless improper because the NFL and its clubs "jointly organize[d] the licensing of their marks (as a single group) through [NFLP]." AC ¶ 50. But as discussed above, that is wrong under *Texaco v. Dagher*. Casey's cannot attack NFLP's agency agreement by ignoring NFLP's corporate form and attributing NFLP's acts to the clubs. Absent a challenge to the very existence of the agency agreement itself, it must be "***presumed … lawful*** for purposes of this case," meaning the ODP is an act of NFLP alone. *Dagher*, 547 U.S. at 6 & n.1 (when "competitors pool their capital and share the risks of loss as well as the opportunities for profit … such joint ventures [are] regarded as a *single-firm* competing with other sellers in the market"); Antitrust Law ch. 1478c, at 325 (a lawful venture's acts "should generally be regarded as those of a single entity rather than the parents' daily conspiracy").[6]

Casey's next makes vague allegations of unspecified conspiratorial conduct between NFLP and its licensees. But Casey's does not allege the ODP arose out of some "pre-existing agreement" among the licensees. *See Apple*, 601 F. Supp. at 1293. Rather, the ODP is unilateral on its face. It gives NFLP "***sole discretion***" in approving online retailers; it is subject to "change at any time, in NFLP's ***sole discretion***," and it does not depend on any licensee's agreement to adhere. AC ¶¶ 3, 136. Casey's acknowledges that "*NFLP* announced" the ODP years ago, without any allegations

---

[6] *American Needle* is not to the contrary. That case involved a ***direct*** challenge to the joint licensing of the individual team's marks through NFLP and plaintiff's inability to purchase product from a single team. 560 U.S. at 187. As noted, Casey's is not asserting such a challenge and lacks standing to bring it in any case.

about the surrounding circumstances. *Id.* ¶ 89. Nor would it matter if NFLP considered its licensees' concerns when enacting the ODP. As explained in *Apple*, no "conspiracy may be inferred … from dealer complaints to Apple about mail order outlets, … and [its] subsequent modification of its Dealer Sales Agreement to prohibit mail order sales." 601 F. Supp. at 1292.

Nor can Casey's transform NFLP's unilateral policy into a conspiracy by alleging that licensees "responded to the [NFL's] requests … by enforcing the ODP…." AC ¶ 100. When a licensee *complies* with the ODP, it does not reach a separate *agreement* with NFLP. Again, the analogy to traditional resale pricing policies is apt. When a retailer only resells products to its customers at or above the suggested minimum, it is following the policy's dictates; it is not reaching an agreement with the manufacturer that subjects both to antitrust liability. As such, Casey's has failed to allege an actionable agreement to support its conspiracy claims.

### C.    Casey's Per Se Claim Fails Because the ODP Is a Vertical Non-Price Policy.

Casey's claims the ODP is *per se* illegal. AC ¶¶ 137, 204. But the Supreme Court has made crystal clear that the *per se* rule applies only to "horizontal agreements among direct competitors." *Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 128 (1998). "[V]ertical restraints" like the ODP are always "assessed under the rule of reason." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018); *Sylvania*, 433 U.S. at 57-59.

Casey's does not deny this. Instead, it claims the *per se* rule applies because it alleges a "horizontal boycott." AC ¶ 137.[7] But bandying about the term "boycott" does not satisfy Casey's pleading burden. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564, 570 (2007) (dismissing boycott claim because allegations of conspiracy were "merely legal conclusions"). To fall under the *per*

---

[7] Casey's does not identify which defendants entered into the so-called horizontal boycott. Despite saying it "has been shown" a copy of this agreement, the AC refers only to "defendants" generically. AC ¶ 115. Such "group pleading" is improper. *See In re Treasury Sec. Auction Antitrust Litig.*, 595 F. Supp. 3d 22, 32 (S.D.N.Y. 2022). Moreover, other allegations suggest that this claim really only concerns Fanatics' alleged agreements with Walmart, WinCraft, and Logo Brands. AC ¶¶ 4, 114, 115, 128. These allegations do not involve any of the NFL Defendants.

*se* rule, Casey's needs to allege a "hub-and-spokes" conspiracy with vertical spokes between NFLP and each licensee ***and*** a horizontal "'rim' … in the form of an agreement among the horizontal competitors." *United States v. Apple, Inc.*, 791 F.3d 290, 314 n.15 (2d Cir. 2015). Casey's has alleged neither. The ODP is a unilateral policy with neither spokes nor rim.

