UNITED STATES DISTRICT COUR
SOUTHERN DISTRICT OF NEW YORK

---

CASEY'S DISTRIBUTING, INC., on Behalf
of Itself and all Others Similarly Situated,

                Plaintiff,

      v.

NATIONAL FOOTBALL LEAGUE;
NATIONAL FOOTBALL LEAGUE
PROPERTIES, LLC.; NFL ENTERPRISES
LLC; ARIZONA CARDINALS FOOTBALL
CLUB LLC; ATLANTA FALCONS
FOOTBALL CLUB, LLC; BALTIMORE
RAVENS LIMITED PARTNERSHIP;
BUCCANEERS TEAM LLC; BUFFALO
BILLS LLC; THE CHICAGO BEARS
FOOTBALL CLUB, INC.; CHARGERS
FOOTBALL COMPANY, LLC;
CINCINNATI BENGALS, INC.;
CLEVELAND BROWNS FOOTBALL
COMPANY, LLC; DALLAS COWBOYS
FOOTBALL CLUB, LTD.; DETROIT
LIONS, INC.; FOOTBALL NORTHWEST
LLC; GREEN BAY PACKERS, INC.;
HOUSTON NFL HOLDINGS, L.P.;
INDIANAPOLIS COLTS, INC.;
JACKSONVILLE JAGUARS LLC; KANSAS
CITY CHIEFS FOOTBALL CLUB, INC.;
LAS VEGAS RAIDERS FOOTBALL LLC;
MIAMI DOLPHINS LTD.; MINNESOTA
VIKINGS FOOTBALL LLC; NEW
ENGLAND PATRIOTS LLC; NEW
ORLEANS LOUISIANA SAINTS, LLC;
NEW YORK FOOTBALL GIANTS, INC.;
NEW YORK JETS FOOTBALL CLUB,
INC.; PANTHERS FOOTBALL, LLC; PDB
SPORTS, LTD. d/b/a DENVER BRONCOS
FOOTBALL CLUB; THE PHILADELPHIA
EAGLES FOOTBALL CLUB INC.;
PITTSBURGH STEELERS LLC; PRO-
FOOTBALL, ~~INC~~ LLC.;THE RAMS
FOOTBALL COMPANY LLC; SAN
FRANCISCO FORTY NINERS II, LLC;
TENNESSEE FOOTBALL, INC.; and
FANATICS, ~~INC~~LLC.

              Defendants.

---

Case No. 1:22-cv-03934-ALC

**CLASS ACTION**

~~FIRST~~**SECOND AMENDED
COMPLAINT FOR VIOLATIONS OF
THE FEDERAL ANTITRUST LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page(s)**

I.   NATURE OF THE ACTION ................................................................................1

II.   PARTIES ..........................................................................................................4

   A.   Plaintiff ................................................................................................4

   B.   Defendants ...........................................................................................4

III.   JURISDICTION, VENUE, AND INTERSTATE COMMERCE .....................10

IV.   FACTS ..............................................................................................................12

   A.   NFLP has the Power and Authority to Decide Who can Become an NFL Licensee ...............................................................................................12

   B.   Fanatics is a Dominant and Growing Online Retailer with Substantial Leverage Over the NFL Licensed Product Market.................................14

   C.   Online Retail is a Market Separate and Distinct from Brick-and-Mortar Retail ....................................................................................................18

   D.   Plaintiff Has Been Excluded from Selling on Amazon's Platform ...................23

   E.   The NFLP's Policy Prohibiting Retailers from Selling NFL Licensed Products on Amazon's TPOM Together with the Merchandise Agreement Violate the Antitrust Laws and Harm Competition ...............................42

   F.   No Procompetitive Justifications Excuse Defendants' Collusive Conduct ........48

V.   THE RELEVANT ANTITRUST MARKET AND MARKET POWER .....................50

   A.   NFLP's Monopoly or Market Power ....................................................53

   B.   Amazon's Monopoly or Market Power ................................................54

   C.   Fanatics' Monopoly or Market Power ..................................................56

VI.   DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT ......................................................................59

   A.   NFLP ....................................................................................................59

   B.   Fanatics ................................................................................................61

VII.   PLAINTIFF IS ENTITLED TO INJUNCTIVE RELIEF ...............................63

i

VIII.   CLASS ACTION ALLEGATIONS .................................................................65

        A.      Class Definition ..................................................................................65

        B.      Class Certification Requirements Under Rule 23 ...............................66

IX.     CAUSES OF ACTION .......................................................................................73

FIRST CAUSE OF ACTION Sherman Act § 1, 3    Conspiracy in Restraint of Trade
(As to All Defendants) ..........................................................................................73

SECOND    CAUSE    OF    ACTION    Sherman    Act    §    2        Monopolization
(As to All Defendants) ..........................................................................................75

THIRD    CAUSE    OF    ACTION    Sherman    Act    §    2        Attempted Monopolization
(As to All Defendants) ..........................................................................................77

FOURTH CAUSE OF ACTION Sherman Act § 2        Conspiracy to Monopolize
(As to All Defendants) ..........................................................................................79

PRAYER FOR RELIEF ..........................................................................................81

JURY DEMAND .....................................................................................................82

I.      NATURE OF THE ACTION .............................................................................1

II.     PARTIES ............................................................................................................4

        A.      Plaintiff ..............................................................................................4

        B.      Defendants .........................................................**Error! Bookmark not defined.**

III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE .....................10

IV.     FACTS ..............................................................................................................12

        A.      NFLP has the Power and Authority to Decide Who can Become an NFL
                Licensee ............................................................................................12

        B.      Fanatics is a Dominant and Growing Online Retailer with Substantial
                Leverage Over the NFL Licensed Product Market.............................15

        C.      Online Retail is a Market Separate and Distinct from Brick-and-Mortar
                Retail .................................................................................................18

        D.      Plaintiff Has Been Excluded from Selling on Amazon's Platform ....23

        E.      The NFLP's Policy Prohibiting Retailers from Selling NFL Licensed
                Products on Amazon's TPOM Together with the Merchandise Agreement

Violate the Antitrust Laws and Harm Competition .................................................43

F.    No Procompetitive Justifications Excuse Defendants' Collusive Conduct ........49

V.    THE RELEVANT ANTITRUST MARKET AND MARKET POWER ....................52

A.    NFLP's Monopoly or Market Power ......................................................54

B.    Amazon's Monopoly or Market Power ..................................................55

C.    Fanatics' Monopoly or Market Power ...................................................56

VI.   DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT .................................................................60

A.    NFLP .................................................................................................60

B.    Fanatics .............................................................................................62

VII.  PLAINTIFF AND THE CLASS IS ENTITLED TO INJUNCTIVE RELIEF..............64

VIII. CLASS ACTION ALLEGATIONS .................................................................66

A.    Class Definition .................................................................................66

B.    Class Certification Requirements Under Rule 23 ...................................67

IX.   STATUTES OF LIMITATION ARE TOLLED ..................................................92

A.    Discovery Rule and Continuing Course of Unlawful Conduct .................70

B.    Fraudulent Concealment ....................................................................71

X.    ADDED ALLEGATIONS CONCERNING ANTITRUST INJURY ........................92

A.    The Several Independent Categories of Antitrust Injury That Casey's and the Class Suffered Directly From the Competition-Reducing Aspects of Defendants' Anticompetitive Practices Alleged in Totality.................................................74

B.    The Alleged Anticompetitive Schemes in Totality are Broader Than the ODP or AMRA. .................................................................78

C.    The ODP and AMRA Are Still Nevertheless Alleged to Be Anticompetitive Agreements and Practices. .................................................80

D.    The Alleged Anticompetitive Agreements Are Horizontal. .............81

E.    Defendants Have Horizontally Colluded to Cede Fanatics 100% Control of

TPOMs. .............................................................................................84

F.     In the Alternative and at the Least, if the Agreements Are Deemed to be Vertical, They Still Are Unlawful Under the Quick Look, Rule of Reason, and Section 2 Tests, and They Cause Antitrust Harm to Casey's and the Class (and Derivatively, to Consumers). .....................................................85

XI.     CAUSES OF ACTION ...................................................................................92

FIRST CAUSE OF ACTION Sherman Act § 1, 3 – Conspiracy in Restraint of Trade (As to All Defendants) .............................................................................................92

SECOND CAUSE OF ACTION Sherman Act § 1, 2 – Exclusive Dealing (As to All Defendants) .............................................................................................94

THIRD CAUSE OF ACTION Clayton Act § 3 – Exclusive Dealing (As to All Defendants) .............................................................................................96

FOURTH CAUSE OF ACTION Sherman Act § 2 – Monopolization (As to All Defendants) .............................................................................................98

FIFTH CAUSE OF ACTION Sherman Act § 2 – Attempted Monopolization (As to All Defendants) ...........................................................................................100

SIXTH CAUSE OF ACTION Sherman Act § 2 – Conspiracy to Monopolize (As to All Defendants) ...........................................................................................104

PRAYER FOR RELIEF .......................................................................................104

JURY DEMAND ...................................................................................................106

Plaintiff Casey's Distributing, Inc. ("Casey's" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through its undersigned counsel, upon personal knowledge as to facts known to Plaintiff and upon information and belief as to all other facts following investigation of counsel, alleges as follows against Defendants in this Second Amended Class Action Complaint ("SAC"). Defendants are professional football teams, the National Football League ("NFL") and affiliated entities, and Fanatics, Inc.LLC ("Fanatics") (collectively hereinafter "Defendants"). Plaintiff's counsels' investigation into the factual allegations contained herein is continuing. Many of the relevant facts are known only by Defendants or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support exists for the allegations set forth herein and that such evidence will be available after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Every year, consumers spend billions of dollars on NFL licensed products. Many of these transactions take place through online channels, especially third-party online marketplaces ("TPOM" or "TPOMs") such as Amazon.com, Inc.'s ("Amazon") online retail platform. In fact, Amazon's TPOM serves as a sole source of income for many small companies who sell NFL licensed products to consumers. Amazon's TPOM is the most important platform for small businesses, such as Plaintiff, to participate in the online retail market for sales of NFL licensed products. But just last yearover the past several years, the NFL Teams and Fanatics entered into various agreements that choke that competition off of Amazon's TPOM and channel the business that previously went to those smaller competitors to Fanatics, a gargantuan sporting goods licensee, manufacturer, wholesaler, distributor, and retailer, which not only holds an NFL license to manufacture NFL licensed products, distributes those products, and retails those products, but

is itself owned by the NFL.  These agreements violate the antitrust laws.

2.      Fanatics' appetite for growth cannot be overstated.  Fanatics' value has more than quadrupled during the past ~~couple of~~several years and ~~is now~~has recently been estimated to be $27 billion.  In fact, in March 2022, Fanatics raised an additional $1.5 billion in a new funding round that included an additional $320 million invested by the NFL.  Fanatics has used its funding to buy up competing licensees of NFL products, slowly securing its dominance in the licensed sporting goods market, the crown jewel of which is NFL licensed products.

3.      The NFL aids and abets Fanatics because it has invested well over $400 million in Fanatics to become a large equity shareholder.  As Fanatics' value grows, so does the value of the NFL's equity share in Fanatics.  Thus, it is in the NFL's interest to assist Fanatics in its campaign to usurp as much of the online retail space as possible.  And TPOMs, including Amazon's enormous online retail platform, was a logical candidate to target for growth.  Fanatics now dominates TPOMs, as a result of the agreements described herein.  As alleged herein, at least two licensees have agreements with Fanatics (also a licensee) that mandate that the licensees are not to sell to entities that will sell the products on or to TPOMs, as well as to certain other online retailers.  Indeed, Casey's has seen a written agreement that appears to be between Fanatics and its horizontally competing licensees, which in effect calls for a group boycott of entities, such as Plaintiff, which are competitors of Fanatics and its colluding licensees in selling of products on or to TPOMs.  And Licensees told Casey's that in enforcing the purported NFL policies, licensees were acting at the direction of Fanatics.  Fanatics acquired its dominance by excluding smaller competitors like Plaintiff through the NFL's recently implemented restrictions that prohibit competing retailer entities, such as Plaintiff, from selling on Amazon's TPOM, unless approved by the NFL to do so—at the NFL's sole discretion.  In order to even be considered by the NFL,

the NFL requires applicants to release all legal rights against it, albeit with no promise in return that the NFL will allow—in its sole discretion—an applicant access to Amazon's TPOM to sell NFL licensed products.  The agreements described herein are designed to allow the NFLP, Fanatics, and the constituent teams to reach downwards to attempt to restrict the conduct of retailers—including those that lack privity with the NFLP, Fanatics, and the constituent teams— that horizontally compete with them.  The alleged anticompetitive scheme has also resulted in consolidation and a decrease in the number of licensees willing to sell NFL Licensed Products to Casey's and the Class members, which has resulted in lower supply and Casey's and the Class members paying increased prices to purchase NFL Licensed Products from licensees, but for the alleged anticompetitive scheme.

4.    Plaintiff alleges herein additional agreements that in totality form a horizontal conspiracy in which NFL, Fanatics, and horizontally competing licensees collude to agree to boycott sales to TPOM retailers.  In addition to removing competition from the Amazon TPOM, which has approximately 41 percent of the market share for e-commerce (in second place is Walmart Inc. ("Walmart") with approximately 6.6 percent), Defendants have removed competition from other TPOMs.  For example, in January 2019, Fanatics reached an agreement with Walmart to be the exclusive seller on Walmart.com.  All NFL products previously and legitimately listed by sellers on Walmart.com, including, without limitation, those of Casey's, were inexplicably removed from Walmart.com, leaving only Fanatics' products.  Additionally, NFL restricts the online advertising terms that small retailers can use, almost guaranteeing that their websites appear far below those affiliated with Fanatics, including those run by NFL and its Teams.  Plaintiff brings this lawsuit to restore free and fair competition on TPOMs.

5.    Plaintiff brings this action on behalf of itself and other online retailers of NFL

Licensed Products (as defined below) who have been damaged and denied the opportunity to sell on TPOMs due to Defendants' anticompetitive conduct in violation of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §§ 1, 2, and 3, and the Clayton Antitrust Act ("Clayton Act"), 15 U.S.C. § 14, and seeks damages and equitable, declarative, and injunctive relief, among other forms of relief, under the Clayton Antitrust Act ("Clayton Act"),Act, 15 U.S.C. §§ 12, 16, 26, against Defendants to restore competition on TPOMs to the status quo.

II.    **PARTIES**

A.    **Plaintiff**

6.    Plaintiff Casey's is a Nebraska corporation with its principal address at 8921 J Street, #300, Omaha, Nebraska, 68127.  Casey's product line primarily focuses on licensed hardgoods, which includes automotive accessories, banners, blankets, collectibles, displays, full-size authentic and mini helmets, flags, home and office products, toys, drinkware, and items for dining, the kitchen, and tailgating.  Casey's also sells licensed apparel.  Casey's purchased NFL licensed products directly from WinCraft, which was acquired by Fanatics in or about December 2020, and other licensees during the Class Period, as defined below.

B.    **Defendants**

7.    Defendant **National Football League** (the "NFL") is an association of 32 professional football teams in the United States.  Each of the member teams, headquartered in various cities across the country, is separately owned and operated.  The NFL has its headquarters at 345 Park Avenue, 7th Floor, New York, NY 10154.  This Amended Complaint uses the term "NFL Defendants" to refer collectively to the 32 NFL Teams, the NFL, NFL Properties, and NFL Enterprises.

8.    Defendant **National Football League Properties, LLC** ("NFLP") is a Delaware

4

Limited Liability Corporation with its headquarters at 345 Park Avenue, New York, NY 10154.[1]

NFLP serves as the representative of the NFL and its member professional football teams ("Team" or "Teams") for the licensing of their trademarks and logos ("NFL Marks"), which include, among others, the NFL shield, the words SUPER BOWL and PRO BOWL, the Super Bowl and Pro Bowl logos, and the Team names, nicknames, colors, symbols, emblems, helmet designs, and uniform designs. To that end, the NFL and each Team have granted NFL Properties the exclusive right to license the Teams' trademarks and related intellectual property.

9.    Defendant **NFL Enterprises LLC** is a Delaware limited liability company with its principal place of business at 280 Park Avenue, New York, NY 10017. NFL Enterprises owns the "NFLShop.com" domain name.

10.    Defendant **Arizona Cardinals Football Club LLC** is a Delaware limited liability company with its principal place of business at 8701 South Hardy Dr., Tempe, AZ 85284. The Arizona Cardinals are a professional football team and member of the NFL.

11.    Defendant **Atlanta Falcons Football Club, LLC** is a Georgia limited liability company with its principal place of business at 4400 Falcon Pkwy., Flowery Branch, GA 30542. The Atlanta Falcons are a professional football team and member of the NFL.

12.    Defendant **Baltimore Ravens Limited Partnership** is a Maryland limited partnership with its principal place of business at 1101 Russel St., Baltimore, MD 21230. The Baltimore Ravens are a professional football team and member of the NFL.

13.    Defendant **Buccaneers Team LLC** is a Delaware limited liability company with its principal place of business at 1 Buccaneer Pl., Tampa, FL 33607. The Tampa Bay Buccaneers

---

[1] https://www.dnb.com/businessdirectory/companyprofiles.nfl_properties_llc.da85ba3b2befbb9d9981288bcb8a29 97.html (last visited October 4, 2021); *see also* https://www.nfl.info/NFLConsProd/Welcome/cpAgreement.htm (last visited October 4, 2021).

are a professional football team and member of the NFL.

14.    Defendant **Buffalo Bills LLC** is a Delaware limited liability company with its principal place of business at 1 Bills Dr., Orchard Park, NY 14127.  The Buffalo Bills are a professional football team and member of the NFL.

15.    Defendant **The Chicago Bears Football Club, Inc.** is a Delaware corporation with its principal place of business at 1000 Football Drive, Lake Forest, IL 60045.  The Chicago Bears are a professional football team and member of the NFL.

16.    Defendant **Chargers Football Company, LLC** is a California limited liability company with its principal place of business at 3333 Susan St., Costa Mesa, CA 92626.  The Los Angeles Chargers are a professional football team and member of the NFL.

17.    Defendant **Cincinnati Bengals, Inc.** is an Ohio corporation with its principal place of business at 1 Paul Brown Stadium, Cincinnati, OH 45202.  The Cincinnati Bengals are a professional football team and member of the NFL.

18.    Defendant **Cleveland Browns Football Company, LLC** is a Delaware limited liability company with its principal place of business at 76 Lou Groza Blvd., Berea, OH 44017. The Cleveland Browns are a professional football team and member of the NFL.

19.    Defendant **Dallas Cowboys Football Club, Ltd.** is a Texas limited liability company with its principal place of business at 1 Cowboys Way, Ste. 100, Frisco, TX 75034.  The Dallas Cowboys are a professional football team and member of the NFL.

20.    Defendant **Detroit Lions, Inc.** is a Michigan corporation with its principal place of business at 222 Republic Dr., Allen Park, MI 48101.  The Detroit Lions are a professional football team and member of the NFL.

21.    Defendant **Football Northwest LLC** is a Washington limited liability company

with its principal place of business at 12 Seahawks Way, Renton, WA 98056. The Seattle Seahawks are a professional football team and member of the NFL.

22.     Defendant **Green Bay Packers, Inc.** is a Wisconsin corporation with its principal place of business at 1265 Lombardi Ave., Green Bay, WI 54304. The Green Bay Packers are a professional football team and member of the NFL.

23.     Defendant **Houston NFL Holdings, L.P.** is a Delaware limited partnership with its principal place of business at 2 NRG Park, Houston, TX 77054. The Houston Texans are a professional football team and member of the NFL.

24.     Defendant **Indianapolis Colts, Inc.** is a Delaware corporation with its principal place of business at 7001 West 56th St., Indianapolis, IN 46254. The Indianapolis Colts are a professional football team and member of the NFL.

25.     Defendant **Jacksonville Jaguars LLC** is a Florida limited liability company with its principal place of business at 1 TIAA Bank Field Dr., Jacksonville, FL 32202. The Jacksonville Jaguars are a professional football team and member of the NFL.

26.     Defendant **Kansas City Chiefs Football Club, Inc.** is a Texas corporation with its principal place of business at 1 Arrowhead Dr., Kansas City, MO 64129. The Kansas City Chiefs are a professional football team and member of the NFL.

27.     Defendant **Las Vegas Raiders Football LLC** is a Nevada limited liability company with its principal place of business at 1475 Raiders Way, Henderson, NV 89052. The Las Vegas Raiders (formerly the Oakland Raiders) are a professional football team and member of the NFL.

28.     Defendant **Miami Dolphins Ltd.** is a Florida limited company with its principal place of business at 347 Don Shula Dr., Miami Gardens, FL 33056. The Miami Dolphins are a

professional football team and member of the NFL.

29.    Defendant **Minnesota Vikings Football LLC** is a Delaware limited liability company with its principal place of business at 2600 Viking Cr., Eagan, MN 55121.  The Minnesota Vikings are a professional football team and member of the NFL.

30.    Defendant **New England Patriots LLC** is a Delaware limited liability company with its principal place of business at 1 Patriot Pl., Foxboro, MA 02035.  The New England Patriots are a professional football team and member of the NFL.

31.    Defendant **New Orleans Louisiana Saints, LLC** is a Delaware limited liability company with its principal place of business at 5800 Airline Dr., Metairie, LA 70003.  The New Orleans Saints are a professional football team and member of the NFL.

32.    Defendant **New York Football Giants Inc.** is a New York corporation with its principal place of business at 1925 Giants Drive, East Rutherford, NJ 07073.  The New York Giants are a professional football team and member of the NFL.

33.    Defendant **New York Jets Football Club, Inc.** is a Delaware corporation with its principal place of business at 1 Jets Drive, Florham Park, NJ 07932.  The New York Jets are a professional football team and member of the NFL.

34.    Defendant **Panthers Football, LLC** is a North Carolina limited liability company with its principal place of business at 800 South Mint Street, Charlotte, North Carolina 28202.

35.    Defendant **PDB Sports, Ltd. d/b/a Denver Broncos Football Club** is a Colorado limited company with its principal place of business at 13655 Broncos Parkway, Englewood, CO 80112.  The Denver Broncos are a professional football team and member of the NFL.

36.    Defendant **The Philadelphia Eagles Football Club Inc.** is a Delaware corporation with its principal place of business at 1 Novacare Way, Philadelphia, PA 19145.  The Philadelphia

Eagles are a professional football team and member of the NFL.