Even if licensees had agreed to abide by the ODP, rather than NFLP unilaterally imposing it on them, such agreements still would simply be a series of *vertical* agreements, not a *horizontal* agreement. "If plaintiffs could prevail merely by showing adherence to the manufacturer's contracts under threat of termination, all vertical non-price distribution restraints would be illegal *per se*. That is not the law." *Apple*, 601 F. Supp. at 1294. Thus, Casey's *per se* claim fails.

### D.  Casey's Rule of Reason Claim Fails.

No court has ever held that a manufacturer's policy regulating online sales violates the antitrust laws. This Court should not be the first. Casey's rule of reason claim fails because it has alleged neither a proper relevant antitrust market nor injury to competition.

### 1.  Casey's Fails to Properly Allege a Relevant Antitrust Market.

Casey's must allege a relevant antitrust market. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019). If the alleged market is "legally insufficient," "a motion to dismiss may be granted." *Id.* Casey's proposed relevant market – "the TPOM retail market (including, without limitation, direct sales to Amazon for resale) for Products bearing the Intellectual Property of the NFL or any NFL team," AC ¶ 143 – is legally insufficient for four independent reasons.

***First***, Casey's alleged market improperly excludes interchangeable merchandise. A relevant market must include "all products 'reasonably interchangeable by consumers for the same purposes.'" *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). Casey's proposed market is limited to NFL-branded products. AC ¶ 143. But Casey's "fail[s] to allege facts plausibly supporting the counterintuitive claim that [NFL-branded products are] so unique

that [they] suffer[] *no* actual or potential competitors." *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *see also Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp. 674, 678-79 (S.D.N.Y. 1987) (noting "courts have consistently refused to restrict a relevant market to a company's trademarked product" (collecting cases)). Common sense dictates otherwise. For instance, t-shirts differing only in their team logo are reasonably substitutable. And it's not just t-shirts. A Cleveland Browns™ cap is substitutable for a Nike Swoosh™ or Chicago Bulls' cap. That a logo may be unique – like a parcel of land is unique – does not make it a market.

Casey's instead suggests that a market is formed by the *collection* of NFL trademarks. But this is no excuse for *excluding* otherwise identical non-NFL products. The Second Circuit's *Salvino* decision is instructive. There, now-Justice Sotomayor rejected a relevant market limited to MLB intellectual property because it competes with "football, boxing, basketball, ice skating, hockey, and NASCAR." 542 F.3d at 328-31. That same reasoning applies here. *Spinelli v. NFL*, 96 F. Supp. 3d 81, 112 (S.D.N.Y. 2015) (finding the complaint "does not make sufficient factual allegations that would justify a product market limited to NFL-related photographs to the exclusion of, at a minimum, other sports-related photographs"); *see also, e.g.*, *Weber v. NFL*, 112 F. Supp. 2d 667, 674 (N.D. Ohio 2000) (alleged market for NFL domain names failed).[8]

Nor can a market be defined because sports merchandise expresses fan loyalty, as Casey's claims. AC ¶ 145. Some consumers may indeed want to buy NFL gear to show support on game day. But consumers have diverse interests, and one can only wear so many shirts. Casey's own

---

[8] Plaintiffs will likely rely on ***out-of-circuit*** decisions that have recognized NFL merchandise markets ***in other contexts***. *See Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1105, 1106 (N.D. Cal. 2013). But "Second Circuit precedent" instructs otherwise: "there exist available substitutes for the intellectual property of a professional sports organization." *Spinelli*, 96 F. Supp. 3d at 113. *Dang* involved a challenge to the NFLP agency agreement itself, alleging that the clubs were separate competitors in an NFL-related "submarket" for the licensing of their marks. Because the court was analyzing the effect of combining the clubs' marks, the court accepted a submarket consisting of only those marks. In contrast, the "but for" world here does not involve the separate licensing of NFL marks. Here, in both the actual world and the but for world, NFL merchandise competes with non-NFL merchandise, so the latter must be included in the relevant market.

allegations recognize that a consumer "may be a fan of both the New York Jets and a comic book hero." *Id.* ¶ 147. Though Casey's asserts that such a consumer "would still not consider a T-shirt bearing the comic book hero's logo as a reasonable substitute for one bearing a New York Jets logo," the consumer may only need one shirt, and a "Batman" shirt would be in direct competition with a "Jets" shirt. The shirts are substitutes and in the same market. It is not as if the consumer buys clothes for each interest, keeping separate "Jets" and "Batman" drawers.