37. Defendant **Pittsburgh Steelers Sports LLC** is a Pennsylvania corporation with its principal place of business at 3400 S. Water St., Pittsburgh, PA 15203. The Pittsburgh Steelers are a professional football team and member of the NFL.

38. Defendant **Pro-Football, Inc.** is a Maryland corporation with its principal place of business at 21300 Redskin Park Drive, Ashburn, Virginia. ~~The~~ During 2023, the entity changed its title to Pro-Football LLC, doing business as Washington ~~Redskins~~Commanders. It is a ~~professional~~ football team and member of the NFL.

39. Defendant **The Rams Football Company LLC** is a Delaware limited liability company with its principal place of business at 29899 Agoura Rd., Agoura Hills, CA 91301. The Los Angeles Rams are a professional football team and member of the NFL.

40. Defendant **San Francisco Forty Niners II, LLC** is a Delaware limited liability company with its principal place of business at 4900 Marie P. DeBartolo, Santa Clara, CA 95054. The San Francisco 49ers are a professional football team and member of the NFL.

41. Defendant **Tennessee Football, Inc.** is a Delaware corporation with its principal place of business at 460 Great Circle Rd., Nashville, TN 37228. The Tennessee Titans are a professional football team and member of the NFL.

42. Defendant **Fanatics,** ~~Inc. is a Delaware Corporation, established in 2011 and headquartered at 8100 Nations Way, Jacksonville, FL 32256.~~LLC is a sole-member LLC organized in Delaware. It has its headquarters at 8100 Nations Way, Jacksonville, FL 32256-4405. Fanatics, Inc., which Casey's named as a defendant in the prior pleading, executed a certificate of conversion to a Delaware limited liability company, changing its name to Fanatics, LLC in December 2021 (this point is according to Fanatics' counsel). Fanatics LLC's parent companies

in succession—not named as Defendants—are Fanatics Commerce Intermediate Holdco, LLC, Fanatics Commerce Holdco, Inc., Fanatics Global Holdco, LLC, and Fanatics Holdings, Inc. Fanatics Holdings, Inc. is a Delaware corporation with its principal place of business in Jacksonville, Florida. Fanatics Commerce Holdco, Inc., is a Delaware corporation. Fanatics is a manufacturer, supplier, distributor, and retailer of licensed sportswear, sports equipment, and merchandise, including, without limitation, NFL Licensed Products. Fanatics is also a licensee of NFLP. Several of Fanatics' subsidiaries or affiliated entities have headquarters in New York, NY.[2]

### III.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE

43.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1337 and Clayton Act, 15 U.S.C. §26.

44.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391 (b), (c), and (d)), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged wrongful activity affected interstate trade and commerce in this District.

45.    Defendants' conduct was within the flow of, was intended to, and did in fact have a substantial effect on interstate commerce in the United States, including in this District.

46.    During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, airways, cable, wires, wireless spectrum, and the U.S. mail, to effectuate their unlawful scheme.

47.    Defendants' manipulation, conspiracy, and conduct alleged herein was in U.S.

---

[2] The unlawful anticompetitive acts alleged against Defendants were authorized, ordered, or performed by Defendants' respective officers, agents, employees, representatives, or shareholders, while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants' agents operated under the explicit and apparent authority of their principals. Other individuals and entities not currently named as defendants herein participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Each Defendant acted as the principal, agent, or joint venture of or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

import/commerce and/or had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, within the meaning of the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6(a).

48.     This Court has personal jurisdiction over each defendant, because each defendant transacted business, maintained substantial contacts, is located, and/or they or their co-conspirators committed overt acts in furtherance of their illegal conspiracy in the United States, including in this District.  The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

49.     All Defendants have substantial and continuing locations and operations within New York that relate, at least in part, directly to the anticompetitive conduct alleged in this Amended Complaint.  The three NFL Defendants are all headquartered within this District. Buffalo Bills LLC has its headquarters in New York.  The New York Football Giants Inc. is a New York Corporation.  In addition, although they play their games in New Jersey, the New York Football Giants Inc. and the New York Jets Football Club, Inc. have historical and longstanding associations with New York (as indicated by their names), and many of their fans reside in New York.  The NFL and the owners of the Teams regularly meet in New York to discuss the business of the NFL and the Teams, most recently on October 30 and 31, 2021.[3]  Several of Fanatics' subsidiaries or affiliated entities have headquarters in New York, NY.  Michael Rubin, who is Fanatics' founder, chairman, and chief executive officer, has a residence in New York, NY. Defendants operate several retail locations in New York, many affected sales occurred in or were transacted in New York, many affected customers reside in New York, and overt acts taken in

---

[3] *See* Pat Leonard, *Roger Goodell, NFL Owners Must Face the Music at This Year's Fall Meetings in the Big Apple*, N.Y. Daily News (Oct. 24, 2021), https://www.nydailynews.com/sports/football/ny-roger-goodell-20211024-fkfe6obwnvhtzeq65t3bqhhf4u-story.html.

furtherance of the Defendants' anticompetitive scheme took place in New York. All Defendants have engaged in sufficient minimum contacts with both the United States in general and with New York in particular. All Defendants sell and ship millions of dollars' worth of NFL Licensed Sports Products to customers in New York. All Defendants have purposefully availed themselves of the benefits and protections of United States and New York law, such that the exercise of jurisdiction over them would comport with due process requirements, including notions of fair play and substantial justice.

## IV.   FACTS

### A.    NFLP has the Power and Authority to Decide Who can Become an NFL Licensee

50.    The NFL Licensed Sports Products industry operates much like other licensed merchandise industries. Trademark owners (e.g., individual sports teams) license their marks to licensees who make products that are then sold to distributors, who retail the products themselves to consumers or re-sell the products to retailers, who in turn re-sell them directly to consumers. But instead of competing independently, the teams that comprise the NFL (the "Teams") have formed a cartel to jointly organize the licensing of their marks (as a single group) through Defendant NFL Properties. Unlike real competitors in an open and competitive marketplace, the Teams' collusive marketing agreements disincentivize competition between the Teams. The NFL's operation as a business cartel is key to understanding the collusive agreements at issue herein.

51.    Another relevant feature of the NFL Licensed Sports Products industry is that firms occupying upstream positions in the supply chain as manufacturers or trademark owners also act as retailers selling directly to consumers. Although the Teams collectively license their marks to licensees who make products bearing the Teams' logos, those Teams also have historically sold

those same products directly to consumers in their online and "brick-and-mortar" fan shops. The same is true for licensees who manufacture products that they sell to both distributors and fans directly.

52.    The last 20 years have seen a dramatic shift from traditional "brick-and-mortar" businesses to "e-commerce," which is the buying and selling of goods or services using the internet. Although the NFL Teams have historically sold merchandise online through their individual sites, by far the biggest player in the online retail market for NFL Licensed Sports Products is Defendant Fanatics, Inc.

53.    NFLP serves as the representative of the NFL and its 32 constituent member Teams for the licensing of their logos, trademarks, emblems, or other indicia ("Intellectual Property"). In this role, the NFLP controls the Intellectual Property of the NFL and its constituent Teams, including merchandising and licensing of NFL products that bear NFL Intellectual Property ("NFL Licensed Products" or "NFL Licensed Sports Products"). For that reason, the NFLP maintains all or substantially all control over how NFL Licensed Products reach consumers, and it does so for the NFL itself and for each of the NFL's constituent member Teams.

54.    Within its authority to issue and renew NFL Intellectual Property Licenses, NFLP has the power to set the price of such licenses. Through this power to set license prices and exclude competition, NFLP has the ability to determine which, as well as how many, licenses it will issue or renew. Further, both as part of its authority to set prices and its power to exclude competition, NFLP can determine which individuals or entities can receive renewed licenses.

55.    Prior to the implementation of the anti-competitive anticompetitive scheme alleged herein, non-licensee companies, such as Plaintiff, were permitted to purchase NFL Licensed Products from licensees and distribute those products to retailers or retail the products online

13

themselves.  As written, the NFL's policies do not mandate that only licensees can retail NFL Licensed Products online.  But in practice, through the ~~anti-competitive~~anticompetitive scheme alleged herein, the NFL Defendants, Fanatics, and colluding licensees are effectuating a system that limits the retailers who are permitted to sell NFL Licensed Products online.

56.     The NFL and each of its constituent Teams can retail Licensed Products.

57.     NFL licensees, including but not limited to Fanatics, also compete in retailing Licensed Products.

58.     NFL Licensed Products are also sold at the retail level by various retailers who do not hold a license but who legitimately purchase NFL Licensed Products from licensees.  Plaintiff does not hold a license but purchases NFL Licensed Products from various licensees.

59.     Previously, even retailers who did not hold NFL licenses, but legitimately purchased NFL Licensed Products, had the freedom to retail them on TPOM.

60.     By deciding which individuals or entities can receive NFL Intellectual Property Licenses, NFLP has the ability to determine the level of competition occurring between and among licensees, including the NFL licensees participating in the NFL Licensed Products market. Further, NFLP has the power to dictate the terms that govern the conduct of these NFL licensees. As part of this power, NFLP has threatened or prevented NFL licensees from selling NFL Licensed Products to those, like Plaintiff, with interest in retailing NFL Licensed Products on or through TPOMs.  In addition, NFLP has the power to favor certain NFL licensees over others.  For example, NFLP has placed Fanatics—with whom the NFL has an investment interest (further described below)—in the favored position of operating or "powering" the NFL's Amazon "storefront," Walmart, and most of the NFL's and member Teams' e-commerce websites.  In this way, NFLP has ensured that one particular licensee, Fanatics, unlawfully monopolizes the online

retail market for NFL Licensed Products.

**B.**    **Fanatics is a Dominant and Growing Online Retailer with Substantial Leverage Over the NFL Licensed Product Market**

61.    Fanatics was launched by Michael Rubin in 2011.    Today, Fanatics has relationships with over 1,080 product vendors.  Fanatics offers products through its Fanatics and FansEdge brands, as well as sports collectibles and memorabilia through Fanatics Authentic and SportsMemorabilia.com.    Fanatics currently operates the e-commerce websites of major professional sports leagues (MLB, NASCAR, NBA, NFL, NHL, PGA, MLS, and UFC), major media brands (CBS Sports, Fox Sports, and NBC Sports), and over 150 collegiate and professional team properties.  It operates over 300 online and offline stores, including, but not limited to, Fanatics.com, NFLShop.com, MLBShop.com, and Fansedge.com.

62.    In 2014, Fanatics began developing its "vertical commerce" or "v-commerce" business model, pursuant to which Fanatics aimed to produce, manufacture, supply, wholesale, distribute, and retail licensed merchandise, including NFL Licensed Products.

63.    In or about May 2017, the NFL invested approximately $95 million to acquire a minority equity stake in privately held Fanatics, a licensee that manufactures, supplies, wholesales, distributes, and retails NFL Licensed Products.  The NFLP receives a share of Fanatics' monopoly rents through licensing fees and increased royalty revenue, both in absolute dollars and as a percentage of sales.  Rubin explained it this way:

> They get a cut of everything we sell.  So the more we sell, the more money they/we make and I can tell you, the growth we've seen in both the NFL and MLB in this partnership has been, I think in a lot of ways better than anyone expected.[4]

---

[4]    *Michael Rubin Interview*, Forbes: Sports Money (Sep. 30, 2020), https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=15b496cf1147 (hereinafter "*Sports Money Interview*").

64.     In March 2022, the NFL invested an additional $320 million in Fanatics, which was part of Fanatics' latest funding round of $1.5 billion.[5]

65.     As a further benefit of these investments and because direct-to-consumer sales generate data about consumers, the NFL has been able to leverage the greater consumer traffic going to websites controlled by the NFL Defendants and Fanatics to gather data that would, as Michael Rubin puts it, "drive all aspects of their business."

66.     Since the NFL's initial investment in Fanatics, and at least in part due to NFLP's, Walmart's, and Amazon's conduct favoring Fanatics, Fanatics' valuation and market strength has ballooned.  Fanatics was valued at $6.2 billion in August 2020 after raising $350 million in a private funding round.  Fanatics raised $320 million in additional funding in May 2021, having giving it a valuation of $12.8 billion.  In August 2021, Fanatics secured an additional $325 million and was valued at $18 billion.[6]  Following the $1.5 billion funding round in March 2022, Fanatics was valued at over $27 billion.

67.     Fanatics has used its funding to expand upon its "vertical" commerce model whereby it operates at all levels of the market, acting as licensee, manufacturer, supplier, wholesaler, distributor, and retailer.  In December 2020, Fanatics purchased WinCraft, Inc. ("WinCraft"), a supplier to Plaintiff Casey's and licensee of NFL Licensed Hardgoods, including, but not limited to, flags, banners, wall art, pennants, decals, and lanyards.[7]  At the time of Fanatics' acquisition of WinCraft, it was estimated that WinCraft generated $100 million in annual revenue,

---

[5] These investments by the NFL Defendants into Fanatics are an added plus factor of collusion, in that there was motive to conspire.

[6]  https://www.cnbc.com/2021/08/10/fanatics-valued-at-18-billion-with-new-investors-including-jay-z-.html  (last visited October 7, 2021).

[7] https://www.sportspromedia.com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel (last visited June 14, 2021).

employed over 500 staff, and held client relationships with all of North America's professional sports major leagues and teams.[8]

68.    As explained by Steve Davis, President of Fanatics International, "Fanatics has already successfully implemented this 'v-commerce' model across North America, where the company has dramatically scaled up its design, manufacturing, and distribution capabilities whilst securing an enviable portfolio of valuable sports licensing rights." [9]

69.    Due in part to its various acquisitions, including WinCraft, Fanatics' sales from its global e-commerce operations were ~~recently~~ reported to have been up 30% year-over-year and reported about $4 billion in sales in 2021.[10]   Fanatics ~~is~~was projecting $6 billion in e-commerce sales for 2022.   Approximately one-third of Fanatics' sales are attributable to sales of NFL Licensed Products[11], 90% of which is transacted online.[12]   Thus, Fanatics' $1 billion in sales of NFL Licensed Products in 2020 accounted for approximately one-third of the entire market for NFL Licensed Products, which was estimated to have generated $3 billion in retail sales for that year.

70.    More generally since 2017, upon information and belief, Fanatics' share of selling NFL Licensed Products online has been over 50%.   Fanatics' market power has been recognized by industry observers.   For example, *Sportico* reported that Fanatics "has more or less cornered

---

[8]    *Id.*

[9]    https://www.sportspromedia.com/analysis/how-fanatics-is-taking-its-v-commerce-model-global (last visited June 15, 2021).

[10]    https://www.cnbc.com/2021/03/24/fanatics-valuation-doubles-to-12point8-billion-after-new-funding-round.html (last visited October 7, 2021).

[11]    https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=76bf987c1147 (last visited October 7, 2021).

[12]    *See*    https://www.cnbc.com/video/2020/08/14/fanaticss-michael-rubin-on-the-companys-6-point-2-billion-valuation-and-growth-despite-pandemic.html (last visited October 7, 2021).

the industry (in addition to the league itself, it has partnerships with 25 NFL clubs)."[13]   It has become a trope to call Fanatics the "Amazon of sports apparel," analogizing Fanatics' dominance of the market for licensed sports products to Amazon's dominance of online retail.[14]

71.    Fanatics' market share is sufficient by itself to infer market power in the relevant market.  And when combined with the NFL Defendants' additional market share, it can reasonably be inferred that Defendants control the vast majority of the relevant market for NFL Licensed Products.

72.    Defendants' market power gives them the ability to exclude competitors. Defendants demonstrated their actual market power by prohibiting licensees from selling to retailers and boycotting retailers from operating on TPOMs—for example, Amazon and Walmart—and thus competing with Defendants' own retail operations.  This power is especially noticeable because Defendants used it to restrain not only licensees' future sales but also the ultimate retail sale of NFL Licensed Products that licensees had already sold to distributors and retailers without these restrictions.  Defendants stunted the growth and effectuated the removal of scores of retailers' NFL Licensed Products from TPOMs, such as Amazon and Walmart.

### C.    Online Retail is a Market Separate and Distinct from Brick-and-Mortar Retail

73.    Online retail through TPOMs constitutes a market distinct from brick-and-mortar retail.  As Rubin recognizes, e-commerce is the "most efficient vehicle."[15]

---

[13] Eben Novy-Williams, *NFL, Amazon Are Bringing Thousands of New Products to Retail Giant*, Yahoo: Sportico (Mar. 24, 2021), https://www.yahoo.com/now/nfl-amazon-bringing-thousands-products-200037755.html.

[14] *See, e.g.*, Jon Wertheim, *Fulfilling Fanatic*, Sports Illustrated (Jan. 5, 2021), https://www.si.com/nba/2021/01/05/michael-rubin-fanatics-nba-owner; Kendall Baker, *Fanatics Is Dominating the Sports Apparel Market*, Axios (May 20, 2019), https://www.axios.com/fanatics-sports-apparel-retail-a924fe76-5f9a-4b49-9db3-88d0c6897958.html ("Fanatics is to sports apparel what Amazon is to, well, everything else.").

[15] *Fireside Chat with Michael Rubin: Disrupt SF 2018*, Tech Crunch (Sep. 7, 2018, 12:02 PM), https://techcrunch.com/video/fireside-chat-with-michael-rubin-fanatics-disrupt-sf-2018/.

74.     Because of the unique features of online retail through TPOMs, NFL Licensed Sports Products purchased from brick-and-mortar retailers are not an adequate substitute for NFL Licensed Sports Products purchased online through TPOMs.  These unique features include the following, without limitation:

a)      **Convenience**.  Online retail marketplaces give consumers the ability to purchase items and have those items shipped directly to their homes without needing to travel to a physical location; allow consumers to shop at any time rather than only when a physical store happens to be open; and enable consumers to avoid the inconvenience and potential safety hazards associated with crowds.[16]

b)      **Selection**.  Online retail marketplaces give consumers access to a larger volume and variety of inventory.  As Rubin explains, "[t]he advent of the internet allowed this incredible availability of inventory to serve every fan for whatever team they want, whatever player they want, whatever gender they want, whatever color they want."[17]

c)      **Geographically unlimited**.  Online retail marketplaces make it possible for consumers to purchase NFL Licensed Sports Products from geographically distant Teams, in addition to more local Teams and Teams with national followings.  As Rubin has publicly stated, online retail of NFL Licensed Sports Products has been successful in part because "we realized that there were so many fans that lived in different markets from the team that they were a fan of and they couldn't find that merchandise."[18]

d)      **Data Collection**.  Online retail marketplaces give retailers the ability to

---

[16] This benefit of online retail ~~has been~~was amplified during the COVID-19 pandemic.

[17] NBC Sports Phila., *Sixers Partner Michael Rubin: Barkann's Big Guest*, Youtube (Dec. 18, 2019), https://www.youtube.com/watch?v=IQRzlcywjO4.

[18] *The Rich Eisen Show*, YouTube, (Sep. 18, 2019), https://www.youtube.com/watch?v=mPVPBItYVd4.

collect more and higher quality data regarding consumer behavior, in order to more accurately anticipate fans' desires and have the correct product mix available.

e)    **Virtual Shelf Space**.  Online retail marketplaces allow sellers to offer a greater variety of merchandise without the expense of acquiring and maintaining the additional display space that would otherwise be needed at a physical retail location.

f)    **Agility**.  Online retail marketplaces help retailers make new products or products for which demand has unexpectedly increased available more quickly than is possible for brick-and-mortar stores.  For instance, if a player makes an impressive play in a nationally televised game, demand for products bearing that player's name often spikes; this demand can be more easily satisfied by retailers that do not have to acquire and display products in a brick-and-mortar store before they can sell them to satisfy the demand.

75.    For these and other reasons, there is an inelasticity of demand between products available for purchase online through TPOMs and those that could be purchased at brick-and-mortar stores or websites more generally.  Prices available at brick-and-mortar stores or websites more generally do not meaningfully constrain the prices charged by online retailers through TPOMs.

76.    Retailers within the online market through TPOMs for NFL Licensed Sports Products look to other online retailers when determining what prices or other features are necessary in order to compete.[19]

---

[19] For the sake of full clarity, this allegation means that retailers of NFL Licensed Sports Products on TPOMs look to other retailers on TPOMs when determining what prices and other features to offer: earlier in the sentence for this allegation, it reads "Retailers within the online market through TPOMs…[,]" and later in the same sentence, for brevity and lack of repetition, the language reads "other online retailers when determining …[,]" meaning to allege other online retailers on TPOMs.  This is so because when consumers consider retailers' NFL Licensed Sports Products on TPOMs, they often can view on the same digital display right next to those products other retailers' NFL Licensed Sports Products on TPOMs.  It makes sense that retailers consider those other TPOM retailers' offered prices and other features, because consumers can seamlessly view all of those TPOM retailers' offerings right on the same screen.  This seamless review on the same screen is substantially less prevalent between products

77.     Although online retail is typically considered to have lower barriers to entry than brick-and-mortar retail, the barriers are still significant and overlap with those facing brick-and-mortar retailers, including the following, without limitation:

a)     New retailers need to acquire NFL Licensed Sports Products to sell from the limited number of licensed manufacturers and their distributors;

b)     New retailers need to construct a website and then advertise through search engines and other means, in order to generate traffic;

c)     Established retailers' ability to take advantage of economies of scale; and

d)     Consumer preference for retailers with whom the consumers are already familiar.

78.     To lower these barriers to entry, many online retailers use TPOMS rather than more traditional e-commerce platforms.  A more traditional e-commerce platform is a separate website for a single individual retailer that allows purchases of that retailer's products (e.g., www.dicksportinggoods.com) and is analogous to a brick-and-mortar store that sells one retailer's inventory exclusively (e.g., a Dick's Sporting Goods store).

79.     A TPOM, by contrast, is analogous to a farmers' market where a single location

---

offered on TPOMs, versus those offered on separate individual retailers' websites or other websites outside of the TPOM.  This benefit of TPOMs to consumers of being able to seamlessly compare competitors' pricing and offers on similar products, along with the other benefits of TPOMs described herein of convenience, selection, geographical reach, agility, and payment-processing security, among other benefits, are why consumers also deem TPOMs to not be substituted by brick-and-mortar stores and individual websites.  Indeed, in the policies addressed herein, even the NFL Defendants and Fanatics treat TPOMs differently than brick-and-mortar and individual website retailing.  Moreover, despite that prices that Casey's paid to licensees to purchase NFL Licensed Sports Products have increased dramatically, resulting from the alleged anticompetitive practices in totality, Casey's could not switch to purchasing substitute products instead, because there are no substitute products to NFL Licensed Sports Products.  Casey's had to continue purchasing the NFL Licensed Sports Products and pay the supracompetitive prices, as they retail those products to consumers who purchase NFL Licensed Sports Products, because of fan loyalty.  Casey's business model is based, in part, on purchasing and retailing NFL Licensed Sports Products; they could not shift their business model and avoid purchasing and retailing NFL Licensed Sports Products in totality.  Indeed, Defendants and industry participants track data for NFL Licensed Sports Products and on TPOMs separate and apart from other products and avenues.  There are no purported substitutes to NFL Licensed Sports Products in terms of either reasonable interchangeability or cross-elasticity of demand.

hosts multiple independent sellers, who often offer the same or very similar products and compete on the basis of price or quality. In exchange for providing a platform for sales, a TPOM takes a commission from the third-party retailers' sales (and may charge other fees as well). Familiar TPOMs include the Amazon Marketplace and Walmart.com.