**Second**, Casey's proposed market improperly lumps together all NFL licensed merchandise. Even if team affinity justified excluding other branded products, it does not justify an NFL merchandise market. Team rivalries do not end on the field. Teams do not compete for the same merchandise customers. A New York Giants fan will not buy Philadelphia Eagles' gear. There may, of course, be casual viewers who view an NFL shirt as an NFL shirt, but those consumers would also consider other non-NFL shirts as substitutes. Put simply, if fan affinity excludes non-NFL merchandise (like comic book hero merchandise), it must also exclude other NFL teams' merchandise, so there can be no single overarching market for NFL merchandise.

**Third**, Casey's proposed market improperly excludes other retail channels. TPOMs are not the only way to buy NFL merchandise. Yet Casey's excludes every other retail channel from its proposed market, including in-stadium stores, brick-and-mortar sporting goods stores, brick-and-mortar department stores, and retailer-owned websites. This gerrymandered market is facially implausible. *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1108 (N.D. Cal. 2022) (rejecting market limited to "Apple's distribution of iOS apps" because it excluded other platforms "that provide access to apps"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) (rejecting market "limited only to those hair care products sold in salons").

**Fourth**, Casey's proposed market does not match the alleged conduct. NFLP participates

in the trademark licensing market, not the TPOM market.  AC ¶ 50.  Even if the Court looked behind NFLP's corporate form, NFL clubs do not participate in the TPOM market either (Casey's does not allege they sell on Amazon or Walmart.com); they sell through their own ecommerce sites.  AC ¶ 159.  Thus, Casey's does not and cannot plausibly allege that the NFL Defendants have market power in the TPOM market.

### 2.    Casey's Fails to Allege Anticompetitive Effects.

Casey's also fails to allege the ODP has a "substantial anticompetitive effect."  *See Am. Express*, 138 S. Ct. at 2284.  It is simply "not unreasonable for a manufacturer to refuse to allow a specific retailer to market the manufacturer's products."  *Sylvania*, 694 F.2d at 1138; *Apple*, 601 F. Supp. at 1291 ("an essential predicate for liability under the rule of reason is absent" where there is no showing that "Apple's mail order prohibition adversely affects competition").  The same is true here because the ODP does not impair inter- or intra-brand competition.

Because the "primary purpose [of the antitrust laws] is to protect ***inter-brand*** competition," a "vertical restraint is not unreasonable unless it impacts on inter-brand competition."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 878, 889-90 (2007); *MHB Distribs., Inc. v. Parker Hannifin Corp.*, 800 F. Supp. 1265, 1269 (E.D. Pa. 1992).  The ODP enhances interbrand competition.  It ***spurs*** demand for NFL merchandise by traditional retailers and dedicated ecommerce operators.  This benefits licensees who would otherwise "lose sales and market share to licensees" supplying retailers that did not make these investments.  AC ¶ 101.  This is procompetitive.  Vertical distribution policies "encourage[] retailers to invest in tangible or intangible services or promotional efforts that aid the manufacturer's position as against rival manufacturers."  *Leegin*, 551 U.S. at 890.

At bottom, Casey's has not alleged anticompetitive *effects*.  *See Giordano v. Saks Inc.*, 2023 WL 1451534, at *19 (E.D.N.Y. 2023) ("An antitrust plaintiff must allege not only cognizable

harm to herself, but an adverse effect on competition market-wide.") (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001)). Casey's acknowledges the ODP *increases* demand by traditional retailers, and that, without the ODP, licensees would "lose sales" to these retailers. AC ¶ 101. While it claims that *other* licensees would gain sales, Casey's does not allege the ODP reduces ***overall*** output. At most, Casey's complains that its sales dipped after it did not apply to obtain approval to sell on Amazon. But that is not injury to competition.

The ODP also does not meaningfully restrict ***intra***-brand competition. Unlike many manufacturers that place each distributor in its own exclusive territory or channel, the ODP does not confer "an airtight territorial restriction," or ***any*** exclusivity, on anyone. *See Sylvania*, 694 F.2d at 1137 (upholding partially exclusive dealerships). Instead, every licensee competes with every other licensee, and every retailer competes with every other retailer.

### E.    Casey's Monopolization Claims Fail.

Casey's monopolization claims fail for the same reasons. The NFL Defendants do not participate, let alone have monopoly power, in the TPOM *retail* market. NFLP participates in the upstream trademark licensing market, while the NFL and its clubs participate in direct, non-TPOM, retail markets. AC ¶¶ 50, 159.[9] Nor is the ODP an exclusionary act that creates, enhances, or maintains any power in these unalleged markets.