80.    Some websites, such as Amazon.com, include both traditional retail (where Amazon purchases products that it then resells to consumers) and a TPOM (where third parties sell products to consumers using Amazon's platform).

81.    TPOMs offer various advantages over individual retailer websites. They reduce transaction and start-up costs by allowing the seller to piggyback on the brand recognition and traffic of the marketplace site, thereby eliminating the need to design and drive traffic to a separate e-commerce platform. This advantage is particularly great for retailers that sell products that are identical or very similar to products sold by many other retailers.

82.    TPOMs also provide centralized payment processing for shoppers and third-party sellers, thereby providing shoppers with a sense of security when providing their financial information online and eliminating the need for third-party sellers to create and maintain a secure portal for internet purchases. On most TPOMs, a buyer may select items from one or many different sellers but combine all of the items into a single purchase on the TPOM platform.

83.    For an additional fee, some TPOMs, such as the Amazon Marketplace, allow third-party sellers to store their products at the TPOM's warehouses, from which the TPOM will ship the product to the customer. For a smaller retailer, this benefit further reduces start-up costs and allows the retailer to take advantage of the lower cost of fulfillment services made possible by the TPOM's economies of scale.

84.    Because these features increase access to customers and reduce transaction costs,

they are significant, particularly for smaller retailers and the companies that supply them.

85.    In effect, TPOMs reduce the cost of accessing the benefits of e-commerce, thereby making it easier for new retailers to enter the online retail market and smaller retailers to remain in that market.  As discussed herein, Defendants have conspired to protect their share of the online retail market by excluding competing distributors and retailers from all TPOMs, thereby substantially increasing the cost of participating in the online retail market through TPOMs for NFL Licensed Sports Products.

86.    These distinct functionalities, including, without limitation, perceptions of even Defendants, market participants, and analysts, and pricing and costs qualities demonstrate that brick-and-mortar and websites more generally are not reasonably interchangeable transacting methods for TPOMs.

87.    Defendants themselves, especially through the distinction in which they treat TPOMs in their policies and agreements (as further alleged herein)), as compared to other transacting methods, such as brick-and-mortar and websites more generally, recognize that TPOMs have distinct functionalities, perceptions by market participants and analysts, and pricing and costs qualities, further demonstrating that brick-and-mortar and websites more generally are not reasonably interchangeable transacting methods for TPOMs.[20]

### D.    Plaintiff and others have Been Excluded from Selling on Amazon's Platform and other TPOMs

---

[20] Even Fanatics Collectibles Topco, Inc. in its complaint in a recent lawsuit concerning the sports-trading-cards industry has touted the importance of online trading platforms.  *Fanatics Collectibles Topco, Inc. v. Panini S.p.A.*, No. 1:23-cv-06895-JHR (S.D.N.Y.), COMPLAINT, ECF 1, ¶¶35-37 (Aug. 7, 2023).  Fanatics' company alleged that its adversary ceded a multi-billion-dollar business by not participating in an industry "revolutionized by the advent of online trading platforms."  *Id.* at ¶35.  Fanatics alleged that these "platforms facilitate a global exchange of trading cards, bringing together buyers and sellers from around the world" and "make it possible to conduct transactions with ease and speed that were" once "unimaginable."  *Id.*  When it suits Fanatics, it faults its competitor for not participating on online trading platforms, claiming its adversary's "lack of a strong online presence and digital strategy has resulted in missed revenue and customer engagement opportunities."  *Id.* at ¶37.

88.     The trend in this market has been for all participants—licensees and non-licensee distributors and retailers (including, but not limited to, Plaintiff)—to sell NFL Licensed Products directly to consumers through TPOMs, the most important avenue being Amazon.  This has rendered these market participants as horizontally competing retailers on TPOMs, especially Amazon, for NFL Licensed Products.  In fact, Amazon's TPOM serves as a sole source of income for many competitors who sell NFL Licensed Products to consumers.  Amazon's TPOM is the most important platform for small businesses, such as Plaintiff, to participate in the online retail market for NFL Licensed Products sales, as it accounts for more than 40% of e-commerce.

89.     In 2015, the NFLP announced that it was implementing an Online Distribution Policy ("ODP"), which was kept confidential at points during the Class Period, restricting NFL Licensed Product sales on TPOMs, such as Amazon.com, by purportedly requiring licensees to arrange that any retailer on TPOMs first be approved by NFLP, in order to ensure that such retailers "maintain control over, and responsibility for, their e-commerce transactional environment." However, the ODP as written did not prohibit licensees and non-licensees from selling directly to Amazon.  In other words, the ODP as written allowed licensees and non-licensees to sell products directly to Amazon, but it prohibited licensees from selling to distributors or retailers that intended to sell on Amazon (or other TPOMs) without receiving prior authorization to do so from the NFL.

90.     Fanatics has been inexplicably excluded from the purported ODP; it has been allowed to sell on TPOMs without any restriction, such as on Walmart.com and Amazon, in direct violation of the very policies that the NFL has been trying to enforce with licensees.

91.     Moreover, NFL at its discretion has been able to revise the ODP throughout the years.

92.     Plaintiff initially experienced little to no enforcement of the NFLP's ODP.

Meanwhile, Amazon was in the process of becoming the most important retail outlet for Plaintiff to reach consumers of NFL Licensed Products. Indeed, licensees sold NFL Licensed Products to Plaintiff without referencing the ODP.

93.    It is a legitimate practice for non-licensee companies, such as Plaintiff, to purchase NFL Licensed Products from licensees and distribute those products to retailers or retail the products themselves. The NFL's policies as written do not restrict the retailing of NFL Licensed Products to licensees. But in practice, the NFL Defendants, Fanatics, and colluding licensees are effectuating a system that in fact limits online retailers.

94.    What made this practice even more egregious was the context and sequencing of when the ODP was raised and collusively enforced. Plaintiff and similarly situated companies legitimately bought NFL Licensed Products from licensees, without a mention at the time of the transactions of (i) the ODP, and (ii) limitations on the lawful purchasers being able to retail the NFL Licensed Products to or on TPOMs. Plaintiff and similarly situated companies were not parties to the ODP.

95.    Only after the legitimate purchases of these products from licensees did the Defendants and licensees use the ODP as a weapon to disable Plaintiff and similarly situated companies from legitimately retailing NFL Licensed Products to or on TPOMs.

96.    Only in the year leading up to the mid-2017 NFL equity investment of approximately $95 million into privately-held Fanatics did enforcement of the ODP begin in earnest, with enforcement efforts carried out by licensees pressuring Plaintiff and the Class to remove NFL Licensed Products from TPOMs or risk having their supply cut off.[21]

97.    Fanatics recognized the problem that robust competition on Amazon posed to it. It

---

[21] As alleged in *infra* ¶104, Casey's own damages started to accrue in 2019.

is in their role as retailers that Fanatics and the NFL Defendants are in competition with retailers that sell on TPOMs. But therein lies the problem for Defendants—the presence of rivals selling the same or similar NFL Licensed Products on TPOMs. According to Rubin, if everyone else is selling what you're selling on a TPOM, "it is going to get commoditized by Amazon and Alibaba."[22] And as Rubin put it, if NFL Licensed Products were commonly available on Amazon, "there'd be no reason for [Fanatics] to be."[23] In another interview, Rubin put an even finer point on it: "If your strategy is just to win on price [selling on a TPOM], you're eventually going to die."[24]

98.    Faced with the challenge of increased competition and recognizing the benefits of collusion, Defendants conspired to allocate the market for NFL Licensed Products on Amazon and other TPOMs. Defendants unlawfully leveraged their market power over licensees to force those licensees to boycott smaller retailers who sold NFL Licensed Products on or through TPOMs.

99.    Defendants employed a carrot-and-stick approach to enlist licensees' cooperation. Defendants first threatened licensees with the loss of both their licenses to produce NFL Licensed Sports Products and the loss of Fanatics' business if they did not comply. Then, as the carrot, Fanatics promised that it would increase its purchases from those licensees who played ball, in order to make up for the now-forbidden sales to smaller retailers. And, in at least one case, Fanatics outright purchased the business of a large cooperating licensee and then used that entity to further enforce the scheme.

---

[22] *Kynetic CEO: Here's How a $12 Billion Company Competes Against Amazon*, CNBC: Squawk Box (Nov. 27, 2017), https://www.cnbc.com/video/2017/11/27/kynetic-ceo-heres-how-a-2-billion-company-competes-against-amazon.html.

[23] *Fireside Chat with Michael Rubin: Disrupt SF 2018*, *supra*.

[24] Recode, *Full Interview, Adam Silver, NBA Commissioner and Michael Rubin, Exec Chairman of Fanatics*, Youtube (Sep. 13, 2017), https://www.youtube.com/watch?v=TQx65nkEDPI.

100.    The licensees indeed responded to the requests from the NFL—and even by Fanatics, a horizontally competing licensee—by enforcing the ODP to exclude retailers of NFL Licensed Products on TPOMs.  Indeed, each individual licensee's enforcement of the ODP to prevent their clients—the non-licensee distributors and retailers like Plaintiff—from retailing on TPOMs would have been economically disadvantageous to them because they would have lost sales and market share to horizontally competing licensees who would sell to those same clients. But this economic disadvantage was mooted because the licensees had an understanding that other licensees would also enforce the ODP to boycott non-licensee distributors and retailers from selling NFL Licensed Products to or on TPOMs, and thus no individual licensee would have to worry about its former clients being poached by other licensees.  A former NFL licensee of hard goods and a supplier of Casey's has stated that in late February 2021, it was contacted by the NFLP and was told that the NFLP would not renew its license because the NFLP said that it was partnering with Fanatics and that Fanatics would fill the NFLP's hardgoods needs.  The former licensee also said that it had an understanding that other licensees were going to enforce the NFLP's ODP against non-licensee companies that ultimately retailed on TPOMs.  Licensees would receive letters from the NFLP saying that the licensed products they produced were being sold on TPOMs by non-licensees.

101.    Licensees that enforced the ODP—without an understanding or assurances from the Defendants that other licensees would enforce the ODP—would be put at a competitive disadvantage because they would lose sales and market share to licensees who did not enforce the ODP.  The licensees who did not enforce the ODP would continue selling to non-licensed purchasers who sold NFL Licensed Products on TPOMs, especially Amazon.  This dynamic demonstrates why it was important for the Defendants to create a collusive system where licensees

understood that other licensees were also agreeing to enforce the ODP.

102.    The licensees indeed responded to requests from the NFL—and even from a horizontally competing licensee, Fanatics—by enforcing the ODP to exclude retailers of NFL Licensed Products on TPOMs, especially Amazon.

103.    The ODP explicitly carved out Fanatics and related websites that Fanatics controls, specifying them as approved to sell the restricted NFL Licensed Products, including the following websites:

     a.     NFLShop.com

     b.     NFL Member Club stores on the Member Club's official website

     c.     NFLPA.com

     d.     Fanatics.com

     e.     Fansedge.com

     f.     Profootballhof.com

     g.     Nike.com

     h.     NewEraCap.com

In addition to the inclusion of fanatics.com on this exclusive list, Fanatics "powers" or operates NFLShop.com and fansedge.com, has struck various exclusive licensing deals with Nike, and powers the websites of a majority (but not all) of the NFL Teams (i.e., NFL "Member Club" official websites).

104.    In line with this expansion of ODP-enforcement efforts during the period leading up to, and following, the NFL's investment in Fanatics, and as the NFL's investment grew, Casey's experienced the following:

     a.     In 2017, Plaintiff began selling on Walmart.com where sales steadily grew

until 2019 when, inexplicably, all or nearly all of Plaintiff's products were removed from the website—action taken around the same time when Fanatics announced its partnership with Walmart.com.  In January 2019, Fanatics agreed with Walmart.com to be the exclusive seller of NFL products, and all of the other sellers' (including Casey's) products previously listed by sellers were inexplicably removed from Walmart.com.

b.    In a letter dated May 20, 2019, from Duck House to Casey's, Duck House demanded that Casey's remove NFL Licensed Products from TPOM pursuant to the NFLP's purported policies.

c.    In an email on August 1, 2020, Casey's supplier and licensee ForeverCollectibles, LLC, d/b/a FOCO ("FOCO") demanded Casey's remove NFL Licensed Products from Amazon, even though FOCO itself sold NFL Licensed Products on Amazon.

d.    In an email on August 5, 2020, to Casey's from Little Earth on the NFL's behalf, Little Earth asked for lists of confidential information about Casey's transactions and customers.

e.    During an October 8, 2020, call from Casey's supplier and wholesaler/licensee, WinCraft, ***WinCraft said that it was acting on Fanatics' behalf*** and demanded that Casey's remove products from Amazon that Casey's lawfully bought from WinCraft.  This took place before Fanatics' acquisition of WinCraft.  And at that time, WinCraft and Fanatics were supposedly horizontal competitors.

f.    During a call on January 25, 2021, after Fanatics' acquisition of WinCraft

in December 2020, a high-level representative at WinCraft told Casey's that (i) Fanatics is forcing WinCraft to impose the TPOM policy, (ii) he knew that TPOMs are the industry's future, (iii) he knew that enforcing the TPOM policy would drive Casey's out of business, but (iv) Casey's must nonetheless reduce its listings on Amazon. ***According to the high-level representative at WinCraft, Fanatics wanted to dominate the industry at all costs by putting pressure on WinCraft to eliminate Fanatics' horizontal competitors.*** He also sent Casey's a TPOM compliance tracker of several companies showing how other company's sales of WinCraft products on TPOM had been reduced. This call marked a significant change in the relationship between Casey's and WinCraft, as Casey's had received WinCraft's "Distributor of the Year" award for two consecutive years prior to this demand. Indeed, in an email on January 26, 2021, the high-level representative at WinCraft stated: "Thanks for your time yesterday and great accomplishments in 2020. Your company has been a great customer of WinCraft for many years. We appreciate your business."

g.    In an email in February 2021, Casey's supplier and licensee Siskiyou Sports demanded Casey's remove NFL Licensed Products from Amazon because of the ODP.

105.    In emails exchanged during February and March 2021, a second high-level representative at WinCraft demanded that Casey's remove all WinCraft products from Amazon, including those listed by one of Casey's customers. The high-level representative at WinCraft additionally threatened to withhold shipments if the demand was not met. These demands were

made due to Casey's customers' sales of NFL Licensed Products on TPOM.  In particular, the high-level representative at WinCraft emailed Casey's Kelly Vande Mheen on March 16, 2021, demanding that Casey's take down from Amazon all products that WinCraft sold to Casey's.

106.    On or about March 18, 2021, the NFL and Amazon announced an agreement where the NFL granted the "all-digital" rights associated with "Thursday Night Football" to Amazon, originally scheduled to begin with the 2023 season, but which was subsequently moved up to commence with the 2022 season.[25]

107.    On March 24, 2021, Amazon notified Casey's that it must become an NFL-authorized seller to continue selling NFL Licensed Products on Amazon due to a "new agreement with the NFL."  Casey's was provided until May 23, 2021, to remove all items that would be in violation of the new policy.  Soon after, NFLP imposed and implemented new restrictions on which entities could sell NFL Licensed Products on Amazon's TPOM, as manifested in the NFLP's Approved Marketplace Retailer Application ("AMRA").[26]  The AMRA provides in part:

> NFLP will authorize its Licensees to sell their NFL licensed products to a limited number of approved quality retailers that will sell those NFL licensed products under an Amazon URL through the Amazon Marketplace (the "Approved Marketplace Retailers") through the 2021 NFL season and in accordance with all applicable NFL policies.

Under this NFLP policy (sometimes referred to herein as the "TPOM Policy"), licensees are not allowed to sell NFL Licensed Products to retailers that intend to sell those products on the Amazon

---

[25]    *See*    https://nflcommunications.com/Pages/NFL-COMPLETES-LONG-TERM-MEDIA-DISTRIBUTION-AGREEMENTS-PROVIDING-FANS-GREATER-ACCESS-TO-NFL-GAMES-THAN-EVER-BEFORE.aspx  (last visited August 23, 2021).  In May of 2021, the parties agreed to accelerate the timing to begin Amazon's distribution of *Thursday Night Football* "across hundreds of compatible digital devices," beginning with the 2022 season.  *See* https://nflcommunications.com/Pages/AMAZON-PRIME-VIDEO-TO-BECOME-THE-EXCLUSIVE-HOME-OF-THURSDAY-NIGHT-FOOTBALL-BEGINNING-WITH-THE-2022-SEASON.aspx (last visited August 23, 2021).

[26] This application has not been reopened meaningfully and in good faith, and the anticompetitive results from Defendants' alleged actions in violation of federal antitrust laws persist to the date of the filing of this Second Amended Class Action Complaint.

Marketplace, unless expressly granted permission to do so by the NFLP and at the NFLP's "sole discretion" as the Approved Marketplace Retailer Application states.[27]

108.    Although the NFLP is not obligated in any way to approve applicants, the terms of NFLP's AMRA require that applicants broadly release their rights in exchange for (merely) the opportunity to be considered as an "Approved Marketplace Retailer."  Specifically, the AMRA provided:

> Company hereby irrevocably releases NFLP, NFL Ventures, L.P. and its direct and indirect subsidiaries, the National Football League and its member professional football clubs ("Member Clubs"), and each of their respective affiliates, officers, directors, agents, subsidiaries, shareholders, representatives and employees (collectively, the "NFL Entities") from any claims whatsoever arising out of, or related to, this Application, the Application process, and/or any decision to approve or disapprove Company as an Approved Marketplace Retailer.

109.    Plaintiff did not release its rights in exchange for the mere possibility of becoming an "Approved Marketplace Retailer" and so are not "Approved Marketplace Retailers."[28]

110.    The day after Amazon notified Casey's that it would no longer be allowed to continue selling NFL Licensed Products, unless it became an "Approved Marketplace Retailer," on March 25, 2021, news articles reported that NFLP and Amazon had entered into an agreement where the NFL would begin selling NFL Licensed Products on Amazon with Fanatics operating the NFL's Amazon "storefront" (herein referred to as the "Merchandise Agreement").  The publication *Promo Marketing* reported that "Fanatics, which operates the NFL's online store, created an NFL Shop 'storefront' on the Amazon platform, which marks the first time Fanatics will sell its products on Amazon."[29]

---

[27] The window within which to apply to become an "Approved Marketplace Retailer" closed on April 14, 2021, the web portal to which was located at https://marketplace.nfl.net/.

[28] Casey's has recently learned, as further discussed herein, that even those approved to engage in Amazon TPOM sales have had their NFL Licensed Product supplies limited or placed at risk due to agreements entered into between one or more licensees and Defendant Fanatics.

[29] *See* https://magazine.promomarketing.com/article/amazon-will-start-selling-licensed-nfl-merchandise-via-fanatics/

111.    The Merchandise Agreement is believed to permit the NFLP to limit the number of NFL Licensed Products retailers are or were allowed to sell on the Amazon marketplace.

112.    The NFLP-Amazon Merchandise Agreement has been described as "a move that could transform the multibillion-dollar market for fan gear" ***because it opened Amazon's platform up to Fanatics—a former competitor of Amazon's in the e-commerce retail market of licensed sporting goods, including NFL Licensed Products.***[30]  To be sure, the Merchandise Agreement is a convergence of the world's richest sports league (the NFL), the world's largest retailer (Amazon), and the world's largest seller of licensed fan gear (Fanatics).  Fanatics appears to have a critical role within the Merchandise Agreement insofar as Fanatics now operates the NFL's online store and now operates the NFL Shop "storefront" on Amazon's website, its first time selling on Amazon's platform.

113.    Commenting on both the streaming rights deal and the NFL's decision to sell licensed products on Amazon, *Sportico* observed on March 24, 2021, that "[l]ast week Amazon signed a new streaming deal with the NFL worth $1.32 billion per year.  Though these two deals are separate, they are strategically aligned."[31]  *Engadget* reported on March 25, 2021, that "Amazon is partnering with the NFL to plug a gap in its online store by making the vast majority of the league's fan gear available to purchase."[32]  *Engadget* then observed that "[i]t's hard to ignore the timing of the tie-up, which arrives on the heels of Amazon's exclusive grab of *Thursday Night*

---

(last visited August 23, 2021).  *See also* https://sgbonline.com/fanatics-nfl-launching-amazon-storefront/ (last visited August 23, 2021).

[30] https://www.sportico.com/leagues/football/2021/amazon-nfl-shop-1234625615/ (last visited August 24, 2021).

[31] *See* https://www.sportico.com/leagues/football/2021/amazon-nfl-shop-1234625615/ (last visited August 23, 2021).

[32]  *See*  https://www.engadget.com/amazon-official-nfl-merch-thursday-night-football-124004019.html  (last  visited August 23, 2021).

*Football* rights for its Prime Video service."[33]  The sports reporting and business consultancy, *Sportcal*, reported on March 25, 2021, that the NFL-Amazon "deal also incorporates Fanatics, the US online sportswear and merchandise retailer which has a long-term deal with the NFL."[34] Similarly, *Sports Pro Media* reported on March 25, 2021, Fanatics' perspective on its involvement with the NFL-Amazon merchandise-related agreement:  "a Fanatics spokesperson said:  'As part of the National Football League and Amazon's collaboration to expand the assortment of officially licensed NFL products, Fanatics will be opening an NFL storefront on Amazon in the near future and, along with other authorized sellers, is now enhancing the fan shopping experience through an increased selection of officially licensed NFL products.'"[35]

114.    Soon after Amazon informed Plaintiff that it would need to become an "Approved Marketplace Retailer" in order to continue selling on Amazon's TPOM and after the reporting of the Merchandise Agreement, the following took place:

a.    On May 20, 2021, a representative of Casey's reached out to a representative of Logo Brands indicating that Casey's had previously received an email from Logo Brands requesting that Casey's "take all products off of Amazon because of . . . 'contractual agreements,'" and asking Logo Brands to "shed some light of who these agreements are with." In response, on May 24, 2021, wholesaler/supplier Logo Brands sent an email to Casey's demanding that Casey's remove products it had listed on Amazon due to a "new" "contractual agreement" ***Logo Brands "just signed***

---

[33] *Id.*

[34] *See* https://www.sportcal.com/News/FeaturedNews/136088 (last visited August 23, 2021).