Alleging a "conspiracy to monopolize" does not save Casey's' Section 2 claims. Casey's claims "NFLP granted Fanatics the right to operate the NFL's Amazon 'storefront.'" AC ¶ 159. That is not anticompetitive. Authorized Amazon retailers need not sell through any storefront. Nor was NFLP required to appoint multiple "operators." *See Dreamstime.com, LLC v. Google,*

---

[9] The AC includes allegations regarding NFLP's trademark enforcement with respect to paid search advertising (AC ¶¶ 135-36). But Casey's does not allege an advertising market, and, as the Second Circuit has held, "forcing companies to be less aggressive in enforcing their trademarks is antithetical to the procompetitive goals of trademark policy." *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 122 (2d Cir. 2021).

*LLC*, 2019 WL 341579, at *9 (N.D. Cal. 2019) ("Nor do the antitrust laws require Google to enter into those same agreements with every stock photography company in the world."). Exclusive distributorships are not conspiracies to monopolize. *See Discon, Inc.*, 525 U.S. at 139.

## III.   THE NFL DEFENDANTS ARE NOT LIABLE FOR FANATICS' CONDUCT.

Aside from the ODP, Casey's challenges Fanatics' agreements with two licensee-suppliers that allegedly prevented Casey's from reselling NFL merchandise on Amazon. But these alleged exclusive supply arrangements between Fanatics' and its vertical partners (WinCraft and Logo Brands) have nothing to do with the ODP or the NFL Defendants. WinCraft made clear that "even if Casey's applied and was accepted as an Approved Marketplace Retailer…, WinCraft would still not sell any such products to Casey's, because Fanatics would have deemed that to have been against its business goals." AC ¶ 114. Logo Brands similarly told Casey's that its agreement with Fanatics, "which prevents 3rd part[ies] from selling Logo Brands products on Amazon, … has nothing to do with … the NFL." *Id.* The NFL Defendants should be dismissed from these claims.

## IV.   THE NFL AND ITS CLUBS ARE NOT PROPER DEFENDANTS.

Even if the Court allows Casey's claims to go forward, the NFL itself and its member clubs should be dismissed. The Amended Complaint alleges only that they own trademarks, appointed NFLP as their licensing agent, and sell retail NFL merchandise in their own stores or websites. None of this is anticompetitive. NFLP is the only relevant NFL Defendant here.

## V.   CASEY'S SELF-INFLICTED INJURY IS NO BASIS FOR INJUNCTIVE RELIEF.

Casey's injunctive relief claim fails because its injury is self-inflicted. It decided not to *apply* to be an Authorized Amazon Retailer, precluding irreparable injury. *See, e.g.*, *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) ("Self-inflicted wounds are not irreparable injury."); *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co.*, 2020 WL 5894079, at *5 (S.D.N.Y.

2020) (same); *GEO Grp., Inc. v. United States*, 100 Fed. Cl. 223, 229 (2011) ("[T]he Court is ill-inclined … to pull GEO's chestnuts out of a fire sparked by its own ill-fated tactical decisions.").

Casey's does not deny it would have suffered no harm had it applied and been accepted as an Authorized Amazon Retailer.  Nor does Casey's contend that applying would have been futile. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 849 (7th Cir. 2003) ("The record does not afford any reason to suppose that [the plaintiff] would be turned down, if it carried through with an application.").  Instead, Casey's supposedly did not like the application's clause releasing claims relating to the application process.  AC ¶ 109.  But Casey's does not allege the release itself is unlawful, so it is no excuse for not applying.  *Second City Music*, 333 F.3d at 849 (objection to "good character and repute" clause in the licensing agreement is no basis for irreparable injury).[10]

## <u>CONCLUSION</u>

For the foregoing reasons, the claims against the NFL Defendants should be dismissed.

---

[10] Casey's self-inflicted injury also precludes Article III standing.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves"); *Union Cosm. Castle, Inc.*, 454 F. Supp. 2d at 71 ("A plaintiff cannot establish Article III standing to pursue a cause of action where that plaintiff is the primary cause of its own alleged injury.").

Dated: October 6, 2023

PROSKAUER ROSE LLP

/s/ *Bradley I. Ruskin*
Bradley I. Ruskin
David A. Munkittrick
Jeffrey H. Warshafsky
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:  (212) 969-3000
bruskin@proskauer.com
dmunkittrick@proskauer.com
jwarshafsky@proskauer.com

Bart H. Williams (*pro hac vice*)
Susan L. Gutierrez (*pro hac vice*)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone:   (310) 284-4520
bwilliams@proskauer.com
sgutierrez@proskauer.com

Colin R. Kass (*pro hac vice*)
PROSKAUER ROSE LLP
101 Pennsylvania Avenue, N.W.
Suite 600 South
Washington, D.C. 20004
Telephone:  (202) 416-6800
ckass@proskauer.com

*Attorneys for the NFL Defendants*