[35] *See*  https://www.sportspromedia.com/news/nfl-amazon-merchandise-ecommerce-streaming-rights  (last  visited August 26, 2021).

*with Fanatics* which prevents 3rd part[ies] from selling Logo Brands products on Amazon."

b.  On May 24, 2021, Casey's inventory began being removed from Amazon's TPOM, with the removal of over 3,460 of Casey's items listed for sale between May 24, 2021, and June 2, 2021.

c.  On May 24, 2021, one of Casey's customers, and a TPOM retailer, contacted Casey's after being removed from Amazon due to a lack of "authorization" to sell the products.

d.  On June 3, 2021, Casey's received a demand from the supplier and licensee Logo Brands for Casey's to remove all of its listings on Amazon *due to an "agreement" signed between Logo Brands and Fanatics*. The agreement that Logo Brands made with Fanatics apparently directed Logo Brands, which also owns Boelter Brands,[36] not to sell products on Amazon or allow any of their customers to sell on Amazon. A high–ranking official at Logo Brands told Casey's Vande Mheen that the official had told the owners of Logo Brands a statement to the effect of "*do you realize that we are making a deal with the devil?*" (Emphasis added.)

e.  On June 18, 2021, a high–ranking representative at WinCraft emailed Casey's to inform them that another customer of Casey's was not allowed to purchase NFL Licensed Products, despite its status as an "Approved Marketplace Retailer" purportedly allowed to sell on Amazon. Specifically, the high–ranking representative at WinCraft wrote: "We have confirmed

---

[36] Boelter Brands has been a retailer of league licensed products.

35

although Casey's customer has authorization from the NFL to sell on Amazon, we (WinCraft) are not to sell any NFL merchandise to them unless authorized and it aligns with our strategy."[37]   That same day, Casey's received a telephone call from the high-level representative at WinCraft, confirming that WinCraft would not sell to this customer, even though the customer was an Approved Marketplace Retailer.

f.     On or around June 24, 2021, at the 2021 College Baseball World Series in Omaha, Nebraska, Casey's Mr. Vande Mheen met with a high-level representative of WinCraft. ***The high-level representative at WinCraft told Mr. Vande Mheen that even if Casey's applied and was accepted as an Approved Marketplace Retailer of NFL-licensed products, WinCraft would still not sell any such products to Casey's, because Fanatics would have deemed that to have been against its business goals.***

g.     On September 21, 2021, that same customer—an Approved Marketplace Retailer of NFL-licensed products—received an email from a sales representative of Logo Brands (that had acquired Boelter Drinkware in 2021), stating that the NFL notified Logo Brands that this customer of Casey's was selling NFL Licensed Products (Boelter Drinkware products) on Amazon and must remove them from Amazon's TPOM, despite the fact that Casey's customer was purportedly approved by the NFL to sell on

---

[37] In addition to Casey's customer, the high level representative at WinCraft informed Casey's Mr. Vande Mheen that she knew of only two accounts that were approved to sell NFL Licensed Products on Amazon: (1) State Street (dba College Flags and Banners), which is an entity owned by WinCraft (which, in turn, was purchased by Fanatics in December 2020), and (2) Team Effort, which is an entity owned by WinCraft (which, in turn, was purchased by Fanatics in December 2020).

Amazon.

h.   Then, on September 22, 2021, that same customer emailed a representative of Casey's, informing the Casey's representative that it had received an email from Logo Brands asking it to stop selling items on Amazon. Based on this request, this customer asked Casey's "to cancel the PO that I have placed with" Casey's.

i.   On September 23, 2021, Casey's Vande Mheen emailed a high–ranking representative of Logo Brands to inquire about this demand, as Casey's customer was apparently an Approved Marketplace Retailer. Later that day, the high-ranking representative of Logo Brands replied that he would consider this and assumed that Mr. Vande Mheen was referring to that specific Casey's customer (which reflects how few Approved Marketplace Retailers there are). Then, on September 24, 2021, the high-ranking representative of Logo Brands emailed Casey's Vande Mheen, stating: "We are not allowed any 3rd parties (except Fanatics) to ship NFL products to Amazon. This has nothing to do with [Casey's customer's] agreement with the NFL. The Logo Brands agreement with Fanatics is why he can't sell this. Please don't sell this guy anymore NFL products for him to sell Amazon." This reflects that horizontally competing licensees, Fanatics and Logo Brands, have entered into an agreement to boycott retailers that compete with Fanatics and Logo Brands.

j.   Around September 27, 2021, a Logo Brands high-ranking executive had a call with Casey's Vande Mheen. This high-ranking executive said that he

gets a call from a vice president at Fanatics, which competes horizontally with Logo Brands as a licensee, once every few weeks. The Fanatics vice president advised the Logo Brands high-ranking executive about which companies were selling on Amazon.com, which was against the agreement that Fanatics made with Logo Brands; according to the Logo Brands' high-ranking executive, no one was allowed to sell on or even to Amazon.com. Casey's Vande Mheen asked what would have occurred if Casey's applied and was granted permission under the AMRA to have been an "Approved Marketplace Retailer." The Logo Brands high-ranking executive stated that it would not have mattered because of Logo Brands' agreement with Fanatics, which are both horizontally competing licensees, under which Casey's would not have been able to sell its products on or even to Amazon.com—it is noteworthy that even under the ODP language, Casey's would have been permitted to sell products to Amazon.com. Casey's Vande Mheen asked the Logo Brands high-ranking executive about the legality of the agreement between Logo Brands and Fanatics. In essence, the Logo Brands high-ranking executive stated that the agreement was known to have been problematic but that people realized how much wealth Fanatics and Rubin had, and thus nobody wanted to contest them.

k.   On September 29, 2021, as described in an email to Casey's Vande Mheen, this same customer spoke to a representative of Logo Brands and confirmed that Logo Brands has an exclusive deal with an Amazon approved seller and that Logo Brands requested that this Casey's customer "stock-down on"

items then listed on Amazon's TPOM.

l.    Starting on November 5, 2021, a high-ranking executive at WinCraft emailed Casey's Vande Mheen, showing data that WinCraft has been monitoring the listings on Amazon.com by an "Approved Marketplace Retailer" under the AMRA, and demanding that Casey's Vande Mheen force the "Approved Marketplace Retailer" to take down the products from Amazon.com.  Casey's Vande Mheen emailed a response that day, noting that its client was indeed an "Approved Marketplace Retailer" on Amazon.com under the AMRA and that Casey's reaching out to its client would put a strain on Casey's business relationship with the client.  And Casey's Vande Mheen asked WinCraft's high-ranking executive if WinCraft could forward a written policy that supported WinCraft's demand. On November 7, 2021, WinCraft's high-ranking executive responded to Casey's Vande Mheen's email, stating the following, in part: "I understand the challenge and will always provide support within our policies.  At this time I don't have a specific document to [send the company] I am sure you understand why 3rd party selling would be important."  Throughout the rest of November 2021, the WinCraft high-ranking executive had been continuing to reach out to Casey's to demand reporting and compliance.

115.    In addition to the allegations above concerning correspondence demonstrating collusion among horizontal competitors in the licensee and online retail segments, ***Casey's has been shown a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics***

***and its colluding licensees in selling products on or to TPOMs, including, without limitation,***

***Amazon.*** And licensees during phone calls to Casey's had stated that in enforcing the purported NFL policies, licensees were acting at the direction of their horizontally competing licensee and retailer, Fanatics. The alleged anticompetitive scheme has also resulted in consolidation and a decrease in the number of licensees willing to sell NFL Licensed Products to Casey's and the Class members, which has resulted in lower supply and Casey's and the Class members paying increased prices to purchase NFL Licensed Products from licensees, but for the alleged anticompetitive scheme.

116. Defendants established and operated a mechanism to police and enforce the conspiracy through compliance trackers of the number of products and sellers who had been removed and/or boycotted from selling NFL Licensed Sports Products on TPOMs. Those trackers were shared between Defendants, in an effort to enforce the conspiracy with maximum efficiency. Fanatics is the key driver and enforcer of the conspiracy, using high-pressure, strong-arm tactics to encourage licensees to help eliminate Fanatics' competitors from TPOMs. Fanatics and its agents created reports that it sent to licensees showing the names of sellers and products offered for sale on TPOMs and threatened the licensees with consequences, if the reports did not show progress in lowering the number of competing retailers and products offerings.[38]

117. Plaintiff's purchasing and sales data demonstrate firsthand the importance of selling through TPOMs, especially Amazon, and show the damaging impact of the collusive enforcement

---

[38] Such conduct is inconsistent with each Defendant's independent self-interest by, among other things, revealing to each other proprietary technological information and sensitive internal commercial information, including, without limitation, data on consumer preferences. Such information is among a company's most valuable assets. In a truly competitive environment, protecting those essential resources is critical to maintaining a company's competitive edge. In the absence of agreement, each Defendant would have kept its proprietary information secretive and used it to innovate and attract consumers to its own products. The fact that Defendants did not do so further supports the existence of a conspiracy.

of the ODP and TPOM Policy, the boycotts, and the other alleged anticompetitive agreements and actions in violation of Sherman Act Section 1 and Clayton Act Section 3, and the monopolization, attempt to monopolize, and conspiracy to monopolizatione in violation of Sherman Act Section 2.

118.    For example, although Casey's Amazon TPOM sales of NFL Licensed Products increased for years, almost tripling from 2016 to 2020, they dropped precipitously upon increased enforcement by the NFLP and Fanatics.  Along with the March 2021 announcement of the *Thursday Night Football* "Streaming Rights Deal," the reporting of the "Merchandise Agreement," and the subsequent step-up in the enforcement of the TPOM Policy through Fanatics' influence and control over others, as of September 30, 2021, Casey's Amazon TPOM sales of NFL Licensed Products suddenly plummeted.  As all of Casey's NFL Licensed Products were de-listed by Amazon by September 30, 2021, Casey's has sold few, if any, NFL Licensed Products through Amazon's TPOM since that date.[39]  As a result of the Merchandise Agreement, Fanatics has effectively commandeered the e-commerce market for NFL Licensed Products to and for itself, while e-commerce retailers such as Casey's and the Class are excluded from their previously held positions as competitors in the NFL Licensed Products market on Amazon's platform. Defendants' alleged anticompetitive schemes in totality effectuated removal of scores of NFL Licensed Products from TPOMs that has caused dramatic decreases in revenue for Casey's and the Class members, increases in costs paid to remove MLBNFL License Products and handle logistics of such removal, and the evisceration of the assets, investments, costs, and overall marketing devoted by Casey's and the Class members to have established their presence,

---

[39] Exacerbating Plaintiff's injury, the timing of the de-listing has resulted in denying Casey's the benefit of sales made during the important fourth quarter of 2021, which includes both holiday-related sales and the heart of the 2021-2022 NFL regular season.  *See* https://nflcommunications.com/Pages/NFL-Season-To-Feature-17-Regular-Season-Games-Per-Team.aspx (last visited October 6, 2021) (indicating that the regular season extends from September 9, 2021, to January 9, 2022).

especially to consumers, on TPOMs to have retailed NFL Licensed Products. Indeed, the overall marketing, brand image, and business viability of Casey's and the Class members has been crucially threatened; retailing NFL Licensed Products on TPOMs is mission critical for these companies.

119. Defendants have unlawfully reaped financial rewards at the expense of such financial loss by Casey's and the Class Members.

120. On December 14, 2021, a high-ranking executive at WinCraft sent Casey's a detailed tracker of the Casey's transacting data in league-licensed products, including, without limitation, those from the MLB and NFL. Casey's purchases from WinCraft for all leagues was down 33% year-to-date at that time from the prior year. They also projected a further erosion in 2022.

121. Moreover, the anticompetitive agreements and other types of anticompetitive actions alleged herein—the boycott, agreements in violation of Section 1, and monopolization, attempted monopolization, and conspiracy to monopolize in violation of Section 2—have caused Casey's and the Class, for example, monetary damages in the form of them having had to pay significantly elevated prices to purchase NFL Licensed Products from licensees. Defendants' scheme has resulted in fewer NFL Licensed Products licensees offering to sell fewer NFL Licensed Products to Casey's and the Class (for example, as a result of having to sell all products to Fanatics, the NFL, and the Teams, and follow Defendants' demands to enforce the boycott from TPOMs), which have resulted in damages through higher prices for NFL Licensed Products that are imposed on Casey's and the Class. For example, the prices of NFL Licensed Products that Casey's was offered and paid to licensees in 2022, compared to corresponding periods in 2021 from licensees, were higher on average to the tune of 25%, 42%, 47%, and 50%, with an exemplar range from

13% to even 71% price increases. Casey's has experienced price increases by licensees that support the allegations that Casey's and the Class would have paid less for NFL Licensed Products, but for the anticompetitive agreements and other types of anticompetitive actions alleged herein—the boycott, agreements in violation of Section 1, and monopolization, attempted monopolization, and conspiracy to monopolize in violation of Section 2.

122.    Casey's and the Class also purchased products from licensees at values that were elevated because when purchasing those products, no privity existed with the policies that purportedly forbade selling those products to or on TPOMs, rendering those products less alienable and thus less valuable when Defendants and licensees later enforced those policies in collusive fashion to have Casey's and the Class take down those products from TPOMs.

**E.    The NFLP's Policy Prohibiting Retailers from Selling NFL Licensed Products on TPOMs Together with the Merchandise Agreement Violate the Antitrust Laws and Harm Competition**

123.    Through both its ODP and its AMRA, the NFLP restricts which entities are permitted to sell on TPOMs, thus reducing the number of entities on TPOMs that compete in the market for retail sales of NFL Licensed Products. It is important to emphasize that both the AMRA and the ODP are designed to allow the NFLP to reach downwards to attempt to restrict the conduct of retailers – including those that lack privity with the NFLP. As the AMRA indicates:

> NFL Properties LLC ("NFLP") obligates its consumer products licensees ("Licensees") to ensure the retailers that sell such Licensee's NFL licensed products via e-commerce maintain control over, and responsibility for, the e-commerce transactional environment, and refrain from selling their NFL licensed products under a third-party URL, without the prior written approval of NFLP.

In other words, through the AMRA, the NFLP leverages its license-renewal and other powers over its licensees in order to have its licensees affect control over those "retailers" to which its licensees sell and with which the NFLP has no direct contractual relationship. Through this power to reach

43

downwards through its licensees to control those with which it has no direct relationship, the NFLP

regulates and restricts who can sell NFL Licensed Products on TPOMs.

124.    The AMRA states that even if approved, each "Approved Marketplace Retailer will

be required to enter into a separate agreement with NFLP setting forth the terms and conditions

pursuant to which NFLP will continue to designate such retailer as an Approved Marketplace

Retailer."

125.    Similarly, the ODP obligates the NFLP's licensees to restrict the conduct of

downstream retailers with which the NFLP lacks privity: "This Online Distribution Policy applies

to all retailers of Licensed Products, and it is the express obligation of all licensees to ensure that

its retailers comply with the terms of the policy."  Under an implied threat of non-renewal and

other powers over licensees, the NFLP uses the ODP to have its licensees regulate and restrict the

conduct of downstream retailers on the NFLP's behalf.  In its "Website Branding" section, the

ODP further requires that:

> Licensees shall ensure that, without prior approval of NFLP, any retailer approved
> by NFLP to sell such Licensee's Gameday Product/Practicewear Apparel online (i)
> shall only sell such products via an e-commerce website that (a) is owned by such
> retailer, (b) is not co-branded with any third-party, and (c) displays primary and
> secondary branding consistent with the e-commerce website URL, and (ii) shall not
> offer such products for sale via the website portal of a third party that is not
> otherwise authorized by NFLP to sell Gameday Product/Practicewear Apparel.

Under "Control of Transaction Experience," the ODP also requires:

> All Licensees (including Licensees of apparel, headwear and hardlines products)
> shall ensure that retailers that sell such Licensee's Licensed Products via their e-
> commerce site(s) . . . maintain control over, and responsibility for, their e-
> commerce transactional environment.  Such retailers are not authorized to sell
> Licensed Products under a third-party URL, including the URL of any third party
> Internet marketplace site (e.g., buy.com, ebay.com, amazon.com), without the prior
> written approval of NFLP.

With respect to ODP enforcement, the NFLP requires:

> Licensees who become aware that retailers are selling their Licensed Products in a

manner prohibited by this Online Distribution Policy shall immediately advise their NFL licensing manager of such activity.

Also:

NFLP reserves the right to cause all Licensees to immediately cease shipments of Licensed Products to any retailers that sell Licensed Products in a manner prohibited by this Online Distribution Policy, and all Licensees shall comply with any such prohibition.

Specifying its power over Licensees, the ODP further indicates that:

NFLP reserves the right to amend this Online Distribution Policy in any manner and at any time. This includes prohibiting any Licensee from selling Licensed Products to any e-commerce retailer if NFLP determines that allowing sales by such e-commerce retailer would be detrimental to the NFL brand image (i.e., if the e-commerce site is selling Licensed Products in a manner that reflects poorly upon the NFL brand).

Further, under the ODP, approved marketplace retailers could not bid on search terms that were NFL marks, whether it be on general Internet search engines or other forms of targeted advertising.

126.    Defendants' alleged anticompetitive schemes in totality effectuated removal of scores of NFL Licensed Products from TPOMs that has caused dramatic decreases in revenue for Casey's and the Class members, increases in costs paid to remove ~~MLB~~NFL License Products and handle logistics of such removal, and the evisceration of the assets, investments, costs, and overall marketing devoted by Casey's and the Class members to have established their presence, especially to consumers, on TPOMs to have retailed NFL Licensed Products. Defendants have unlawfully reaped financial rewards at the expense of such financial loss by Casey's and the Class Members. Indeed, the overall marketing, brand image, and business viability of Casey's and the Class members has been crucially threatened; retailing NFL Licensed Products on TPOMs is mission critical for these companies. Defendants have unlawfully reaped financial rewards at the expense of such financial loss by Casey's and the Class Members.

127.    In addition, Defendant Fanatics engaged in anticompetitive conduct by entering

into separate agreements with WinCraft (before it was acquired by Fanatics) and with Logo Brands, which interfered with, restricted, or hindered the ability of TPOM retailers such as Casey's itself, Casey's customers, and the Class members to obtain supply, including, without limitation, one of Casey's customers that was a purported Approved Marketplace Retailer.    This anticompetitive conduct is demonstrated by Logo Brands informing Casey's that even if Casey's was an Approved Marketplace Retailer, Logo Brands would not be allowed to sell products to Casey's because of Logo Brand's agreement with Fanatics.

128.    Fanatics' ability to strangle competition in online retailing of NFL Licensed Products is further demonstrated by unlawful written agreements that it has in place with horizontally competing licensees and other types of companies that, like Fanatics, either supply or retail products online.  For example, Casey's has been shown a written agreement that appears to be between Fanatics and its horizontally competing licensees to group boycott entities, such as Casey's, from competing with Fanatics and its colluding licensees in selling products on or to Amazon.  And licensees during phone calls to Casey's had stated that in enforcing the purported NFL policies, licensees were acting at the direction of their horizontally competing licensee and retailer, Fanatics.  The alleged anticompetitive scheme has also resulted in consolidation and a decrease in the number of licensees willing to sell NFL Licensed Products to Casey's and the Class members, which has resulted in lower supply and Casey's and the Class members paying increased prices to purchase NFL Licensed Products from licensees, but for the alleged anticompetitive scheme.

129.    Another example is a written minimum-advertised-prices policy ("MAP Policy") that appears to be enforced by Fanatics against its horizontal competitors, whether they be licensees that horizontally compete with Fanatics or retailers that horizontally compete with

Fanatics, that in essence forbids them from advertising lower prices than Fanatics—virtually all types of advertising in any forum, whether it be print, outdoor billboards/signage, broadcast, direct (paper) advertising, email and web advertising, internet advertising, or any type of web advertising. This MAP Policy is not a suggestion: it provides for byzantine punishments for violators, such as suspension from purchasing Fanatics products indefinitely.

130.    By reducing the number of competing entities on Amazon's TPOM, prices for NFL Licensed Products are artificially increased.  In addition, product quality, service quality, and product selection are diminished, all reducing the quality of the customer experience.

131.    NFLP's restriction on selling on TPOMs does not impact Fanatics.  Rather, Fanatics' market power is greatly expanded by allowing it to increase its already dominant role in the market for NFL Licensed Products sold online—market power that Fanatics previously held by "powering" the NFL's various websites, including the websites for most of the NFL's thirty-two member Teams, in addition to its own website (Fanatics.com).  Fanatics thus has become the exclusive seller of NFL Licensed Products on Amazon's marketplace, to the detriment of former competitors such as Plaintiff who once sold a substantial amount of NFL Licensed Products on Amazon's platform prior to being foreclosed from doing so by the anticompetitive conduct alleged herein.

132.    The anticompetitive conduct described herein has caused or is likely to cause consumers to pay higher prices for NFL Licensed Products and interference with the particular NFL Licensed Products that Plaintiff and others are able to sell.  Further, this anticompetitive conduct discourages new entrants into the market.

133.    If competing retailers are hindered, restricted, or prohibited from selling NFL Licensed Products on TPOMs, end-user customers will likely use the NFL's Amazon TPOM

"storefront" or otherwise buy from the NFL, its member Teams, or Fanatics' other online retail Internet properties, where the NFL and Amazon can charge more for the products and generate even greater profits.

134.    As alleged above, the anticompetitive agreements and other types of anticompetitive actions alleged herein—the boycott, agreements in violation of Section 1, and monopolization, attempted monopolization, and conspiracy to monopolize in violation of Section 2—have caused Casey's and the Class monetary damages, for example, in the form of them having had to pay significantly elevated prices to purchase NFL Licensed Products from licensees and other increased costs.  Defendants' scheme has resulted in fewer NFL Licensed Products licensees offering to sell fewer NFL Licensed Products to Casey's and the Class (for example, as a result of having to sell all products to Fanatics, the NFL, and Teams, and follow Defendants' demands to enforce the boycott from TPOMs), which has resulted in damages through higher prices for NFL Licensed Products that are imposed on Casey's and the Class, but for the anticompetitive agreements and other types of anticompetitive actions alleged herein.

135.    Further limiting an e-commerce retailer's ability to compete, the NFLP places restrictions on entities looking to sell NFL Licensed Products by preventing them from using any trademarks associated with the NFL or its member Teams in connection with paid searches on Internet search engines (e.g., Google, Yahoo!).  For example, the NFL recently discovered that one of Casey's customers purchased the phrase "Philadelphia Eagles" as part of its purchased search terms in violation of the NFLP's ODP.

136.    On April 14, 2021, a Licensing Director at the NFL emailed a high-level representative of Evergreen the "PLA Violation" letter stating, in part, that, "without authorization from NFL Properties LLC ("NFLP"), Carroll's Cove ("Retailer") has been bidding on, or

48

purchasing, NFL trademarks on Internet search engines in connection with product listing advertisements ("PLAs") for NFL licensed products manufactured by and/or purchased from the licensee for sale via Retailer's ecommerce site." (Emphasis in original.) Enclosed with the "PLA Violation" letter was a version of the NFL's ODP, which stated that the "NFLP will review the Online Distribution Policy on no less than an annual basis and it is subject to change at any time, in NFLP's sole discretion, with or without prior notice." The ODP included an ~~anti-competitive~~anticompetitive clause forcing NFL Licensed Properties licensees and retailers—who had no privity to this ODP—to agree not to compete on purchasing and using search terms, stating the following, in relevant part:

> Unless otherwise expressly approved in advance in writing by NFLP, retailers authorized under this policy to sell Licensed Products (including, but not limited to, Gameday Product/Practicewear Apparel) online are not authorized to use NFL Marks (as defined in the Licensee's license agreement from NFLP) on, or in connection with, their e-commerce sites (other than the extent such NFL Marks are visible on Licensed Products displayed for sale on such e-commerce sites), including, but not limited to, (a) bidding on or purchasing "NFLShop", any variation of such term, or any other NFL Marks (e.g., Philadelphia Eagles or Philadelphia Eagles [jersey]) in connection with (i) paid search on Internet search engines (e.g., Google, Yahoo!) or (ii) other forms of targeted advertising (e.g., Product Listing Ads or targeted advertising via social media), or (b) using NFL Marks to indicate that their e-commerce store sells NFL and/or Member Club Licensed Products.

## F.    No Procompetitive Justifications Excuse Defendants' Collusive Conduct

137.    Because Defendants' collusion to impose a horizontal boycott of retailers competing with Fanatics and the NFL Defendants is *per se* illegal, any procompetitive justifications for their conduct are irrelevant.

138.    Nevertheless, there are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Amended Complaint or for any individual aspect of the Defendants' conspiracy. But even if there were, there are substantially less restrictive means of achieving those purported procompetitive effects. To the extent that Defendants' conduct has any

cognizable procompetitive effects, they are far outweighed by the harm to competition and consumer welfare described in this ~~Amended Complaint~~SAC.

139.    The AMRA's purported objective is to "improve the selection of NFL licensed products on the Amazon.com marketplace (the "Marketplace") and to protect the NFL brand by ensuring a premium presentation of NFL licensed products and a high level of customer service to purchasers of NFL licensed products."

140.    Ironically, evidence of diminishing product quality and poor customer service directly attributable to Fanatics is abundant.  For example, the Better Business Bureau lists 489 complaints ~~in the past three~~over just a few years for "Fanatics Retail Group" with an average Customer Review Rating of 3.27/5 stars[40]; and 269 complaints ~~in the past three~~over just a few years for "Fanatics, Inc." with an average Customer Review Rating of 1.2/5 stars.[41]  Common complaints include problems with customer service, shipping delays, and product defects.[42] Improved competition in the market would naturally diminish the frequency of such complaints because competing market participants would compete to improve product quality, service quality, and customer satisfaction.  Despite that in the AMRA application process, the NFL Defendants demanded that retailers have an approximate 97% rating or above, Fanatics itself fell woefully short of that, but yet Fanatics has been given free reign by the NFL Defendants to control retail of NFL Licensed Products on Amazon.  Indeed, Fanatics' rating on Amazon has fallen as low as 71%.

141.    The NFLP's purported objectives as stated in the AMRA are nothing more than

---

[40]        https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-retail-group-0403-29000877/complaints (last visited June 22, 2021).

[41]        https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-235965780/customer-reviews (last visited June 22, 2021).

[42] *Id*.

pretext and could be accomplished by substantially less restrictive means and, in fact, likely will

not be accomplished by restricting entities, such as ~~Plaintiff~~Casey's and the Class, from ~~s~~retail~~l~~ing

on Amazon's TPOM.  For example, Amazon's Founder and CEO, Jeff Bezos, testified before the

U.S. House Judiciary Committee that third-party sellers on Amazon's platform increase product

selection and improve customer satisfaction:

> But we committed to the idea that over the long term [allowing third-party sales]
> would increase selection for customers, and that more satisfied customers would be
> great for both third-party sellers and for Amazon.  And that's what happened.
> Within a year of adding those sellers, third-party sales accounted for 5% of unit
> sales, and it quickly became clear that customers loved the convenience of being
> able to shop for the best products and to see prices from different sellers all in the
> same store.  These small and medium-sized third-party businesses now add
> significantly more product selection to Amazon''s stores than Amazon''s own retail
> operation.[43]

In Mr. Bezos' words, and in contradiction of the NFLP's TPOM policy, after the introduction of

third-party sellers, "the whole pie did grow, third-party sellers did very well and are growing fast,

and that has been great for customers and for Amazon."[44]

142.    In addition, the NFLP's TPOM policy does not reduce the presence of counterfeit

goods in a manner that is narrowly tailored to accomplish that goal.  Rather than reducing the

presence of counterfeit goods, Defendants' concerted action is targeted not at pirates, but, by

definition, at those entities who are reselling officially licensed products sold by approved

licensees.  For example, Plaintiff does not sell counterfeit goods, has never been accused of selling

counterfeit goods, and has no intention of selling counterfeit goods in the future.  The NFLP

decides who receives a license in the first instance; subsequent transactions on TPOMs do not

invalidate the license nor the validity of the ~~intellectual property~~Intellectual Property of the NFL

---

[43]   https://www.congress.gov/116/meeting/house/110883/witnesses/HHRG-116-JU05-Wstate-BezosJ-20200729.pdf
(last visited October 7, 2021).

[44] *Id.*

Licensed Products purchased from the licensees. Yet, Plaintiff and the Class members are prohibited from selling NFL Licensed Products on TPOMs. If the goal is to prevent the sale of counterfeit NFL Products, the NFLP's TPOM policy is overbroad and inapplicable.

## V.    THE RELEVANT ANTITRUST MARKET AND MARKET POWER

143.    The relevant product market is the TPOM retail market (including, without limitation, direct sales to Amazon for resale) for Products bearing the Intellectual Property of the NFL or any NFL team (also referred to herein as NFL Licensed Products or NFL Licensed Sports Products). The relevant geographic market is the United States of America (including its territories and the District of Columbia). This relevant product market and relevant geographic market is collectively referred to herein as the "Relevant Antitrust Market."

144.    Through the alleged anticompetitive conduct herein, Plaintiff Casey's and the Class members have been (and are continuing to be) boycotted and otherwise collusively removed from retailing NFL Licensed Products—that they legitimately acquired—through TPOMs to consumers. And Plaintiff Casey's and the Class members are being forced to pay higher prices to licensees for NFL Licensed Products.

145.    The Relevant Antitrust Market is limited to NFL Licensed Products because Plaintiff Casey's and the Class members are being unlawfully foreclosed from retailing to consumers who are purchasing products with an NFL or Team's logo for the ability to be identified with the NFL or the Team—the right to be recognized as a fan. These consumers who would be purchasers from Plaintiff Casey's and the Class members have fan loyalty and do not deem licensed products from other athletic leagues or other types of licensed products to be reasonable substitutes. There is neither reasonable interchangeability nor cross-elasticity of demand for non-NFL Licensed Products or other types of licensed products.

146.    NFL Licensed Products are distinct from products that do not bear NFL or Team logos.  Consumers purchase NFL Licensed Products not because they value the object bearing the logo itself; rather, these consumers want to use a product that displays their loyalty to the NFL or Team.  Indeed, Fanatics itself acknowledges this important purchasing dynamic[45], and industry participants track economic and financial statistics about the market for NFL Licensed Products separate and apart from those tracked for other league licensed or unlicensed products.  The NFL and its Teams have a fan base that is distinct from those of other athletics leagues.  Other athletics leagues generally play a different sport, a different level or caliber of the same sport, at different times of the year, in different cities (and some in the same cities), and at different venues.  Similar products bearing other league logos are not reasonable substitutes.

147.    The market for NFL Licensed Products is distinct from that for licensed products representing other fandoms.  For example, although a consumer may be a fan of both the New York Jets and a comic book hero, this consumer would still not consider a T-shirt bearing the comic book hero's logo as a reasonable substitute for one bearing a New York Jets logo.  And although that same consumer may also be a fan of the New York Yankees (a team within a different athletic league), this consumer would still not consider a T-shirt bearing the New York Yankee's logo to be a reasonable substitute for the one bearing the comic book hero's logo nor the one bearing the New York Jets' logo.  The licensed products would be used to express different loyalties and potentially at different times and places to elicit satisfaction and approving reactions from different sorts of people.

148.    This market is limited to new products.  The market for new NFL Licensed Sports

---

[45] *See Why Shop With Us?*, Fanatics, https://www.fanatics.com/why-shop-with-us/ch-2389 (last visited Aug. 17, 2021).

Products is distinct from the market for vintage NFL Licensed Sports Products. Vintage NFL Licensed Sports Products are sold by different types of sellers through different outlets. For instance, vintage sports memorabilia, particularly if it is valuable or rare, is often sold through auctions or private sales rather than through retail outlets. Even sellers that sell both new and vintage NFL Licensed Sports Products will tend to display them separately in both brick-and-mortar or online stores rather than mixing the two types of products together. The pricing structure also tends to differ; prices for products associated with current athletes on a team tend not to vary substantially with the identity of the athlete, while the price of vintage products heavily depends on the rarity and age of the product, as well as on the popularity of the player appearing on the product (e.g., a signed Joe Montana football would typically sell for much more than a football signed by a lesser-known player). Consumers also treat the two types of products quite differently, indicating that they are not exchangeable for one another. For instance, a fan might purchase a new jersey bearing the name of a favorite player to wear to a game or a victory parade but would be unlikely to wear a costly vintage jersey.

### A.     NFLP's Monopoly or Market Power

149.    According to the "Licensing Pre-Qualification Terms and Conditions Agreement," within the United States, the "NFLP serves as the representative of the National Football League and its member professional football clubs for the licensing of their trademarks and logos . . . ."[46] Thus, the NFLP is the entity responsible for licensing the NFL and its member Teams' intellectual property. Although non-exclusive licenses were previously the norm, in December 2000, the NFL member Teams voted to authorize the NFLP to grant exclusive licenses.[47]

---

[46] *See* https://www.nfl.info/NFLConsProd/Welcom/cpAgreement.htm (last visited June 14, 2021).

[47] *See American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 187 (2010).

150.    As alleged herein, NFLP controls the merchandising and licensing of NFL Licensed Products.  It is not legally possible for licensees to sell NFL Licensed Products without first obtaining a license to use the Intellectual Property from the NFLP or without first obtaining a license to use the Intellectual Property from any of the NFL's member Teams.  The NFLP has monopoly or market power over the market for the licensing of the NFL's and its member Teams' Intellectual Property, including licensing fees and minimum guarantees.  For that reason, the NFLP maintains all or substantially all control over how NFL Licensed Products ultimately reach consumers and has market power as a result.[48]

151.    NFLP's monopoly power in the Relevant Antitrust Market is also demonstrated by its ability to control the entities that may sell NFL Licensed Products as shown by the AMRA and other policies that are challenged in this case.  By controlling who may sell NFL Licensed Products, the NFLP's control of NFL trademarks poses a barrier to entry to competition.  As discussed above, NFLP's control extends to regulating the conduct of its licensees, including by requiring them to monitor downstream product purchases and restricting downstream sales on TPOMs.

### B.    Amazon's Monopoly or Market Power

152.    The monopoly power of Amazon over the third-party marketplace was recently recognized by Congress in a House Judiciary Committee Staff Report and Recommendations ("Judiciary Report"), which concluded that Amazon has significant and durable power in the U.S. online retail market, with up to 50% of all online sales being controlled by Amazon.[49]  The report

---

[48] As Defendant NFLP is a privately held entity and has not released to the public market share-related information in any meaningful helpful way, Defendant NFLP's market share information is not known with specificity to Plaintiff at this time.  However, discovery will likely shed light as to both Defendant NFLP's and Defendant Fanatics' respective market shares, as well as how Defendant NFLP's market share impacts others.

[49] Staff of S. Comm. On Antitrust, Commercial, and Admin. Law of the Comm. On the Judiciary, 116th Cong., Rep. on Investigation of Comp. in Digital Markets, p. 15.

also concluded that as the dominant marketplace in the United States for online shopping, Amazon's market power is at its height in its dealings with third-party sellers.[50] According to the Judiciary Report:

> The [Amazon] platform has monopoly power over many small- and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers. Amazon has 2.3 million active third-party sellers on its marketplace worldwide, and a recent survey estimates that about 37% of them—about 850,000 sellers—rely on Amazon as their sole source of income.[51]

The Judiciary Report also noted that "[a]s a result of Amazon's dominance, other businesses are frequently beholden to Amazon for their success."[52]

153.    Moreover, the Judiciary Report explained that:

> Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers. Publicly, Amazon describes third-party sellers as 'partners.' But internal documents show that, behind closed doors, the company refers to them as 'internal competitors.' Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest.[53]

154.    In part, the NFL's decision to enter into the Merchandise Agreement and other policies that benefit and protect Fanatics, confirms Amazon's power over retail sales to end-user consumers. Rather than battling with its dominant e-commerce rival, Amazon, Fanatics benefitted from Amazon's conduct. For example, on March 24, 2021, Amazon alerted Casey's that it would only allow "authorized" retailers to sell NFL Licensed Products on its website. Then, enforcement of the NFLP's TPOM policy resulted in Plaintiff and the Class member's legitimately purchase NFL Licensed Products having been delisted.

## C.    Fanatics' Monopoly or Market Power

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

155.    As Fanatics' size and power have grown, so has its market share and, in particular, its market share of the Relevant Antitrust Market.  Fanatics' sales of NFL Licensed Products account for nearly one-third of the $3 billion estimated total sales of NFL Licensed Products for 2020, of which a majority were sold online through Fanatics' websites.  Because online sales account for much less than half of all retail sales,[54] a conservative estimate would attribute substantial market power, if not monopoly power, to Fanatics for e-commerce sales of NFL licensed products.[55]

156.    More generally, since 2017, upon information and belief, Fanatics' share of selling NFL Licensed Products online has been over 50%.  Fanatics' market power has been recognized by industry observers.  For example, *Sportico* reported that Fanatics "has more or less cornered the industry (in addition to the league itself, it has partnerships with 25 NFL clubs)."[56]  It has become a trope to call Fanatics the "Amazon of sports apparel," analogizing Fanatics' dominance of the market for licensed sports products to Amazon's dominance of online retail.[57]

157.    Fanatics' market share is sufficient by itself to infer market power, if not monopoly power, in the Relevant Antitrust Market.  And when combined with the NFL Defendants' additional market share, it is reasonable to infer that Defendants control the vast majority of the

---

[54] Some sources estimate online sales account for roughly 11-15% of all retail sales. *See, e.g.*, https://www.statista.com/statistics/187439/share-of-e-commerce-sales-in-total-us-retail-sales-in-2010/ (last visited October 7, 2021).

[55] As Defendant Fanatics is a privately-held entity and has not released to the public market share-related information in any meaningful way, Defendant Fanatics' market share information is not known with specificity to Plaintiff at this time.  However, discovery will likely shed light as to both Defendant NFLP's and Defendant Fanatics' respective market shares, as well as how Defendant Fanatics' market share impacts others.

[56] Eben Novy-Williams, *NFL, Amazon Are Bringing Thousands of New Products to Retail Giant*, Yahoo: Sportico (Mar. 24, 2021), https://www.yahoo.com/now/nfl-amazon-bringing-thousands-products-200037755.html.

[57] *See, e.g.*, Jon Wertheim, *Fulfilling Fanatic*, Sports Illustrated (Jan. 5, 2021), https://www.si.com/nba/2021/01/05/michael-rubin-fanatics-nba-owner; Kendall Baker, *Fanatics Is Dominating the Sports Apparel Market*, Axios (May 20, 2019), https://www.axios.com/fanatics-sports-apparel-retail-a924fe76-5f9a-4b49-9db3-88d0c6897958.html ("Fanatics is to sports apparel what Amazon is to, well, everything else.").

Relevant Antitrust Market.

158.    Defendants' market power, if not monopoly power, gives them the ability to exclude competitors.  Defendants demonstrated their actual market power, if not monopoly power, by prohibiting licensees from selling to retailers and boycotting retailers from operating on TPOMs and thus competing with Defendants' own retail operations.  This power is especially noticeable because Defendants used it to restrain not only licensees' future sales but also the ultimate retail sale of NFL Licensed Products that licensees had already sold to distributors and retailers without these restrictions.  Defendants stunted the growth and effectuated the removal of scores of retailers' NFL Licensed Products from TPOMs, including Amazon and Walmart.

159.    Fanatics likely has or is substantially close to having a monopoly share of the market for sales of NFL Licensed Products conducted online.  In addition to its own online retail website Fanatics.com, Fanatics currently operates the e-commerce websites of a majority of the major professional sports leagues, including the NFL and a majority of the NFL's member Teams.  NFL websites operated by Fanatics include, but are not limited to:

- Fanatics.com
- Jetsshop.com
- Ramsfanshop.com
- Shop.azcardinals.com
- Shop.buccaneers.com
- Shop.chiefs.com
- Shop.clevelandbrowns.com
- shop.denverbroncos.com/
- Shop.giants.com

- nflshop.com
- Shop.miamidolphins.com
- Shop.colts.com
- Store.chicagobears.com
- Shop.panthers.com
- Shop.chargers.com
- Shop.atlantafalcons.com
- Footballfanatics.com
- Shop.detroitlions.com

- Shop.houstontexans.com
- Shop.jaguars.com
- Shop.neworleanssaints.com
- Shop49ers.com
- Store.washingtonfootball.com

- Shop.baltimoreravens.com
- Proshop.seahawks.com
- Proshop.patriots.com
- Store.philadelphiaeagles.com

However, even if Fanatics cannot be said to have general monopoly power in the NFL Licensed Products market, because the NFLP granted Fanatics the right to operate the NFL's Amazon "storefront," while other previously competing entities were denied access to Amazon's TPOM, Fanatics was granted actual monopoly power over e-commerce sales of NFL Licensed Products conducted on Amazon.

160.    By the fall of 2017, Fanatics was recognized as "one of the world's largest licensed sports merchandise retailers" and that, with respect to its aspirations outside of the U.S, it hopes to "implement[] a strategy to replicate its ***home market dominance*** and capabilities in licensed sports merchandise . . . ."[58]

161.    After it raised approximately $350 million in August 2020, Fanatics purchased "hard good manufacturer" WinCraft in December 2020.[59]  WinCraft, a manufacturer of NFL Licensed Hardgoods, including, but not limited to, flags, banners, wall art, pennants, decals, and lanyards, generates $100 million in annual revenue, employs over 500 staff, and has client relationships with all of North America's major leagues and teams.[60]  Gene Goldberg, a former NFL licensing executive, described WinCraft as "the biggest fish" as WinCraft "has nearly every

---

[58]  *See*  https://www.sportspromedia.com/analysis/how-fanatics-is-taking-its-v-commerce-model-global  (last visited June 15, 2021) (emphasis added).

[59] *See* https://www.sportspromedia.com/news/fanatics-wincraft-acquisition-hard-goods-non-apparel (last visited June 14, 2021).

[60] *See id.*

major license across sports" and its "product line of novelties includes pennants, bumper stickers, koozies, towels, magnets, banners and signs."[61]   WinCraft now operates under the "Fanatics Brands division."[62]

162.   In addition to helping Fanatics dominate the hardgoods side of the NFL Licensed Products business, Fanatics' purchase of WinCraft was apparently also part of the Defendant's "focus[] on accelerating its vertical commerce business and strengthening its manufacturing and distribution businesses."[63]

## VI.   DEFENDANTS WILLFULLY AND IMPROPERLY ACQUIRED OR MAINTAINED THEIR MONOPOLY POWER THROUGH ANTICOMPETITIVE AND EXCLUSIONARY CONDUCT

### A.   NFLP

163.   NFLP engaged in a variety of conduct designed to lessen competition, increase prices, reduce availability, reduce output, reduce quality, reduce innovation, and otherwise unfairly advantage and aggrandize itself with respect to NFL Licensed Products transacting in the Relevant Antitrust Market, separate and apart from having a superior product, business acumen, or historic accident.

164.   The monopoly power of NFLP (as extended into the downstream market for e-commerce sales of NFL Licensed Products on TPOM) was willfully acquired or maintained through the following, without limitation:

- NFLP's decision to not renew at least one NFL Intellectual Property License so as to eliminate competitors of Fanatics in the Relevant Antitrust Market,

---

[61]   *See*  https://www.bizjournals.com/twincities/news/2020/12/07/sportswear-maker-fanatics-acquiring-wincraft.html (last visited June 14, 2021).

[62]   *See*   https://www.postbulletin.com/business/manufacturing/6796519-Winonas-WinCraft-sold-to-Florida-based-fanatics (last visited June 14, 2021).

[63] *See id.*

in violation of 15 U.S.C. § 2;

- NFLP's decision to place Fanatics at an advantage in comparison to its competitors by granting to Fanatics the exclusive right to operate NFL's Amazon "storefront" for retailing NFL Licensed Products on Amazon's TPOM; and

- By entering into agreements with Amazon to de-list from Amazon's TPOM the products of those not approved or authorized by the NFLP (through the "AMRA" process) to retail NFL Licensed Products.

165.    NFLP's intent to acquire and maintain monopoly power through anticompetitive and exclusionary conduct is further established through its efforts to create and then selectively enforce its TPOM Policy.  The TPOM Policy was designed to and prevented Plaintiff and other Class members from selling NFL Licensed Products on TPOMs.  In addition to an implicit threat of non-renewal, the NFLP also required its licensees to prevent Casey's and other Class members from selling on TPOMs, by threatening licensees with its power to prohibit licensees from selling NFL Licensed Products to "any retailer" if the NFL believes that such sales would be detrimental to the "NFL's brand image."  For example:

- On August 1, 2020, a representative of FOCO messaged Casey's through Facebook, stating:  "*The league* has called your company out on selling FOCO's gaiter scarves as a 3rd party marketplace seller.  This is not allowed.  Please remove listings on this item to avoid further issues."

- On August 4, 2020, NFL-Licensed FOCO requested that Casey's remove its products listed for sale on Amazon, using the TPOM Policy as the basis for its request.

- On August 5, 2020, a representative of Little Earth Productions, emailed Casey's Lisa Ford, asking "to please tell us where these large quantities [of Curve Wallets] are going? We don't want to steal this business and we want to continue to partner with you, but we just need to find out where they will be selling ***because we need to advise the NFL*** of where our NFL items are retailing."

Ultimately, Defendant NFLP's market power, if not monopoly power, was confirmed in part by Amazon referring to the "new agreement" it had with the NFL in the warning letter it sent to Plaintiff prior to the de-listing efforts.

### B.    Fanatics

166.    Fanatics has also engaged in a variety of conduct designed to lessen competition, increase prices, reduce availability, reduce output, reduce quality, reduce innovation, and otherwise unfairly advantage and aggrandize itself with respect to NFL Licensed Products transacting in the Relevant Antitrust Market, separate and apart from having a superior product, business acumen, or historic accident.

167.    The monopoly power of Fanatics over NFL Licensed Product transacting in the Relevant Antitrust Market was willfully acquired or maintained, but not through any legitimate pricing, quality, supply chain, technological, or other types of advantages or demand, in violation of 15 U.S.C. § 2.

168.    For example, Fanatics acquired and maintained its monopoly or market power over NFL Licensed Product transacting in the Relevant Antitrust Market through anticompetitive, monopolistic, and exclusionary means, including, but not limited to, the following examples:

- By selling a 3% pre-public equity stake in itself to the NFL, for which the

NFLP acts as an agent with respect to the League's Intellectual Property concerns[64];

- By having itself incorporated into the "Merchandise Agreement"—entered into between the NFLP and Amazon—to sell NFL Licensed Products on Amazon, which provided Fanatics the advantaged position over NFL Licensed Products retailers concerning the right to operate the NFL's Amazon "storefront";

- By enforcing the terms of the TPOM Policy to pressure NFL Intellectual Property licensees to stop selling to companies like Plaintiff and Class members seeking to sell NFL Licensed Products on TPOM; and

- By pressuring its own Hardgoods division (WinCraft) to communicate with representatives of Casey's that Casey's supply of WinCraft-based NFL Licensed Hardgoods could be threatened if Casey's did not stop selling such products on TPOMs.

169.    Fanatics exploited for its own benefit the TPOM-related restrictions faced by its competitors for retail sales of NFL Licensed Products on TPOMs.

170.    Further, Fanatics engaged in efforts to prevent entities competing with it from selling on TPOMs, even when at least one entity had been approved by the NFLP as an Approved Marketplace Retailer under "AMRA."  This included Fanatics entering into written agreements with licensees, containing provisions apparently similar to that of the ODP and AMRA, which enabled Fanatics to use such licensees to discourage or prevent their respective non-Fanatics

---

[64] Fanatics thus benefits from the circumstance of having an equity holder, the NFL, in charge of its agent, the NFLP, from which Fanatics has received one or more NFL Intellectual Property licenses.

customers and competitors from retailing NFL Licensed Products on TPOMs. These alleged anticompetitive agreements have also resulted in consolidation and a decrease in the number of licensees willing to sell NFL Licensed Products to Casey's and the Class members, which has resulted in lower supply and Casey's and the Class members paying increased prices to purchase NFL Licensed Products from licensees, but for the alleged anticompetitive scheme.

171.    Despite the NFLP's TPOM Policy, Fanatics was not only placed in the privileged position of having the right to operate the NFL's Amazon "storefront," but it was permitted to "sell *its* products on Amazon."[65]

## VII.    PLAINTIFF AND THE CLASS IS ENTITLED TO INJUNCTIVE RELIEF

172.    Plaintiff Casey's requests that the Court award declarative and injunctive relief prohibiting Defendants from colluding or otherwise violating the federal antitrust laws in enforcing the NFLP's TPOM Policy or other anticompetitive policies, which hinder, interfere with, limit, and/or prevent Plaintiff and the Class from selling NFL Licensed Products on TPOMs.

173.    Plaintiff requests on behalf of itself and all others similarly situated that Defendants cease, stop, abandon, and otherwise desist from enforcing the NFLP's TPOM Policy or other anticompetitive policies in collusive fashion or in a fashion that otherwise violates the federal antitrust laws, for example as found in the AMRA, which states in part: "NFL Properties, LLC ('NFLP') obligates its consumer products licensees ('Licensees') to . . . refrain from selling their NFL licensed products under a third-party URL, without the prior written approval of NFLP."[66] As reflected in the AMRA, "third-party URL[s]" specifically concern "the Amazon.com

---

[65] *See* https://magazine.promomarketing.com/article/amazon-will-start-selling-licensed-nfl-merchandise-via-fanatics/ (last visited June 15, 2021) (emphasis added).

[66] *See* NFL Properties LLC Approved Marketplace Retailer Application for the "2021 NFL season," which runs "from execution date through March 31, 2022," at p. 1. This application has not been reopened meaningfully and in good faith, and the anticompetitive results from Defendants' alleged actions in violation of federal antitrust laws persist to the date of the filing of this Amended Complaint.

marketplace."[67]    The requested relief here is directed to ending Defendants' unreasonable hindering, limiting, preventing, or prohibiting competition in the Relevant Antitrust Market.

174.    The NFLP, through its TPOM Policy, seeks to limit the numbers of those who are permitted to sell on TPOMs and to limit those who can sell to others seeking to retail NFL Licensed Products on TPOMs.

175.    Defendants have caused Plaintiff and other Class members irreparable harm. Because the efforts by Defendants have denied Plaintiff and others the ability to run a particular type of business, one that benefits from the features, services, technologies, and widespread consumer access associated with selling on TPOMs, legal remedies are inadequate, and the requested equitable relief is justified.  For example, businesses operating on Amazon's TPOM benefit from Amazon's consumer and transaction focused tools, which include credit card processing, product fulfillment, product return, anti-theft, and other security, efficiency enhancement, and order and inventory tracking features, services, and technologies.  In addition, in many circumstances, for example, Amazon's order and inventory tracking technologies communicate and integrate with that used internally by small businesses (referred to by Casey's as "synchronized flow technology"), which helps facilitate orders and prevent small businesses from offering for sale products for which they lack inventory.  Because customer service requirements and demands are comparatively greater in the retail environment (compared to the wholesale environment), for example, Amazon's features, services, and technologies become increasingly important for companies seeking to transition to or add a retail focus to their business. Moreover, so long as the participating businesses follow Amazon's qualifying rules, for example, the nature and format of Amazon's TPOM allow a small business to compete against larger

---

[67] *See id.*

enterprises based on product features, price, and other indicia of value, to the consumers' ultimate benefit.  Further, an injunction is justified as the conduct, acts, and practices of Defendants have harmed competition and are designed to drive Plaintiff and other Class members out of the business of the Relevant Antitrust Market.

## VIII.   CLASS ACTION ALLEGATIONS

### A.   Class Definition

176.   Plaintiff brings this action seeking damages and equitable, declarative, and injunctive relief under Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1-3, Section 3 of the Clayton Act, 15 U.S.C. § 14, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, on behalf of itself and, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of the following "Class":

> All entities or persons in the United States (including its territories and the District of Columbia) who purchased NFL Licensed Products from Defendants, licensees, or any current or former subsidiary or affiliate of Defendants or licensees, and who were prohibited from selling NFL Licensed Products in the Relevant Antitrust Market, due to Defendants' third-party online marketplace policy or similar policies, for example, as reflected in the NFLP's Approved Marketplace Retailer Application, from January 1, 2016, through such time as the alleged unlawful conduct ceases.

177.   The Class excludes the Defendants, any entity in which Defendants have a controlling interest, any individual or entity that has a controlling interest in Defendants, as well as any of their respective officers, directors, employees, legal representatives, successors, assigns, and any of their co-conspirators, including, without limitation, Amazon.  Also expressly excluded from the Class are consumers who purchased NFL Licensed Products for personal use—not for resale.

i.   Plaintiff reserves the right to revise the class definition based upon information learned through discovery.

66

**B.     Class Certification Requirements Under Rule 23**

178.    The Rule 23 requirements are satisfied as to the Class.

179.    **Numerosity:  Rule 23(a)(1)**.    The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Plaintiff is informed and believes that the Class members number in the hundreds, if not the thousands.  Further, the Class is readily identifiable from information available to and in the possession of Defendants.  Class Members may be notified of the pendency of this action by recognized methods, which may include U.S. mail, electronic mail, internet postings, social media, and publication.

180.    **Commonality:  Rule 23(a)(2)**.  This action involves significant common question of law and fact, including, but not limited to:

a.     Where Defendants engaged in the anticompetitive conduct alleged in this Amended Complaint;

b.     The identities of the participants and co-conspirators in the conspiracy alleged in this Amended Complaint;

c.     Existence and scope of the conspiracy;

d.     Levels in the Relevant Antitrust Market that the participants and co-conspirators occupied;

e.     Whether Defendants effectuated a boycott;

f.     Whether Defendants effectuated the other ~~anti-competitive~~anticompetitive agreements alleged in this Amended Complaint;

g.     Whether Defendants' actions are *per se* unlawful;

h.     Alternatively, whether Defendants' actions are unlawful under a quick look or rule of reason analysis;

  i.  Whether Defendants have market or monopoly power in the Relevant Antitrust Market;

  j.  Whether Defendants have acquired or maintained market or monopoly power through anticompetitive, exclusionary, predatory, or other means that violate Section 2;

  k.  Whether there are any procompetitive justifications for Defendants' conduct stemming from the restraints at issue; and whether those procompetitive justifications are outweighed by the anticompetitive effects of Defendants' alleged anticompetitive actions.

  l.  Whether Defendants prohibited competing retailers from using NFL-related keywords to advertise those retailers' products online;

  m.  Whether Defendants' alleged anticompetitive actions caused harm to competition;

  n.  Whether Defendants' alleged anticompetitive actions caused damages to Plaintiff and the Class;

  o.  Impact of the conspiracy; and

  p.  Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

181. **Typicality: Rule 23(a)(3)(i)**.  Plaintiff's claims are typical of those of the Class members whom it seeks to represent.  Plaintiff's claims are typical because Plaintiff and each Class member suffered damages and were forbidden from selling NFL Licensed Products on TPOMs and thus were similarly affected as a direct and proximate result of Defendants' common wrongful

practices. Plaintiff's claims arise from the same practices and courses of conduct that give rise to the claims of the other Class Members and are based upon the same legal theories as the claims of the other Class Members. Plaintiff and Class Members were affected by the same wrongful conduct of Defendants.

182.    **Adequacy: Rule 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, including antitrust class actions. Plaintiff intends to prosecute this action vigorously. Neither Plaintiff nor their counsel have interests that conflict with the interests of the Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

183.    **Declaratory and Injunctive Relief: Rule 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate injunctive and declaratory relief with respect to the Class as a whole.

184.    **Rule 23(b)(3) Predominance.** The common questions of law and fact predominate over any questions individual to the Class members.

185.    **Rule 23(b)(3) Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties will be encountered in the management of this class action. The burden and expense that would be required to individually litigate the claims of each Class member against Defendants make it impracticable for Class members to individually seek redress for Defendants' wrongful conduct.

186.    Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments. Individualized litigation further increases the delay and expense to all parties and the court system.

By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

187.    Plaintiff knows of no special difficulty to be encountered in the conduct of this action that would preclude its maintenance as a class action.

188.    **Ascertainability.**  The Class Members are readily identifiable from Defendants' records.  Defendants maintain records and historical data of which Class members purchased NFL Licensed Products and were forced to remove products from TPOMs—for example, as demonstrated through the detailed information trackers alleged herein to have been circulated and used to enforce the alleged anticompetitive schemes.  Defendants collect and retain the names of each Class member, the item(s) purchased, and the Class members' billing and shipping addresses. Even if Defendants themselves did not maintain records sufficient to identify Class members, almost all Class members will have access to electronic transactional records that can be used to prove class membership and a qualifying purchase at the appropriate stage.

## IX.    STATUTES OF LIMITATION ARE TOLLED

### A.    Discovery Rule and Continuing Course of Unlawful Conduct

189.    Plaintiff and the Class Members did not discover and could not have discovered through the exercise of reasonable diligence that Defendants engaged in their anticompetitive conspiracy, prior to the initiation of Plaintiff and its counsel's investigation within the statute of limitations.  For example (without limitation), Plaintiff and the Class members did not discover and could not have discovered through the exercise of reasonable diligence the collusive activity between the leagues, affiliated entities, teams, Fanatics, and the licensees in effectuating the group boycott and other anticompetitive schemes alleged herein, prior to the initiation of Plaintiff and its

counsel's investigation within the statute of limitations.

190.    Defendants, their employees, their conspirators, and other agents regularly interact both in person at trade association meetings, other professional gatherings, and social gatherings and remotely through company or personal email, company or personal phone calls, text messages, or other messaging tools.   These meetings or communications provide them with ample opportunity to conspire without detection.

191.    Plaintiff and the Class members could not, through exercise of reasonable diligence, have gained knowledge of the private conspiratorial conduct undertaken through meetings, non-public business email, personal email, telephonic conversations, text messages, or other messaging tools.

192.    Any statutes of limitation otherwise applicable to any claims asserted herein have thus been tolled by the discovery rule.

193.    Moreover, Plaintiff alleges a continuing course of unlawful conduct by the Defendants, including conduct within the applicable limitations periods.   That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

**B.    Fraudulent Concealment**

194.    All applicable statutes of limitation have been tolled by Defendants' knowing, active, and ongoing fraudulent concealment of the facts alleged herein.

195.    Defendants made numerous fraudulent statements to create the false appearance of competition and to conceal the existence of their conspiracy.   For example:

> a)    The NFL Defendants hide from the public the fact that the anticompetitive policies alleged herein are enforced in collusive fashion only against companies that are not part of the alleged conspiracy.

71

b)      Mr. Rubin has publicly stated that products like what Fanatics sells cannot be found on Amazon because those products are "unique."  In truth, similar products are being taken down from Amazon because of the collusion alleged herein, including, without limitation, the recent three-way agreement between the NFL, Fanatics, and Amazon.

c)      The NFL Defendants' representations that restrictive licensing agreements are necessary to prevent the sale of counterfeit or unlicensed items concealed the anticompetitive intent of the TPOM Policy behind a façade of concern for protecting valuable intellectual property.  The NFLP's TPOM Policy does not reduce the presence of counterfeit goods in a manner that is narrowly tailored to accomplish that goal.  Rather than reducing the presence of counterfeit goods, Defendants' concerted action is targeted not at pirates, but, by definition, at those legitimate entities who are reselling officially licensed products sold by approved licensees.  Plaintiff does not sell counterfeit goods, has never been accused of selling counterfeit goods, and has no intention of selling counterfeit goods in the future.  The NFLP decides who receives a license in the first instance; subsequent transactions on TPOM do not invalidate the license nor the ~~intellectual property~~Intellectual Property of the NFL Licensed Products purchased from licensees.

d)      Defendants impose anticompetitive agreements on smaller co-competitors that include, among other restrictive provisions, requirements that the individual counterparty keeps the existence and terms of the

agreement strictly confidential.

196.    Defendants were motivated to keep their conduct secret because, if exposed, it not only could have led to private lawsuits, but also would have diminished Defendants' reputations, harmed the value of their respected brands, and impaired their ability to extract premiums based on those reputations.

197.    The NFLP places restrictions on entities wanting to sell NFL Licensed Products by preventing them from using any trademarks associated with the NFL or its member Teams in connection with paid searches on Internet search engines (e.g., Google, Yahoo!).  This policy is, in fact, self-concealing as the operation of the policy means that one cannot acquire knowledge that competing retailers are even offering NFL Licensed Products for sale.

198.    Plaintiff had no knowledge of, nor any reason to suspect the existence of, the conspiracy because Defendants affirmatively concealed its existence.  Defendants enforced the conspiracy through business communications among themselves and with licensees of NFL Licensed Products rather than in publicly accessible statements or actions.

199.    Plaintiff diligently investigated its claims.  Because information regarding Fanatics and horizontally competing licensees' critical roles was not publicly available, it was only upon obtaining access to non-public information that Plaintiff had sufficient information to initiate this suit.

200.    Defendants did not disclose their misconduct and, in fact, actively concealed it.

201.    Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and concealment of the facts alleged herein.

## X.    ADDED ALLEGATIONS CONCERNING ANTITRUST INJURY

202.    The allegations in this section are in addition to the allegations throughout this SAC

concerning antitrust injury.  Cross-referencing in this section to other paragraphs throughout the SAC are merely exemplar paragraph cites and are not meant to be exhaustive of the support for any allegations or new information alleged in this section.

203.    There are several independent categories of antitrust injury (not listed in order of importance) that Casey's and the Class suffered directly from the competition-reducing aspects of Defendants' anticompetitive practices alleged in totality.

**A.    The Several Independent Categories of Antitrust Injury That Casey's and the Class Suffered Directly From the Competition-Reducing Aspects of Defendants' Anticompetitive Practices Alleged in Totality.**

204.    *First*, Casey's and the Class seek declarative and injunctive relief to cease the alleged continuing collusion between horizontally competing retailers—the NFL Defendants, Fanatics, and other retailers identified throughout this SAC (for example, FOCO and Boelter Brands, the latter being owned by Logo Brands)—of group boycotting Casey's and the Class (also Defendants' horizontally competing retailers) from retailing NFL Licensed Products on TPOMs. Them continuing to be boycotted from retailing NLF Licensed Products on TPOMs is the direct result of the horizontally competing retailers' boycott.  *See, e.g. supra*, ¶¶66-67, 72, 88, 104(a), 104(c), 106-20, 122, 126-27, 158, 172-76, 183.

205.    ***Second***, Casey's and the Class seek damages for their financial losses already suffered directly from the collusion between horizontally competing retailers—the NFL Defendants, Fanatics, and other retailers identified throughout this SAC (for example, FOCO, WinCraft before Fanatics acquired it, and Boelter Brands, the latter of which is owned by Logo Brands)—of having group boycotted Casey's and the Class (also Defendants' horizontally competing retailers) from having retailed NFL Licensed Products on TPOMs.  Their financial damages are in the form of lost sales and revenue, increased costs from having taken down

products from TPOMs, increased costs from warehousing those products, and lost profits, in addition to other costs, such as the evisceration of the assets, investments, value of inventory that was less alienable, and overall brand image of Casey's and the Class.  These financial damages have been the direct result of the horizontally competing retailers' boycott.  *See, e.g., supra*, ¶¶66-67, 72, 88, 104(a), 104(c), 104(e), 106-20, 122, 126-27, 158, 176.

206.    ***Third***, Casey's and the Class seek declarative and injunctive relief to cease the alleged continuing collusion between horizontally competing retailers—the NFL Defendants and Fanatics—of group boycotting Casey's and the Class (also Defendants' horizontally competing retailers) from selling NFL Licensed Products directly to Amazon (not on Amazon).  Them continuing to be boycotted from selling NLF Licensed Products to Amazon is the direct result of the horizontally competing retailers' boycott.  *See, e.g., supra*, ¶¶72, 80, 88-98, 114(e)-(l), 115-17, 158, 172-76, 183.

207.    ***Fourth***, Casey's and the Class seek damages for their financial losses already suffered directly from the collusion between horizontally competing retailers—the NFL Defendants and Fanatics—of having group boycotted Casey's and the Class (also Defendants' horizontally competing retailers) from selling NFL Licensed Products directly to Amazon (not on Amazon).  Their financial damages are in the form of lost sales and revenue, increased costs from having taken back products from Amazon, increased costs from warehousing those products, and lost profits, in addition to other costs, such as the evisceration of the assets, investments, value of inventory that was less alienable, and overall brand image of Casey's and the Class.  These financial damages have been the direct result of the horizontally competing retailers' boycott.  *See, e.g., supra*, ¶¶72, 80, 88-98, 114(e)-(l), 115-20, 122, 127-28, 158, 176.

208.    ***Fifth***, Casey's and the Class seek declarative and injunctive relief to cease the

alleged continuing collusion between horizontally competing licensees—Fanatics and other licensees identified throughout this SAC (for example, Logo Brands)—of refusing to sell NFL Licensed Products to Casey's and the Class. *See, e.g., supra*, ¶¶72, 114(e)-(l), 115-17, 121, 127-28, 134. Them continuing to be denied being sold NFL Licensed Products from these horizontally colluding licensees is the direct result of these licensees' boycott. *See, e.g., supra*, ¶¶72, 114(e)-(l), 115-17, 121, 127-28, 134, 158, 172-76, 183.

209. ***Sixth***, Casey's and the Class seek damages for their financial losses already suffered directly from the collusion between horizontally competing licensees—Fanatics and other licensees identified throughout this SAC (for example, Logo Brands)—of having refused to sell NFL Licensed Products to Casey's and the Class. *See, e.g., supra*, ¶¶72, 114(e)-(l), 115-17, 121, 127-28, 134, 158, 176. Their financial damages are in the form of Casey's and the Class having had fewer licensees from which to purchase NFL Licensed Products, which directly lowered the supply of these products and thus increased the prices to anticompetitive levels, which Casey's and the Class paid to non-colluding licensees of NFL Licensed Products. These financial damages have been the direct result of the horizontally competing licensees' boycott. *See, e.g., supra*, ¶¶115-17, 121, 127-28, 134, 158. A reasonably foreseeable result of the colluding licensees' boycott to not sell to Casey's and the Class was that the prices that Casey's and the Class paid for NFL Licensed Products from licensees who were not participating in the boycott at that time were elevated to anticompetitive levels from the fewer sources and less supply of NFL Licensed Products. It is economics 101 that when supply decreases, prices increase.

210. In connection with these independent fifth and sixth bodies of alleged antitrust harm, the Relevant Antitrust Market has as an essential contour of purchasing NFL Licensed Products from licensees: in order to legitimately retail NFL Licensed Products on TPOMs, Casey's

76

and the Class must purchase those products from licensees. This is why purchasing NFL Licensed Products from licensees is an integral component of the Relevant Antitrust Market. *See, e.g., supra*, ¶¶73-102, 143-47.

211. And at the least, in connection with these independent fifth and sixth bodies of alleged antitrust harm, purchasing NFL Licensed Products from licensees is inextricably intertwined with retailing NFL Licensed Products on TPOMs. Defendants' alleged schemes in totality directly target the ability of Casey's and the Class to purchase NFL Licensed Products from licensees; it is one arrow in Defendants' quiver to strangle out competition.

212. For these independent fifth and sixth bodies of alleged antitrust harm, that all licensees did not immediately and at the same time cease selling NFL Licensed Products to Casey's and the Class does not vitiate that there was an anticompetitive scheme. *See, e.g., supra*, ¶¶88-98, 104-22, 127-28. The several tentacles of the alleged anticompetitive scheme in totality have understandably taken time to strangle competition. *See, e.g., supra*, ¶¶72, 80, 88-98, 104-22. As the years of the scheme advanced, so has its stranglehold. *See, e.g., supra*, ¶¶72, 80, 88-98, 104-22, 127-28. All NFL Licensed Products licensees—except for Fanatics, which Fanatics and the NFL Defendants agreed would be put in a privileged position—are subject to the ODP and AMRA. *See, e.g., supra*, ¶¶72, 80, 88-98, 104, 106-20, 122, 127-28, 131-33. But it is not the language of the ODP or AMRA that forbids licensees from selling NFL Licensed Products to non-licensees, such as Casey's and the Class: nothing in the language of the ODP or AMRA forbids licensees from selling NFL Licensed Products to companies who are not licensees themselves—for example, such non-licensee companies may purchase NFL Licensed Products from licensees to purportedly retail them in their brick-and-mortar stores, through their individual websites, or to Amazon directly. *See, e.g., supra*, ¶¶72, 80, 88-98, 106-17. This is why non-colluding licensees were

permitted to continue selling NFL Licensed Products to Casey's and the Class. *See, e.g., supra*, ¶¶55-59, 88-98, 106-17. But for these independent fifth and sixth bodies of alleged antitrust harm, it is the agreements and anticompetitive practices that Casey's and the Class allege that are separate from the ODP and AMRA that are causing horizontally competing licensees—Fanatics and other licensees identified throughout the SAC—from not selling to Casey's and the Class and directly causing this anticompetitive harm. *See, e.g., supra*, ¶¶114(e)-(l), 115-17, 121, 127-28, 134.

### B.    The Alleged Anticompetitive Schemes in Totality are Broader Than the ODP or AMRA.

213.    More generally in connection with all of the independent first through sixth bodies of antitrust harm, the anticompetitive practices alleged in this SAC in totality are far broader than any purported ODP or AMRA.

214.    Indeed, despite that the ODP was in place since 2015 and licensees always faced the threat of not having their licenses renewed, there was little-to-no enforcement of the ODP until after NFL acquired a minority stake in Fanatics, NFL's investment in Fanatics intensified, and their collusive scheme was effectuated—Casey's damages first started to accrue in 2019, when it experienced product takedowns from TPOM, because of agreements between horizontal competitors in retail to boycott other horizontally competing retailers (all with NFL Defendants' approval). Licensees sold NFL Licensed Products to Casey's without referencing the ODP (that was not publicly available during the Class Period) or restrictions on retailing through TPOMs.

215.    Fanatics has been inexplicably excluded from the purported policies: it has been allowed to sell on TPOMs without any restriction, including, without limitation, on Amazon and Walmart, in direct violation of the very policies that were purportedly being enforced. This further reflects that the alleged anticompetitive schemes were not limited to a few purported policies.

216.    In several instances of enforcing the alleged scheme, the companies referenced

neither the ODP nor AMRA as the reason for the boycott.  *See, e.g., supra*, ¶¶104(a), 104(e), 115-17, 127-28.

217.    Even in several instances, the enforcing companies expressly stated that the boycott had nothing to do with the ODP or AMRA.  *See, e.g., supra*, ¶¶114(a), 114(d)-(l).

218.    And in several instances, the enforcing companies even (i) effectuated the boycott against a company that was accepted as an Approved Marketplace Retailer under the AMRA, (ii) stated that even if Casey's applied to and was an Approved Marketplace Retailer under the AMRA, Casey's would have still been boycotted, because of anticompetitive agreements with Fanatics, with the approval of the NFL Defendants (without which Fanatics could not have effectuated the schemes), and (iii) informed Casey's that the true Approved Marketplace Retailers were only Fanatics and its controlled WinCraft entities.  *See, e.g., supra,* ¶¶109 n.28, 114(e), 114(e) n.37, 114(f)-(l), 127-28.

219.    For example and in addition to the instances referenced above, around May 23, 2023, a Little Earth executive emailed Casey's and stated that the NFL Defendants did not allow a retailer whom the NFL approved as an Approved Marketplace Retailer, My Team Outlet, to retail NFL Licensed Products on Amazon—despite that the NFL Defendants approved My Team Outlet as an Approved Marketplace Retailer.

220.    Around October 25, 2024, a My Team Outlet executive—an Approved Marketplace Retailer through the AMRA—emailed Casey's and stated that even My Team Outlet has continued to be forced to take down products from Amazon.

221.    And neither the ODP nor AMRA forbid companies from selling NFL Licensed Products directly to Amazon (not on Amazon).  But still, horizontally competing retailers—the NFL Defendants and Fanatics—have group boycotted Casey's and the Class (Defendants'

horizontally competing retailers) from selling NFL Licensed Products directly to Amazon. *See, e.g., supra*, ¶¶72, 80, 88-98, 106-17, 127-28, 158.

222.    Casey's has been forbidden through the unlawful collusion from selling NFL Licensed Products directly to Amazon (not on Amazon), which is permitted under the ODP and AMRA. *See, e.g., supra*, ¶¶72, 80, 88-98, 106-17, 127-28, 158.

**C.    The ODP and AMRA Are Still Nevertheless Alleged to Be Anticompetitive Agreements and Practices.**

223.    Still, the ODP and AMRA themselves are nevertheless alleged to be anticompetitive agreements, rules, policies, exclusionary practices, or other mechanisms used as a weapon to effectuate the anticompetitive schemes in totality. *See, e.g., supra*, ¶¶104-22.

224.    Whatever the NFL Defendants or Fanatics call the ODP or AMRA, the form that they take do not vitiate the alleged substance and enforcement of them as violative of the antitrust laws.

224.    The ODP or AMRA are not simply a vertical, non-price policy that escapes the purview of antitrust laws.

225.    Indeed, the ODP in its initial years was not enforced to effectuate the alleged anticompetitive schemes. *See, e.g., supra*, ¶¶63, 88-98.

226.    Only after NFL Defendants purchased a minority equity stake in Fanatics, their investments grew, and the NFL Defendants and Fanatics allegedly colluded was the ODP enforced to effectuate the alleged anticompetitive schemes. *See, e.g., supra*, ¶¶63, 88-98, 104-22.

227.    The ODP and AMRA themselves are alleged to be anticompetitive agreements—necessitating at least two parties (not just the NFL Defendants, as reflected by the initial years of no enforcement) to be effective—used by horizontally competing retailers (NFL Defendants, Fanatics, and other retailers identified throughout this SAC, such as FOCO, WinCraft before

Fanatics acquired it, and Boelter Brands, the latter of which is owned by Logo Brands) to group boycott Casey's and the Class (also Defendants' horizontally competing retailers) from retailing NFL Licensed Products on TPOMs.  *See, e.g., supra*, ¶¶88-98, 104-22, 127.

228.    This Action concerns far more than retailers in 2021 having needed to have applied to the NFL Defendants to have been approved retailers on Amazon, which is just the recent tip of the iceberg of the alleged conspiracy in totality, especially where that application process has been alleged to have been a farse and another mechanism for the horizontal boycott scheme: the program was alleged to drag in hapless applicants and approved retailers into privity with the ODP, have them sign away their rights to litigation, have them agree to intense data monitoring over sensitive transacting information, and all of this without any guarantee that licensees would supply the approved retailers with NFL licensed products and allow them to sell on Amazon.  Indeed, Casey's learned from licensees that (i) the one purportedly approved Amazon retailer had nevertheless continued to have been boycotted from retailing NFL licensed products on Amazon, (ii) even if approved, Casey's would have nevertheless continued to have been boycotted because of Fanatics (helping confirm the farse of the approved Amazon retailer program), and (iii) the only true approved Amazon retailers were Fanatics and its controlled WinCraft entities.  *See, e.g., supra*, ¶¶109 n.28, 114(e), 114(e) n.37, 114(f)-(l), 127-28.

**D.    The Alleged Anticompetitive Agreements Are Horizontal.**

229.    The agreements alleged to be anticompetitive in totality are horizontal, because horizontally competing retailers—the NFL Defendants, Fanatics, and other retailers identified throughout this SAC (for example, FOCO, WinCraft before Fanatics acquired it, and Boelter Brands, the latter of which is owned by Logo Brands)—are agreeing and effectuating a scheme to remove their horizontally competing retailers (Casey's and the Class) from TPOMs.  *See, e.g.,*

*supra*, ¶¶104(a), 104(c), 104(e), 106-20, 122, 127.

230.    At the heart of Casey's and the Class' allegations in totality is that horizontally competing retailers, NFL Defendants and Fanatics, are agreeing to and effectuating a scheme to boycott their horizontally competing TPOM retailers, Casey's and the Class.  *See, e.g., supra*, ¶¶88-98, 104(e), 104(f), 106-20, 122, 129, 131-33.  Fanatics and the NFL Defendants—two separate horizontal competitors—together are the catalyst of the anticompetitive practices alleged in totality.  *See, e.g., supra*, ¶¶88-98, 104(e), 104(f), 106-20, 122, 129, 131-33.

230.    At the least, Casey's alleges that the NFL Defendants are themselves horizontally competing parties that effectuated a scheme to end competition between themselves for retailing NFL Licensed Products on TPOMs.  *See, e.g., supra*, ¶¶7-41, 50-53, 56, 143-47.

231.    The alleged schemes in totality do not concern a single brand.  Instead, the NFL Licensed Products are several brands: each team's products, as each team is owned by separate companies and competitors.  *See, e.g., supra*, ¶¶7-41, 50-53, 56, 143-47.

232.    Each NFL Team has its own brand within the Relevant Antitrust Market.  The Teams recognize that they compete with one another for sales of NFL Licensed Products.  For example in 1996, the Dallas Cowboys sued the NFL and its competitor-teams, alleging that the NFL's then-existing licensing rules eliminated competition in the professional football sponsorship and merchandise markets and violated antitrust laws.

233.    This competition is even fierce in U.S. states where there is no "local" team.  For example, Teams with large national followings—such as the Dallas Cowboys, New England Patriots, or Pittsburgh Steelers—compete for sales and fan loyalty, both with each other and with other Teams seeking to grow national fan bases.  Competition between Teams also exists in areas with multiple local Teams: for example, the Los Angeles Rams and the Los Angeles Chargers or

the Washington Commanders and the Baltimore Ravens.

234.    The Teams also compete for purchases and support from "new" football fans (those persons who were not previously NFL fans).  For example, this could be the driving reason why the NFL now hosts regular season games played by a rotating set of teams in international locations, such as London and Mexico City, which lack a history of exposure to the NFL.

235.    Fans are even loyal to Teams other than their current "home" team: for example, the Team whose home stadium is in closest proximity.  It is not uncommon for a fan to start out as a fan of her home team, switch to following a second team based on an affinity with a favorite player, or become a fan of a third team, if or when the fan moves to a different city (or marries a fan of another team).

236.    The expansion of NFL television programming reflects the geographic dispersal of fans for even "local" teams.  Traditionally, networks and even basic cable channels determined which NFL games to broadcast to which viewers, based on geography (for example, the Northeast may get a New England Patriots game, while the Northwest may get a Seattle Seahawks game being played at the same time).  However, providers have begun to offer packages, such as DirecTV's "Sunday Ticket," that allow fans to view games played by Teams throughout the country.  If NFL fandom were not a nationwide phenomenon that transcends geography, there would be no consumer support for these packages.

237.    In essence, the Teams compete for fan purchases both in their "home" markets and across the country and from both new and existing fans.  The growth of TPOM shopping increases the intensity and importance of this competition, as fans can easily purchase NFL Licensed Products bearing the logo of any Team from anywhere else in the country.

238.    Additionally, the Teams are horizontal competitors of Fanatics.  In a competitive

market and as a historical fact, the Teams and Fanatics would compete to retail merchandise. However, the Defendants have eliminated competition among each other through the anticompetitive practices alleged in totality herein.

**E.    Defendants Have Horizontally Colluded to Cede Fanatics 100% Control of TPOMs.**

239.    The goal is to make Fanatics the exclusive seller of NFL Licensed Products on TPOMs, which Defendants have been succeeding in.  *See, e.g., supra*, ¶¶60, 100, 103, 104(a), 104(f), 106-22, 131-33.

240.    NFL Defendants and Fanatics colluded to cease horizontal retail competition on TPOMs and cede control to Fanatics: Walmart, Amazon, NFL Defendants, Fanatics, and retailers identified herein have all terminated horizontal retail competition on TPOMs by ceding control to Fanatics—of course with the agreement and approval of the NFL Defendants, without which Fanatics could not take such control.  *See, e.g., supra*, ¶¶60, 88-98, 100, 103, 104(a), 104(e), 104(f), 106-20, 122, 131-33, 158.

241.    With the NFL Defendants and other horizontal retail competitors ceding full control of TPOMs to Fanatics, as exemplified with agreements to have given Fanatics total control of Walmart and Amazon, Fanatics has or is substantially close to having 100% share of retailing NFL Licensed Products on TPOMs.  This is unlawful exclusive dealing that favors Fanatics over all other former horizontal retail competitors.  *See, e.g., supra*, ¶¶60, 100, 103, 104(a), 104(f), 106-22, 131-33.

242.    It gets worse: the ceding of 100% or nearly all control to Fanatics of retailing NFL Licensed Products on TPOM has neither an expiration date nor end in sight

**F.    In the Alternative and at the Least, if the Agreements Are Deemed to be Vertical, They Still Are Unlawful Under the Quick Look, Rule of Reason, and Section 2 Tests, and They Cause Antitrust Harm to Casey's and the Class (and Derivatively, to Consumers).**

243.    In the alternative and at the least, should the agreements be deemed to be vertical instead of horizontal (they are not), Casey's and the Class in the SAC nevertheless allege antitrust violations under the quick-look, rule of reason, and Sherman Act Section 2 tests.  The antitrust harm suffered under the first through sixth categories alleged above have been directly experienced, even if the quick-look, rule of reason, and Sherman Act Section 2 tests apply.

244.    Casey's and the Class allege in the SAC that Defendants committed unreasonable restraints of trade: any purported procompetitive justifications for the restraints are debunked as a farse and are unreasonably anticompetitive.  *See, e.g., supra*, ¶¶135-36, 138-42.

245.    To the extent that the ODP or AMRA are used to control parties outside of those in privity of the agreements, which are only the NFL Defendants, Fanatics, and licensees, then the ODP and AMRA run amok of the first-sale doctrine, which enables parties to freely sell trademarked products that they purchased from licensees.  The ODP and similar policies are unlawful in of themselves in terms of violating the first-sale doctrine.

246.    There is no privity between the ODP and similar policies and Casey's and the Class, because Casey's and the Class purchase NFL Licensed Products from licensees.

247.    The first-sale doctrine as applied to trademark law allows Casey's and the Class to resell products bearing NFL Marks (NFL Licensed Products), after they legitimately purchased them from licensees.

248.    Simply put, once the NFL Licensed Products are sold, the NFL Defendants' right to control their distribution is exhausted for the products.

249.    There is no defense of materially different goods to combat the application of the

first-sale doctrine: Casey's and the Class retailed the NFL Licensed Products that licensees sold to them; they are the same goods.

250.    And there is no defense of lack of comparable quality controls to combat the application of the first-sale doctrine: if anything, Fanatics is associated with poor quality; and the ODP and similar policies have nothing to do with purportedly protecting against counterfeit goods, because the NFLP decides who receives a license in the first instance, so subsequent transactions by Casey's and Class on TPOMs do not invalidate the Intellectual Property of the NFL Licensed Products purchased from the licensees, which only deal in validly trademarked products.

251.    Casey's and the Class' use of the NFL Marks are truthful.

252.    Even if the ODP and similar policies do not violate the first-sale doctrine, they still violate antitrust laws, because the anticompetitive effects of the agreements substantially outweigh any asserted procompetitive effects and/or are not the least restrictive method to achieve any such procompetitive benefits.

253.    Evidence of diminishing product quality and poor customer service directly attributable to Fanatics is abundant.  For example, the Better Business Bureau lists 489 complaints over just a few years for "Fanatics Retail Group" with an average Customer Review Rating of 3.27/5 stars[68]; and 269 complaints over just a few years for "Fanatics, Inc." with an average Customer Review Rating of 1.2/5 stars.[69]  Common complaints include problems with customer service, shipping delays, and product defects.[70]  Improved competition in the market would naturally diminish the frequency of such complaints because competing market participants would

---

[68]                    https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-retail-group-0403-29000877/complaints (last visited June 22, 2021).

[69]        https://www.bbb.org/us/fl/jacksonville/profile/sporting-goods-retail/fanatics-inc-0403-235965780/customer-reviews (last visited June 22, 2021).

[70] *Id*.

compete to improve product quality, service quality, and customer satisfaction. Despite that in the AMRA application process, the NFL Defendants demanded that retailers have an approximate 97% rating or above, Fanatics itself fell woefully short of that, but yet Fanatics has been given free reign by the NFL Defendants to control retail of NFL Licensed Products on Amazon. Indeed, Fanatics' rating on Amazon has fallen as low as 71%. *See supra*, ¶140.

254.    The NFLP's purported objectives as stated in the AMRA are nothing more than pretext and could be accomplished by substantially less restrictive means and, in fact, likely will not be accomplished by restricting entities, such as Casey's and the Class, from retailing on Amazon's TPOM. For example, Amazon's Founder and CEO, Jeff Bezos, testified before the U.S. House Judiciary Committee that third-party sellers on Amazon's platform increase product selection and improve customer satisfaction:

> But we committed to the idea that over the long term [allowing third-party sales] would increase selection for customers, and that more satisfied customers would be great for both third-party sellers and for Amazon. And that's what happened. Within a year of adding those sellers, third-party sales accounted for 5% of unit sales, and it quickly became clear that customers loved the convenience of being able to shop for the best products and to see prices from different sellers all in the same store. These small and medium-sized third-party businesses now add significantly more product selection to Amazon's stores than Amazons own retail operation. [71]

In Mr. Bezos' words, and in contradiction of the NFLP's TPOM policy, after the introduction of third-party sellers, "the whole pie did grow, third-party sellers did very well and are growing fast, and that has been great for customers and for Amazon."[72] *See supra*, ¶141.

255.    That the alleged products are trademarked does not insulate Defendants from antitrust laws.

---

[71]  https://www.congress.gov/116/meeting/house/110883/witnesses/HHRG-116-JU05-Wstate-BezosJ-20200729.pdf (last visited October 7, 2021).

[72] *Id.*

256.    Defendants' anticompetitive actions do not reduce the presence of counterfeit goods in a manner that is narrowly tailored to accomplish that goal.  Rather than reducing the presence of counterfeit goods, Defendants' actions are targeted not at pirates, but, by definition, at those entities who are reselling officially licensed products sold by approved licensees.  For example, Casey's does not sell counterfeit goods, has never been accused of selling counterfeit goods, and has no intention of selling counterfeit goods in the future.  The NFLP decides who receives a license in the first instance; subsequent transactions on TPOMs do not invalidate the license nor the validity of the Intellectual Property of the NFL Licensed Products purchased from the licensees.  Yet, Casey's and the Class members are excluded.  If the goal is to prevent the sale of counterfeit NFL Products, the exclusionary practices are overbroad and inapplicable.  *See supra*, ¶¶142, 195(c).

257.    Defendants' alleged anticompetitive schemes in totality do not concern avoiding "free riding."  Their policies do not require that licensees sell only to retailers who must have brick-and-mortar stores.  Defendants' intent is not to demand that retailers build out and maintain brick-and-mortar stores.  Indeed, retailers have allegedly been permitted to sell NFL Licensed Products on their own individual websites without having a brick-and-mortar store.  Instead, Defendants' goal is to eliminate NFL Licensed Products retailers on TPOMs that compete with the NFL Defendants and Fanatics.  Indeed, Fanatics' minimum-advertised price policies, which it enforces against its horizontal competitors, and Fanatics and the NFL Defendants' restrictions against licensees and purported approved retailers from advertising products, which compete against Fanatics and the NFL Defendants, further demonstrate that expanding competition is what Defendants aim to kill.  Both of those policies are designed to make competitors' products not be cheaper than those of Fanatics and the NFL Defendants and to make competitors' products in

essence be invisible to people who are searching for them.

258.    The Relevant Antitrust Market was thriving and competitive prior to the purported policies and the collusive effectuation of the schemes alleged in totality.  In no way were these purported policies necessary for NFL Licensed Products to have become available on TPOMs.

259.    Casey's has alleged in the SAC anticompetitive effects not just against it, but against all similarly situated retailers. *See, e.g., supra*, ¶¶106-22, 127-28, 130-33, 135-36, 138-42, 158, 172-83.

260.    Casey's and the Class are the most-direct victims and efficient enforcers of the anticompetitive practices alleged in totality.  Colluding licensees are not more-direct victims.  Non-colluding licensees are not more-direct victims, because they have not suffered antitrust harm.  Indirect victims, the consumers, experienced harm that is derivative of the boycott of the direct victims, Casey's and the Class.

261.    But Casey's also alleges anticompetitive effects derivatively on consumers*. See, e.g., supra*, ¶¶106-22, 127-28, 130-33, 135-36, 138-42, 158, 172-83.

262.    Casey's alleges that a derivative result of the anticompetitive practices alleged in totality is that consumers are forced to purchase only from the NFL Defendants and Fanatics, thus resulting in anticompetitive effects that consumers have derivatively experienced through increased prices, less variety, less quality, less supply, less innovation, and other adverse consequences. *See, e.g., supra*, ¶¶60, 100, 103, 104(a), 104(f), 106-17, 130-33, 135-36, 138-42.

263.    Defendants seek to make NFL Licensed Products unavailable on TPOMs, other than from Fanatics, which powers its own and the NFL Defendants' TPOM platforms.

264.    This anticompetitive model enables Defendants to charge customers more, because eradicating other retailers from TPOMs means far less price competition: according to Rubin,

"[t]he Leagues and Teams make a lot more money in this business than they used to make under the old model."[73]  Indeed, Fanatics recognized the problem that robust competition on Amazon posed to it.  It is in their role as retailers that Fanatics and the NFL Defendants are in competition with retailers that sell on TPOMs.  But therein lies the problem for Defendants—the presence of rivals selling the same or similar NFL Licensed Products on TPOMs.  According to Rubin, if everyone else is selling what you're selling on a TPOM, "it is going to get commoditized by Amazon and Alibaba."[74]  And as Rubin put it, if NFL Licensed Products were commonly available on Amazon, "there'd be no reason for [Fanatics] to be."[75]  In another interview, Rubin put an even finer point on it: "If your strategy is just to win on price [selling on a TPOM], you're eventually going to die."[76]

265.    In interviews around when the alleged anticompetitive activities were swinging in full force, Rubin has admitted that the size of the licensed sports industry has remained largely constant, but Rubin stated that instead of trying to grow the overall market, Fanatics' focus was just on increasing its "share of the closet," i.e., taking market share from other retailers.[77]  Despite the lack of growth in the market overall, the revenues that Fanatics and the NFL Defendants received from the sale of NFL Licensed Products have grown dramatically.

266.    Casey's has observed market data indicating that prices for NFL Licensed Products,

---

[73] *Interview with Michael Rubin*, Jeffrey S. Moorab Ctr. for the Study of Sports L. (Apr. 12, 2019), https://www1.villanova.edu/villanova/law/academics/sportslaw/events/lectures.html.

[74] *Kynetic CEO: Here's How a $12 Billion Company Competes Against Amazon*, CNBC: Squawk Box (Nov. 27, 2017), https://www.cnbc.com/video/2017/11/27/kynetic-ceo-heres-how-a-2-billion-company-competes-against-amazon.html.

[75] *Fireside Chat with Michael Rubin: Disrupt SF 2018, supra.*

[76] Recode, *Full Interview, Adam Silver, NBA Commissioner and Michael Rubin, Exec Chairman of Fanatics*, Youtube (Sep. 13, 2017), https://www.youtube.com/watch?v=TQx65nkEDPI.

[77] *Michael Rubin Interview*, Forbes: Sports Money (Sep. 30, 2020), https://www.forbes.com/sites/mikeozanian/2020/09/30/michael-rubin-dishes-on-his--evolving-game-plan-for-fanatics-and-life/?sh=15b496cf1147.

including, without limitation, those imposed on Casey's and on consumers, were trending downward before the effectuation of the alleged anticompetitive schemes. But this downward trend reversed course, as Defendants' alleged anticompetitive schemes were enforced and effectuated. Discovery would likely reveal that these price increases have not been driven by input costs, given the long-term macroeconomic trends in input prices, coupled with Fanatics' purchasing power—Fanatics' ability to dictate price terms to its suppliers. And these increases coincide with booming growth in online retail, which all else being equal, should enhance price competition. The reversal in the pricing trend and rising prices are thus inconsistent with a competitive market environment and demonstrate that the market has been distorted by anticompetitive conduct.

267.    An example is that a former retailer of NFL Licensed Products conveyed to Casey's and its counsel how consumers have been hurt by the alleged unlawful activity, including, without limitation, supracompetitive pricing: concerning NFL licensed apparel jerseys, as of around June 2022, prices offered by Fanatics, the only Amazon seller of these products, skyrocketed to a range hovering around $160 plus $5.69 shipping; while before the alleged anticompetitive schemes were in force, prices for NFL licensed apparel jerseys hovered between $115 and $140 and free shipping, when there were at least a dozen competitors on Amazon.

268.    Another example is that a Fanatics-branded Super Bowl Champion Locker Room T-Shirt that costed $27.99 in 2017 later costed $37.99 (plus shipping) in 2022.

269.    The result of Defendants' conduct is exactly what one would expect from reduced competition: product quantity, diversity, variety, innovation, and quality are all reduced; and prices have and will increase.

## XI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sherman Act §§ 1, 3 – Conspiracy in Restraint of Trade
### (As to All Defendants)

244.270.    Plaintiff Casey's hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

245.271.    Defendants' conduct violates Sections 1 and 3 of the Sherman Act, which prohibits every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," whether foreign or domestic.  15 U.S.C. §§ 1, 3.

272.    Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracycontracts, combinations, or conspiracies in restraint of trade in violation of §§ 1, 3 of the Sherman Act to unlawfully restrict competition in the Relevant Antitrust Market.  As part of this conspiracy, Defendants undertook a coordinated campaign designed to exclude Plaintiff and other Class members from selling NFL Licensed Products in the Relevant Antitrust Market and otherwise disadvantage Plaintiff and the Class members.  By these actions, Defendants conspired to artificially fix, raise, stabilize, or maintain the prices of these products, to end price competition, to limit or reduce product availability, to limit or reduce output, and to limit or reduce competition in the U.S. in violation of §§ 1, 3 of the Sherman Act.  The conduct of Defendants described throughout this Amended ComplaintSAC constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

246.273.    In the alternative, the conduct violates Sections 1 and 3 under the "quick look" or "rule-of-reason" standards because Defendants' agreements harmed competition in the Relevant Antitrust Market.  The agreements provided no procompetitive benefits and, even if they did, the anticompetitive effects of the agreements substantially outweigh any asserted

procompetitive effects and/or are not the least restrictive method to achieve any such procompetitive benefits. These agreements serve no legitimate or ~~pro-competitive~~procompetitive purpose that could justify their ~~anti-competitive~~anticompetitive effects. They unreasonably restrain competition. And the restraints described herein are substantially more restrictive than necessary to achieve any procompetitive ends.

~~247.~~274.     Defendants' conduct affects a substantial volume of interstate commerce.

~~248.~~275.     Defendants' conduct has substantial anticompetitive effects, including ~~but not limited to,~~ without limitation, decreased output, stabilized or increased prices, and diminished quality ~~of service~~ or innovation.

~~249.~~276.     Plaintiff Casey's and the Class members have been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were meant to prevent. Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury.

277.     Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury caused by Defendants' anticompetitive conduct. As described herein, the damages and irreparable injury suffered by Plaintiff Casey's and the Class members cannot be completely relieved through remedies at law. Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

~~250.~~278.     On behalf of itself and Class members, Plaintiff Casey's seeks declarative and injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26. The violations set forth above and the effects thereof are continuing and will continue, unless injunctive relief is granted. The balance of

hardships supports issuing injunctive relief; the public interest is served best—and not disserved— by an injunction.

279.    Plaintiff Casey's and the Class members suffered monetary damages, for example, through increased prices paid to Defendants and licensees of NFL Licensed Products and other increased costs.  Asas a direct and proximate result of the competition-reducing aspects of Defendants' illegal agreement, contract, combination trustagreements, contracts, combinations, trusts, and/or conspiracyconspiracies.  They have thus suffered antitrust injury and have been damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

280.    Alternatively, Plaintiff Casey's and the Class members paidare entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Sherman Act §§ 1, 3 – Exclusive Dealing
### (As to All Defendants)

281.    Plaintiff Casey's hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

282.    Defendants' conduct violates Sections 1 and 3 of the Sherman Act, which prohibits every "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," whether foreign or domestic.  15 U.S.C. §§ 1, 3.

283.    Defendants have ceased horizontal competition in retailing NFL Licensed Products on TPOMs and ceded 100% or near-full control to Fanatics, which is allegedly unlawful long-term exclusive dealing.  This long-term exclusive dealing has substantially foreclosed competition.  It has resulted in foreclosure of more than a substantial share of the Relevant Antitrust Market with

neither a deadline nor end in sight.  This is to the detriment of Plaintiffs and the Class.

284.    This long-term exclusive dealing harmed competition in the Relevant Antitrust Market.  It provides no procompetitive benefits and, even if it did, the anticompetitive effects substantially outweigh any asserted procompetitive effects and/or are not the least restrictive method to achieve any such procompetitive benefits.  This exclusive dealing serves no legitimate or procompetitive purpose that could justify the anticompetitive effects.  It unreasonably restrains competition.  And the restraints described herein are substantially more restrictive than necessary to achieve any procompetitive ends.

285.    Defendants' conduct affects interstate commerce.

286.    Defendants' conduct has substantial anticompetitive effects, including, without limitation, decreased output, stabilized or increased prices, and diminished quality or innovation.

287.    Plaintiff Casey's and the Class members have been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were meant to prevent.  Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury.

288.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury caused by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff Casey's and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

289.    On behalf of itself and Class members, Plaintiff Casey's seeks declarative and injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged

herein, under Clayton Act § 16, 15 U.S.C. § 26.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.  The balance of hardships supports issuing injunctive relief; the public interest is served best—and not disserved—by an injunction.

290.    Plaintiff Casey's and the Class members suffered monetary damages, as a direct and proximate result of the competition-reducing aspects of Defendants' illegal agreements, contracts, combinations, trusts, and/or conspiracies.  They have thus suffered antitrust injury and have been damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

291.    Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.for

**THIRD CAUSE OF ACTION**
**Clayton Act § 3 (15 U.S.C. § 14) – Exclusive Dealing**
**(As to All Defendants)**

292.    Plaintiff Casey's hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

293.    NFL Licensed Products than they would have paid but for the conspiracy.  They have thus been injured andare products.

294.    Defendants through illegal agreements, contracts, combinations, trusts, and/or conspiracies have imposed unlawful long-term exclusive dealing in the Relevant Antitrust Market, to the detriment of Plaintiff Casey's and the Class.

295.    The effects of Defendants' exclusive dealing are to "substantially lessen competition" or "tend to create a monopoly[.]"  15 U.S.C. § 14.

296.    Defendants' conduct affects interstate commerce.

297.    Defendants' conduct has substantial anticompetitive effects, including, without limitation, decreased output, stabilized or increased prices, and diminished quality or innovation.

298.    Plaintiff Casey's and the Class members have been harmed by Defendants' anticompetitive conduct in a manner that the antitrust laws were meant to prevent. Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury.

299.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury caused by Defendants' anticompetitive conduct. As described herein, the damages and irreparable injury suffered by Plaintiff Casey's and the Class members cannot be completely relieved through remedies at law. Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

300.    On behalf of itself and Class members, Plaintiff Casey's seeks declarative and injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted. The balance of hardships supports issuing injunctive relief; the public interest is served best—and not disserved—by an injunction.

251.301.    Plaintiff Casey's and the Class members suffered monetary damages, as a direct and proximate result of the competition-reducing aspects of Defendants' illegal agreements, contracts, combinations, trusts, and/or conspiracies. They have thus suffered antitrust injury and have been damaged in their respective businesses and property in an amount to be determined

according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. ~~Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.~~

302.    **SECOND**Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial

### FOURTH CAUSE OF ACTION
### Sherman Act § 2 – Monopolization
### (As to All Defendants)

~~252.~~303.    Plaintiff Casey's hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

~~253.~~304.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation] [of] any part of the trade or commerce among the several States, or with foreign nations . . ~~.~~." 15 U.S.C. § 2.

~~254.~~305.    The Relevant Antitrust Market is a valid antitrust market.

~~255.~~306.    NFLP possesses monopoly power over the Relevant Antitrust Market.

~~256.~~307.    Fanatics possesses monopoly power over the Relevant Antitrust Market.

~~257.~~308.    NFLP has unlawfully acquired and/or maintained monopoly power over the Relevant Antitrust Market through the ~~anti-competitive~~anticompetitive acts ~~described~~alleged in totality herein.

~~258.~~309.    Fanatics has unlawfully acquired and/or maintained monopoly power over the Relevant Antitrust Market through the ~~anti-competitive~~anticompetitive acts ~~described~~alleged in totality herein

~~259.~~310.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

260.311.    Defendants' conduct has substantial ~~anti-competitive~~anticompetitive effects, including the following, without limitation: reducing the number of entities on TPOMs that compete in the market for retail sales of NFL Licensed Products; reducing the number of entities who supply NFL Licensed Products; creating barriers to entry to and expansion in the Relevant Antitrust Market; artificially decreasing the supply, quantity, selection, product quality, ~~and~~ service quality, and innovation associated with ~~retailing~~ NFL Licensed Products; artificially increasing the prices for NFL Licensed Products; establishing a single licensee, Fanatics, as the dominant and exclusive or near-exclusive ~~e-commerce~~ retailer of NFL Licensed Products on TPOMs; interfering with the types of and quality of NFL Licensed Products that Plaintiff and Class members can retail on TPOMs; and interfering with ~~the~~competitors' use of phrases associated with the NFL and its member Teams when ~~promoting unaffiliated e-commerce destinations via,~~ marketing—for example, Google AdWords or similar search technologies.

261.312.    As entities and individuals that previously retailed but have now been prevented from or hindered in retailing NFL Licensed Products in the Relevant Antitrust Market, Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

262.313.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury caused by Defendants' anticompetitive conduct.  As described herein, the damages and irreparable injury suffered by Plaintiff Casey's and the Class members cannot be completely relieved through remedies at law.  Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

99

314.    On behalf of itself and Class members, Plaintiff Casey's seeks declarative and injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26.  The violations set forth above and the effects thereof are continuing and will continue, unless injunctive relief is granted.  The balance of hardships supports issuing injunctive relief; the public interest is served best—and not disserved—by an injunction.

263.315.    Plaintiff Casey's and the Class members suffered monetary damages, for example, through increased prices paid to Defendants and licensees of NFL Licensed Products and other increased costs.  Asas a direct and proximate result of the competition-reducing aspects of Defendants' illegal monopolization, agreement, contract, combination trustagreements, contracts, combinations, trusts, and/or conspiracy, Plaintiff Casey's and the Class members paid more for NFL Licensed Products than they would have paid but for the alleged anticompetitive conduct.conspiracies.  They have thus suffered antitrust injury and have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.  Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

316.    THIRDAlternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Sherman Act § 2 – Attempted Monopolization
### (As to All Defendants)

264.317.    Plaintiff Casey's hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

265.318.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations . . .." 15 U.S.C. § 2.

266.319.    The Relevant Antitrust Market is a valid antitrust market.

267.320.    The conduct engaged in by Defendants as further described herein was anticompetitive in that it prevented the normal competitive forces from operating, which resulted in the advantaging of Fanatics over all or nearly all other licensees and resulted in the allowance of one or only a very few selected entities fromFanatics to effectively commandeer retailing NFL Licensed Products on TPOMs.  It was additionally anticompetitive in that it thwarted or hindered Plaintiff Casey's and the Class members from buying NFL Licensed Products and from sretailsing NFL Licensed Products that had been previously listed for retail sale on TPOMs by de-listing such products.

268.321.    NFLPThe NFL Defendants possessed the specific intent to monopolize the Relevant Antitrust Market as alleged herein.

269.322.    Fanatics possessed the specific intent to monopolize the Relevant Antitrust Market as alleged herein.

270.323.    Defendants' course of conduct has the dangerous probability of causing Defendants to achieve monopoly power over the Relevant Antitrust Market.  By such conduct, Defendants caused Fanatics to achieve the status of the operator of the NFL's "storefront" on Amazon and other TPOMs to the exclusion of others and resulted in the de-listing of products offered for sale by those like Plaintiff.

271.324.    Through their course of conduct, Defendants attempted to monopolize the Relevant Antitrust Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

272.325.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

273.326.    Defendants' conduct has substantial anti-competitiveanticompetitive effects.

274.327.    As entities and individuals that previously retailed but have now been prevented from or hindered in buying NFL Licensed Products and from retailing NFL Licensed Products on TPOMs, Plaintiff and the Class members have been directly and proximately harmed in their respective businesses or properties as alleged herein by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

275.328.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct. As described herein, the damages and irreparable injury suffered by Plaintiff Casey's and the Class members cannot be completely relieved through remedies at law. Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

329.    On behalf of itself and Class members, Plaintiff Casey's seeks declaratory and injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26. The violations set forth above and the effects thereof are continuing and will continue, unless injunctive relief is granted. The balance of hardships supports issuing injunctive relief; the public interest is served best—and not disserved— by an injunction.

276.330.    Plaintiff Casey's and the Class members suffered monetary damages, for

~~example, through increased prices paid to Defendants and licensees of NFL Licensed Products and other increased costs. As~~as a direct and proximate result of <u>the competition-reducing aspects of</u> Defendants' ~~a~~illeg~~ed~~al attempted monopolization, ~~illegal~~ agreements, contracts, ~~combination, trust~~<u>combinations, trusts</u>, and/or ~~conspiracy, Plaintiff Casey's and the Class members paid more for NFL Licensed Products than they would have paid but for the alleged anticompetitive conduct.~~<u>conspiracies.</u>  They have thus <u>suffered antitrust injury and have</u> been ~~injured and~~ damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.  ~~Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.~~

331.    ~~FOURTH~~<u>Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.</u>

**<u>SIXTH</u> CAUSE OF ACTION**
**Sherman Act § 2 – Conspiracy to Monopolize**
**(As to All Defendants)**

~~277.~~<u>332.</u>    Plaintiff Casey's hereby incorporates by reference the allegations of each of the preceding paragraphs as if fully set forth herein.

~~278.~~<u>333.</u>    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the "combin[ation] or conspir[acy] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . ~~.~~<u>.</u>"  15 U.S.C. § 2.

~~279.~~<u>334.</u>    Defendants engaged in concerted action that included overt acts that furthered the conspiracy entered into with the specific intent to achieve an unlawful monopoly.

~~280.~~<u>335.</u>    The Relevant Antitrust Market is a valid antitrust market.

~~281.~~<u>336.</u>    Defendants entered into and engaged in a continuing combination,

103

conspiracy, and/or agreement to acquire, maintain, and/or enhance Fanatics' monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in the conduct alleged herein.

282.337.    Defendants engaged in these acts with the specific intent of eliminating competition on the merits in the Relevant Antitrust Market, and thereby installing and protecting Fanatics as the sole or dominating force in e-commerce sales of NFL Licensed Products on TPOMs, including, without limitation, the e-commerce sales of NFL Licensed Products on Amazon (and other TPOMs), a monopoly established coincident with Amazon obtaining the rights to stream "Thursday Night Football." Defendants' conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

283.338.    Defendants' conduct affects a substantial volume of interstate and foreign commerce.

284.339.    Defendants' conduct has substantial anti-competitiveanticompetitive effects as alleged herein.

285.340.    Plaintiff Casey's and the Class members have been directly and proximately harmed in their respective businesses or properties as alleged herein by the Defendants' anticompetitive conduct, which is of a type and has occurred in a manner that the antitrust laws were intended to prevent.

286.341.    Plaintiff Casey's and the Class members have suffered and continue to suffer damages and irreparable injury by Defendants' anticompetitive conduct. As described herein, the damages and irreparable injury suffered by Plaintiff Casey's and the Class members cannot be completely relieved through remedies at law. Plaintiff Casey's and the Class members' damages and irreparable injury will continue and will not abate until this Court issues an injunction ending the Defendants' anticompetitive conduct.

342.    On behalf of itself and Class members, Plaintiff Casey's seeks declarative and injunctive relief barring the Defendants from engaging in the anticompetitive conduct alleged herein, under Clayton Act § 16, 15 U.S.C. § 26.  The violations set forth above and the effects thereof are continuing and will continue, unless injunctive relief is granted.  The balance of hardships supports issuing injunctive relief; the public interest is served best—and not disserved—by an injunction.

343.    Plaintiff Casey's and the Class members suffered monetary damages, for example, through increased prices paid to Defendants and licensees of NFL Licensed Products and other increased costs.  Asas a direct and proximate result of the competition-reducing aspects of Defendants' illegal conspiracy to monopolize, illegal agreements, contracts, combinations, trusts, and/or conspiracy, Plaintiff Casey's and the Class members paid more for NFL Licensed Products than they would have paid but for the alleged anticompetitive actions.conspiracies.  They have thus been injured andsuffered antitrust injury and have been damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

287.344.    Alternatively, Plaintiff Casey's and the Class members are entitled to a judgment of disgorgement against Defendants in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of itself and the Class members, Plaintiff Casey's respectfully requests that the Court order the following:

a.    Certification of this case as a class action on behalf of the Class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), appointment of Plaintiff Casey's as class representative, and appointment of its attorneys as Class Counsel;

b.      Entry of an order providing such equitable, declarative, and injunctive relief as necessary to correct the anticompetitive market effects caused by Defendants' unlawful conduct, consistent with the following:

> None of the Defendants will implement or enforce any collusive or unreasonably anticompetitive policy in connection with the Relevant Antitrust Market, whether drafted, implemented, or enforced by Defendants, that unreasonably hinders, limits, prevents, or prohibits an individual or entity from buying or selling legitimately purchased NFL Licensed Products on or through a third-party online marketplace, including, without limitation, that operated by Amazon;

c.      Entry of an order declaring that Defendants' actions violate the antitrust laws;

d.      Adjudge and decree that Defendants' acts are unlawful and be adjudged to have been a violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff Casey's and the Class members for treble the amount of damages sustained by them as allowed by law, together with costs of the action, including, without limitation, reasonable attorneys' fees, litigation costs and expenses, and pre- and post-judgment interest;

e.      Adjudge and decree that Defendants' acts are unlawful and be adjudged to have been a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff Casey's and the Class members for treble the amount of damages sustained by them as allowed by law, together with costs of the action, including, without limitation, reasonable attorneys' fees, litigation costs and expenses, and pre- and post-judgment interest;

f.      Reasonable costs of this action, including, without limitation, attorneys' fees,

litigation costs and expenses, and pre- and post-judgment interest; and

g.    Award of such other relief that the Court deems just, reasonable, and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as allowed by law.

Dated:  ~~September 22, 2022~~July 30, 2025          **NEMATZADEH PLLC**

By: /s/ Justin S. Nematzadeh
Justin S. Nematzadeh
~~101 Avenue of the Americas, 9th Floor~~
~~New York~~1129 Northern Boulevard, Suite 457
Manhasset, NY 1~~0010~~30
Telephone: (646) 799-6729
Email: jsn@nematlawyers.com

~~**BALESTRIERE FARIELLO**~~

~~John G. Balestriere~~
**SCHMIDT LAW CORPORATION**

Matthew W. Schmidt
~~225 Broadway, 29th Floor~~
~~New York, New York 10007~~
116A Main Street
Tiburon, California 94920
Telephone:    (~~212) 374-5421~~415) 390-6075
~~Facsimile:    (212) 208-2613~~
~~john.balestriere@balestrierefariello.com~~
~~matthew.schmidt@balestirerefariello~~Email:
matt@schmidtlc.com

*Attorneys for Plaintiff and the Proposed Class*

107